allegations used by Defendants in their public statements about Smithfield's alleged workplace practices, as alleged repeatedly herein. He further noted that "as a result" of Smithfield's alleged conduct, "the City of Boston has passed a resolution suspending the purchase of Smithfield products. It also encourages supermarkets within the city to consider doing the same until the workers of Smithfield Foods, Inc. can work in a safe environment with dignity and respect." (*See* Ex. 48).

### E.     Attempts to Reduce the Value of Smithfield Stock

155.    On or about September 18, 2006, Defendants caused to be mailed a form letter containing disparaging information about Smithfield to specifically-targeted financial analysts. The targeted analysts were persons who specialized in providing financial analysis and coverage on publicly-traded companies in the food industry, including Smithfield Foods. Certain of the analysts maintained and published a purchase rating on Smithfield Foods stock. The form letter was signed by Defendant Gene Bruskin and written on "Justice @ Smithfield" letterhead, with a return address listed at 303 E. 4th Avenue in Red Springs, North Carolina. The bottom of the pre-printed letterhead identifies Defendant UFCW as responsible for the content in the letter, and lists Defendant UFCW's address at 1775 K Street in Washington, DC. (*See, e.g.*, Ex. 49).

156.    The letter invites each recipient to view the content of Defendant UFCW's website, www.smithfieldjustice.com, and references unidentified "newspaper clipping" enclosures purportedly regarding the Tar Heel plant. The letter mischaracterizes the "Justice at Smithfield Campaign" as a "heightened effort by the workers at Smithfield's Tar Heel, North Carolina pork processing plant to organize a union." In reality, and as alleged fully above, the "Justice at Smithfield Campaign" is an effort spearheaded not by Smithfield employees, but by the Defendants and their agents. The letter disparages Smithfield by describing Smithfield-

employee relations as "characterized by unlawful assaults, firings, racial manipulation, intimidation, and threatening arrest by Federal immigration authorities by Smithfield."

157. Recipients of the letter included Farha Aslam, the Vice President of Equity Research of Stephens, Inc; William Chappell of Suntrust Robinson Humphrey; John Feeney of Wachovia Securities; Diane Geissler of Merrill Lynch; Christine McCracken of Cleveland Research Company; John McMillan of the former Prudential Equity Group; Tim Ramey of DA Davidson & Company; Andrew Wolf of BB&T Capital Markets, and Pablo Zuanic of JP Morgan.

158. Although self-characterized as an effort to "educate consumers," the letter's obvious purpose was to negatively influence its recipients' analysis and coverage of Smithfield Foods stock and thereby to injure Smithfield by causing a reduction the value of Smithfield stock.

## F. Interference With Smithfield's Annual Shareholder Meetings

### 1. The 2006 Meeting

159. On August 30, 2006, Smithfield Foods held its annual shareholder meeting for 2006 in Richmond, VA. As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted a protest against Smithfield that took place at the shareholder meeting. Participants in the planning and/or effectuation of the protest included Mark Federici, Mikki Harris, Eduardo Pena, Rigo Valdez, and other agents of Defendants CtW, UFCW, Local 400, and JWJ. Defendants publicized their plans to stage their protest activities on the radio, internet and newspapers. In doing so, Defendants misrepresented the protest as being led by "leading civil rights and immigrant rights groups" when in fact the events were led by Defendants. A press

release prepared by Defendants regarding these events revealed the annual salary of Joseph Luter III, Chairman of Smithfield Foods' Board of Directors and former Chief Executive Officer. (*See* Ex. 50).

160.    At the protest, Defendant Gene Bruskin delivered the following threatening statement to Smithfield through the press: "We've come here to send a message to Smithfield Foods while their board of directors and top executives gather to talk about their success and growth of the multibillion-dollar company. We want to remind them that there are people suffering every day in the largest meatpacking plant in the world." The statement served as a reminder to Smithfield that Defendants would continue their unlawful and extortionate conduct indefinitely and into the future until Smithfield agreed to Defendants' demands. (*See* Ex. 51).

### 2.    The 2007 Meeting

161.    On August 29, 2007, Smithfield Foods held its annual shareholder meeting for 2007 in Williamsburg, VA. As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted a protest against Smithfield that took place at the shareholder meeting. Participants in the planning and/or effectuation of the protest included Anna Burger, Mark Federici, Nazey Gulec, Mikki Harris, James Lowthers, Libby Manly, Eduardo Pena, Rigo Valdez, members of UFCW Local Unions 27 and 1776, and other agents of the Defendants.

162.    To generate publicity and support for their protest, Defendants arranged for free bus transportation to Williamsburg from Philadelphia, PA, Wilmington, DE, Washington, DC, Silver Spring, MD, Durham/Chapel Hill/Raleigh, NC, Greensboro/Henderson, NC, Lumberton/Fayetteville/Rocky Mount, NC, Charlotte/Statesville, NC and Richmond, VA for all members of the public who wished to participate in the rally and protest activities of Defendants.

Defendants also publicized their plans to stage their rally and protest activities on the radio, internet and newspapers. Defendants also published on Defendant UFCW's website several versions of a flier advertising the protest. All of the fliers claimed that Smithfield was responsible for: "widespread environmental degradation; retaliation against workers who stand up for their rights; assaults and false arrests of workers; a record of racial tension between African American and Latino workers." (*See* Ex. 52).

163. The protest events were led by UFCW agents as well as several unwitting participants, including but not limited to members of the National Organization for Women, members of the Community Action Coalition and members of Pax Christi USA.

164. During the protest activities, Anna Burger led a group of individuals who interrupted Smithfield's shareholder meeting and attempted to deliver a "petition" to the Chief Executive Officer of the Company demanding a "union contract at Smithfield's Tar Heel, NC, plant." (*See* Ex. 53). Further evidencing the Defendants' ongoing conspiracy to unlawfully extort Smithfield and to inflict damage on Smithfield, UFCW agents participating in the events described herein held signs stating "Break open Smithfield's piggy bank." James Lowthers also made a public statement that revealed the extent of the threat to Smithfield of Defendants' ongoing unlawful scheme: "UFCW is committed to this fight. If it takes 10 years, it will take 10 years." (*See* Ex. 54).

165. Further evidencing the Defendants' refusal to be governed by the NLRB process, Eduardo Pena published a statement to the print media present that Defendant UFCW was unwilling to participate in an election conducted by the NLRB.

166.    Further evidencing the Defendants' intent to harass Smithfield's executives and directors, Defendants positioned outside the shareholder meeting a 20-foot-tall inflatable rat wearing a nametag that read: "Joe Luter."

167.    Following the protest, Defendants published a press release on Defendant UFCW's website that misleadingly characterized the events as having been led by "one thousand workers, religious and civil rights leaders and activists" when in fact the protest was led by Defendants.    The article also included the false statement that participants in the protest presented the Chief Executive Officer of Smithfield Foods with a petition "representing a strong majority of workers in the plant" which demanded a union and a union contract.    The press release further evidenced Defendants' intent to continue its unlawful scheme, as it quoted "supporters" who "promised to continue to stand alongside the Tar Heel workers until the battle is won." (*See* Ex. 55).

## G.    Filing and/or Prosecuting Frivolous and Objectively Baseless Regulatory Claims and Complaints and the Taking of Other Action Designed to Interfere With Smithfield's Business Operations

### 1.    Interference With Smithfield's Application for a State Water Permit

168.    In early 2007, Smithfield sought the renewal and expansion of its National Pollutant Discharge Elimination System permit from the North Carolina Environmental Management Commission, Division of Water Quality (the "Commission").    On or about March 15, 2007, a public hearing was held before the Commission to address Smithfield's application to expand its rights under the permit.    As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted activities at the meeting designed to cause the Commission to deny Smithfield's application.

169.   A press release prepared by Defendant Leila McDowell and dated March 12, 2007, attempts to disguise Defendants' interference in the permit application as an effort spearheaded by "environmentalists" when in fact Defendants were responsible for orchestrating the activity. (*See* Ex. 56).

170.   During the hearing, Julie Eisenberg addressed the Commission on behalf of Defendant RAA. She characterized Defendant RAA only as a non-profit entity and concealed its connections with Defendant UFCW and the other Defendants. She mischaracterized Defendant RAA's conclusions as statistically sound and objective, when in fact Defendant UFCW paid for and pre-determined the results of the purported analysis, as detailed herein. Eisenberg claimed that "increasingly dangerous conditions" were present at the Tar Heel plant, claimed that such conditions were attributable to an increase in the plant's production capacity, and claimed that these alleged conditions were a "warning sign" to the Commission that Smithfield's permit should not be granted. Defendants published a voice recording of Eisenberg's remarks to the Commission on Defendant UFCW's website:

www.smithfieldjustice.com/publichearing_events.php. (*See also* Ex. 57).

171.   Libby Manly also addressed the Commission and made disparaging statements regarding the conditions at the Tar Heel plant. Among the many salacious statements she made during the meeting, Manly baselessly claimed that granting Smithfield's permit application would do "tremendous damage" to "Smithfield workers and to the environment." Manly also claimed that "Smithfield workers have suffered unspeakable abuse at every turn," that "Smithfield workers endure unbearable working conditions that leave many maimed or working through excruciating pain for fear of being fired if they report their injuries," that "injured workers are routinely kicked to the curb with nothing," and that Smithfield "already value[s]

profit over people."  Defendants published a voice recording of Manly's remarks to the Commission on Defendant UFCW's website:

www.smithfieldjustice.com/publichearing_events.php. (*See also* Ex. 57).

172.    Both Eisenberg and Manly knowingly and maliciously misrepresented the nature of the information contained in Defendant RAA's Report, the state of working conditions at Tar Heel, and the allegedly damaging effect that the granting of Smithfield's application would have on the state of North Carolina.  Defendants' actions in this regard were undertaken in an effort to interfere unlawfully with Smithfield's application for said permit, to cause said permit to be denied, and to inflict economic injury upon Smithfield.

## 2.    Manufacturing Allegations Regarding United Nations "Investigation" of Smithfield

173.    In or around spring of 2007, Dr. Jorge Bustamente, a Special Rappaorteur for the United Nations Human Rights Commission ("UN Commission"), conducted a fact finding mission in the United States on the situation of the human rights of migrant workers in the United States.  As stated by Soussarn Raadi-Azarakhchi, the Chief of the Special Procedure Branch of the UN Commission, the purpose of Dr. Bustamente's visit was "to witness first hand the situation of migrants at the borders and in immigration detention facilities and discuss migrant rights related issues with US officials, experts and advocates from the civil society."

174.    Seizing on the opportunity to advance its unlawful and extortionate scheme and to further injure Smithfield, Defendants arranged for two Smithfield employees, Tereza Nieto and Guadalupe Valdez, to meet with Dr. Bustamente during his visit to the United States. Defendants then plotted to knowingly and maliciously misrepresent publicly the nature of Dr. Bustamente's meeting with Nieto and Valdez as a formal United Nations investigation into Smithfield's treatment of immigrant and migrant workers.

-56-

175.    Rather than portray the facts of each individual's workers compensation case to Dr. Bustamente, Defendants schemed to provide him with false, misleading and baseless information regarding each individual and about Smithfield. Upon securing the meeting with Dr. Bustamente, Defendants UFCW and Leila McDowell caused to be published a press release, dated May 14, 2007, entitled: "United Nations Investigates Smithfield Packing's Treatment of Immigrant Workers." (*See* Ex. 58). This statement was patently false. Smithfield has never been under investigation by the UN Commission, nor has any complaint been made to the UN Commission regarding Smithfield or its treatment of migrant workers. At no time did any employee or representative of the United Nations or the UN Commission inform Smithfield that it was being investigated for any reason. At absolutely no time was Dr. Bustamente charged with or assigned the responsibility of conducting an investigation of Smithfield.

176.    The press release described above also portrayed Dr. Bustamente's meeting with Nieto and Valdez as a "hearing," claimed that they would be giving "testimony," and claimed that the "hearing will probe how immigrant workers are being treated at the world's largest pork processing plant." The press release also described Nieto and Valdez as "former" employees. As to Nieto, this statement was false. On or about May 16, 2007, Nieto remained employed with Smithfield. Nevertheless, Defendants' press release included the false statement that Nieto was "forced to quit following an injury at the plant." The press release also misrepresented the nature of Nieto's and Valdez's injuries as well as Smithfield's treatment of them following their injuries.

177.    Dr. Bustamente met with Nieto and Valdez on or about May 16, 2007, at the headquarters office of the AFL-CIO. Upon information and belief, agents of Defendant UFCW were present and controlled Dr. Bustamente's access to Nieto and Valdez. At no time during the

meeting did Nieto or Valdez provide "testimony" to Dr. Bustamente, either in oral or written, or sworn or unsworn, format. Their meeting with Dr. Bustamente did not take place in the form or context of a "hearing." No transcript of the meeting was taken. Dr. Bustamente met with each individual for roughly ten minutes.

178. Defendants' malicious intent regarding these matters was proven by written correspondence between Smithfield and the United Nations. On or about May 16, 2007, Smithfield's Executive Vice President, Jere Null, sent a letter to the Honorable Ban Ki-moon, Secretary General of the United Nations. Null enclosed a copy of the Defendants' press release referenced above and suggested that Defendants were misrepresenting the nature of Dr. Bustamente's visit to the United States and his meeting with Nieto and Valdez. (*See* Ex 59). On or about June 12, 2007, Null received a letter from Soussan Raadi-Azarakhchi, Chief of the Special Procedure Branch of the UN Commission. Raadi-Azarakhchi acknowledged Null's letter to the Secretary General and confirmed that "the purpose of [Dr. Bustamente's] meeting was not to conduct an investigation into Smithfield Packing Company." Raadi-Azarakhchi further stated that Smithfield's "concerns have been duly noted." (*See* Ex. 60).

### 3. Frivolous and Objectively Baseless OSHA Complaint

179. On or about May 25, 2007, investigators from the North Carolina Department of Labor arrived at the Tar Heel plant unannounced for the purpose of investigating a complaint alleging violations of occupational safety and health standards, including allegations of unsanitary drinking water. Smithfield had no prior notice of the investigation. On that date, the investigators conducted an inspection of the facility. The investigators returned to the plant on or about May 29, 2007 to continue their investigation and inspection of the Tar Heel workplace.

Thereafter, the investigators informed Smithfield that they had found no evidence of a workplace condition that violated state workplace safety law. (*See* Ex. 61).

180.     Not satisfied with this result, the Defendants orchestrated the filing of a frivolous and objectively baseless complaint with the Federal Occupational Safety and Health Administration.  The complaint purported to be filed by Smithfield employees, but was actually conceived, prepared and filed by Defendants. The aforementioned complaint contained frivolous accusations against Smithfield and was filed in furtherance of the Defendants' scheme to extort money and property from Smithfield and to inflict damage upon Smithfield. In particular, the complaint accused Smithfield of obstructing the North Carolina Department of Labor investigation that took place on May 25 and 29, 2007 and further accused both Smithfield and the North Carolina Department of Labor of colluding to intimidate the employees who filed the original complaint. Defendants also issued a press release on or about June 13, 2007 that accused Smithfield of unlawfully interfering with a state inspection. (*See* Ex. 62).

### 4.     Misrepresentation of Smithfield's Participation in IMAGE Program

181.     In or around June 2006, seeking to avoid a catastrophic disruption of both business operations and the lives of employees similar to that which occurred when the U.S. Immigration and Customs Enforcement ("ICE") arrested over 1200 employees of meatpacking company Swift & Co. in a series of raids on Swift facilities in December 2006, Smithfield agreed to participate in the ICE Mutual Agreement Between Government and Employers program ("IMAGE").  The program calls on a participating employer to submit the I-9 employee eligibility verification forms of its employees to ICE.  ICE reviews the information submitted as part of its enforcement of U.S. immigration policy.  As part of its participation in the IMAGE program, Smithfield has submitted to ICE the I-9 documentation of its active employees for

ICE's independent review and auditing purposes. Smithfield plays absolutely no role in determining whether the documentation submitted contains evidence of immigration violations by its employees, nor does it play any role whatsoever in any enforcement action deemed by ICE to be necessary to enforce U.S. immigration law.

182. Seizing on the opportunity to advance its unlawful and extortionate scheme and to further injure Smithfield, Defendants caused to be published numerous false, misleading and baseless statements about the nature of Smithfield's participation in the IMAGE program. Specifically, on or about January 29, 2007, Defendant Leila McDowell caused to be published the following objectively baseless statement to the news media: "Whether ICE is consciously in collusion or not, Smithfield could very easily manipulate the process and can use it as a tool to intimidate and threaten workers, which it has done in the past." (*See* Ex. 63). On or about February 1, 2007, Libby Manly caused to be published a press release that included the following characterization of Smithfield's participation in the IMAGE program: "Workers face a company engaged in the systematic, sometimes violent, suppression of their democratic rights." (*See* Ex. 64). Mark Lauritsen went so far as to publicly accuse Smithfield of being in direct collusion with the Department of Homeland Security to use the IMAGE program to eliminate targeted Smithfield employees from the workforce: "[They] were worried about people organizing a union, and the government said, 'here are the tools to take care of them.'" (*See* Ex. 65).

183. On or about November 17, 2006, Gene Bruskin published the following false and malicious statement in a UFCW press release: "Smithfield is clearly using the 'no match' issue as a means to terrorize immigrant workers regardless of their legal status with the express purpose of suppressing the worker-led organizing that is reaching across racial lines in

unprecedented numbers." (*See* Ex. 66). On or about January 25, 2007, Bruskin caused to be published the following baseless statement to the news media: "Smithfield has a history of using threats of arrest by immigration authorities to intimidate workers and this is a continuation of that pattern." Bruskin also caused to be published the following statement to the news media: "The entire community has been terrorized. . . Many of these workers have given their life blood to this company for as long as 6 years and now are being summarily handed over to be arrested and discarded. It is unconscionable and continues Smithfield's pattern of callous disregard for the well being of its workers." (*See* Ex. 67).

184. In or about February 2007, Senator Edward Kennedy, in a letter delivered to Department of Homeland Security Secretary Michael Chertoff, asked that the proposed regulations regarding social security no-match regulations be held in abeyance pending Congressional review. On or about February 13, 2007, Defendant Gene Bruskin caused to be published the following false and misleading characterization of Senator Kennedy's letter: "We applaud the Senator's initiative. It is an important step in stopping Smithfield from using its cooperation with IMAGE as a smokescreen to intimidate workers." (*See* Ex. 68).

185. All of the aforementioned actions of the Defendants were undertaken knowingly, intentionally and maliciously, and in an effort to interfere unlawfully with Smithfield's relations with its shareholders, customers, business partners and lenders and to inflict economic injury upon Smithfield.

## 5. Attempt to Prevent Smithfield's Acquisition of Sara Lee

186. On or about June 26, 2006, Sara Lee Corporation ("Sara Lee"), Smithfield Foods, and Tarvalón, S.L., a then wholly-owned subsidiary of Smithfield (n/k/a Groupe Smithfield Holdings, S.L.), entered into an Agreement for the sale and purchase of the European Meats

Business of Sara Lee Corporation. Pursuant to their agreement, Smithfield, indirectly through Tarvalón, S.L. agreed to purchase substantially all of Sara Lee's European Meats Business, which has locations in France, The Netherlands, Belgium, Germany, Portugal, Italy and the UK.

187.    Prior to the consummation of the transaction, Smithfield was required under applicable law to notify and/or consult with local works councils in The Netherlands, Belgium and France. In fact, Smithfield was actually required to obtain the unconditional positive advice or neutral advice of the works councils in The Netherlands in order for the transaction to close. In an effort to prevent Smithfield's acquisition of Sara Lee Foods by causing those works councils to alter or withhold their advice regarding the transaction, Defendants forwarded handbills to said councils for distribution to their respective memberships. The handbills purported to be sent by the employees at Smithfield's Tar Heel plant when in fact they were created and distributed by Defendants and their agents. The handbills accused Smithfield of engaging in "illegal tactics" during prior NLRB elections at the Tar Heel plant and stated that Smithfield was found liable for "filming the activities of the union and its employees and also of physically assaulting an employee." (*See* Ex. 69).

188.    Defendants also dispatched Mark Lauritsen to the 25th Congress meeting of the International Union of Food, Agricultural, Hotel, Restaurant, Catering, Tobacco and Allied Workers' Associations ("IUF"), which took place in Geneva, Switzerland from March 19-22, 2007. At the meeting, Lauritsen shared information about the Defendants' unlawful scheme with other attendees, in an effort to cause them to oppose Smithfield's acquisition of Sara Lee Foods. Specifically, Lauritsen gave a videotaped interview in which he claimed that: "Smithfield is a notorious violator of human rights." He also accused Smithfield of "routinely violat[ing] the laws of the United States" and "denying justice to workers in North Carolina for years."

Lauritsen further claimed that Smithfield is "a company that not only affects workers adversely, but adversely impacts the environments of the communities where they operate." Regarding Smithfield's attempt to acquire Sara Lee, Lauritsen commented: "As they work on this acquisition, we are working with our European counterparts to make sure that this type of labor relations doesn't expand throughout the world." Finally, Lauritsen left no doubt as to Defendants' attempts to expand the scope of their unlawful scheme: "We're working to make sure that they don't export this labor relations model throughout the world as they expand into Europe, into Romania, Poland, France and all the other acquisitions that they're making throughout Europe." (*See* Ex. 70). Defendants published Lauritsen's interview on Defendant UFCW's website, www.smithfieldjustice.com/marklauritsen_event.php.

## H.      Publication of False, Misleading, Baseless, Negative and/or Damaging Information on the Internet and in the Newspapers

189.    The Defendants have advanced their unlawful and extortionate scheme by repeatedly staging "newsworthy" events, as alleged herein, and promoting those events through press releases to the media that contained false, misleading, baseless, negative or damaging information regarding Smithfield. The Defendants have also caused to be published several false, misleading, baseless, negative or damaging statements on Defendant CtW's internet newsletter, CtW Connect. In addition, Defendants have repeatedly disseminated such press releases to numerous print and television media outlets so that their role in the spread of such information is not apparent or is minimized. In this way, the information contained therein appeared to have originated from an objective and legitimate media source. Defendants' endless stream of press releases is designed to have a cumulative effect on the public. Specifically, Defendants' hoped that their many accusations and allegations against Smithfield, if repeated often enough and in enough places, would result in the general public believing not only the

information being disseminated, but in the idea that the "Justice at Smithfield Campaign" was a worthy and legitimate cause. In fact, each and every press release was specifically calculated by Defendants to further articulate their threat to destroy Smithfield's business and public relations unless it acquiesced in their demands.

### 1. Announcement of "Justice at Smithfield Campaign"

190. In or around June 2006, Defendants issued a barrage of press releases in numerous markets designed to gain as much publicity as possible for their public announcement of the "A Change to Win Week" described above. (*See* Exs. 1, 16). After having invented the notion that the "Justice at Smithfield Campaign" was a coordinated effort of civil rights, immigrant rights, faith, student, and labor groups, when in fact it was just a sham used to mask Defendants' unlawful conspiracy, Defendants saturated the print media with statements supporting this subterfuge in the below round of press releases. Defendants' object in doing so was to condition the media and the public to believe that the "Justice at Smithfield Campaign" was a legitimate and cooperative effort of the groups referenced in the press releases so that they would be more inclined to view Defendants' subsequent malicious actions as the earnest and well intentioned efforts of a variety of groups not related to Defendants.

191. In or around June 2006, Defendant Leila McDowell and other agents of UFCW published a press release entitled "D.C. Immigrant Rights Groups Help Lead National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media. Defendants included in the release the false statement that "there's blood on [Smithfield's] bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place on or about June 22, 2007 in Washington D.C. as led by "local immigrant rights, civil rights, faith and labor leaders groups" when in fact it

was devised and orchestrated by Defendants. The press release contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will. We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products. We are telling people to say no to blood on their bacon." (*See* Ex. 71).

192. In or around June 2006, Defendant Leila McDowell published a press release entitled "Atlanta Churches, Civil Rights Groups Throw Support to Immigrant Workers in Landmark Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media. Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place in Atlanta on or about June 22, 2007 as led by "civil rights groups, area black churches, immigrant rights organizations and labor leaders groups" when in fact it was devised and orchestrated by Defendants. The press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will. We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products. We are telling people to say no to blood on their bacon." (*See* Ex. 72).

193. In or around June 2006, Defendant Leila McDowell published a press release entitled "Chicago Immigrant Rights Coalition Lead National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media. Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place in Chicago on or about June 20, 2007 as led by "immigrant rights, civil rights, faith

and labor leaders groups" when in fact it was devised and orchestrated by Defendants.    The press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon." (*See* Ex. 73).

194.    In or around June 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Immigrant Workers Help Launch Landmark National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media.  Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed the events of "A Change to Win Week" as led by "immigrant rights organizations" when in fact such events were devised and orchestrated by Defendants. The press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon." (*See* Ex. 74).

195.    In or around June 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Foods Faces New Challenge With National Consumer Education Campaign to be Launched Against the Company" on the Internet and in the print media.  Defendants included the false statement that Smithfield Foods had announced "a 99% decline in 4th quarter profits." Defendants also misleadingly portrayed the "national consumer education campaign" as led by "immigrant rights, civil rights, faith, labor and student groups" when in fact such events were devised and orchestrated by Defendants.  The press

release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will. We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products. We are telling people to say no to blood on their bacon." (*See* Ex. 75).

196. In or around June 2006 Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield's Fight With Workers Expands to Europe" on the Internet and in the print media. The press release contained the following statement from Mark Lauritsen: "Our workers are appalled by Smithfield's systematic abuse of employees in Tar Heel who are forced to labor in an environment of intimidation, violence and fear." Defendants also misleadingly portrayed Smithfield as "the target of protests in the U.S., begun in June, by faith, civil rights and religious organizations" when in fact Smithfield was the target of Defendants' unlawful extortion scheme. (*See* Ex. 76).

### 2. Other Press Releases

197. On or about August 30, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Leading Civil Rights and Immigrant Rights Groups to Protest Smithfield Packing's Abuse of Workers at Annual Shareholder Meeting in Richmond" on the Internet and in the print media. The press release revealed the annual salary of Joseph Luter III. (*See* Ex. 50).

198. On or about November 15, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Pork Will Be Off the Holiday Tables of Thousands of Families" on the Internet and in the print media. The press release described an "innovative holiday campaign" designed to take Smithfield products off the tables of consumers during the Thanksgiving holiday. Defendants failed to disclose the fact that Defendants devised

the scheme discussed in the press release. The press release also contained the following statement from Defendant Gene Bruskin: "Pork from this [Tar Heel] plant represents the pain of thousands of workers who have been permanently injured and fired as a result. This is a company that systematically and cruelly violates the rights of its hard working employees." (*See* Ex. 77).

199. On or about November 17, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield, Tar Heel Workers Continue Walk Out at World's Largest Pork Plant for Second Day" on the Internet and in the print media. As alleged herein, the press release contained the following maliciously false statement from Defendant Gene Bruskin: "Smithfield is clearly using the 'no match' issue as a means to terrorize immigrant workers regardless of their legal status with the express purpose of suppressing the worker-led organizing that is reaching across racial lines in unprecedented numbers." (*See* Ex. 66).

200. On or about November 27, 2006, Libby Manly published a press release entitled "Clergy and Civil Rights Leaders Call on Harris Teeter to Stop Selling Smithfield's Problem Pork" on the Internet and in the print media. The press release included the misleading statement that "clergy and civil rights leaders" were orchestrating the events to take place at Harris Teeter stores on or about December 2, 2006 when in fact such events were orchestrated and led by Defendants. (*See* Ex. 20).

201. On or about December 6, 2006, agents of Defendant UFCW reproduced a press release entitled "Area Fifth Graders call on Supermarkets to Drop Pork Products From Company Implicated in Worker Cruelty, Join Nationwide Campaign, Will Meet Children of Abused Meatpackers." The press release misleadingly portrayed a protest at a Johnny's Foodmaster

store, described above, as led by fifth grade children, when in fact it was orchestrated by Defendants. (*See* Ex. 29).

202. On or about January 10, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Walk Out Looming at Smithfield Packing Over Martin Luther King Holiday" on the Internet and in the print media. The press release insinuated that a massive dispute existed between employees at Smithfield's Tar Heel plant and Smithfield's management. (*See* Ex. 78).

203. On or about January 12, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Packing Will Punish Workers Who Celebrate Martin Luther King Day, Company Says" on the Internet and in the print media. The press release insinuated that a massive dispute existed between employees at Smithfield's Tar Heel plant and Smithfield's management. The press release also contained the following statement from Defendant Gene Bruskin: "Smithfield Packing has abused these workers for years. When your child is sick, if you stay home you are punished. When you are injured you are often fired." (*See* Ex. 79).

204. On or about January 15, 2007, Defendant Leila McDowell, Libby Manly and other agents of the UFCW published a press release entitled "Workers' No Shows Cut Production in Half at Smithfield" on the Internet and in the print media. The press release insinuated that Smithfield's production at its Tar Heel plant had been "cut in half." as a result of an alleged massive dispute between employees at Smithfield's Tar Heel plant and Smithfield's management. (*See* Ex. 80).

205. On or about January 17, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers MLK Protest Cut Production

Twenty-Seven Percent" on the Internet and in the print media. Apparently unable to get their "facts" straight, Defendants suddenly modified their earlier allegation regarding the production rate at Smithfield's Tar Heel plant and included in this press release the statement that Smithfield's production at its Tar Heel plant had "dropped from 33,000 to 24,000 hogs for the day" as a result of an alleged massive dispute between employees at Smithfield's Tar Heel plant and Smithfield's management. (*See* Ex. 81).

206. On or about January 25, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Union Condemns Arrests of Workers at Smithfield Plant in North Carolina as a Continuing Pattern of Terrorizing Workers and Their Communities" on the Internet and in the print media. As alleged above, the press release contained the following statement from Defendant Gene Bruskin: "Smithfield has a history of using threats of arrest by immigration authorities to intimidate workers and this is a continuation of that pattern." (*See* Ex. 67).

207. On or about February 1, 2007, Libby Manly and other agents of the UFCW published a press release entitled "Clergy, Civil Rights and Immigrants Rights Leaders Condemn Arrests and Intimidation of Workers, Gather in Front of Smithfield Hog Plant" on the Internet and in the print media. Defendants used this press release to misleadingly portray a press conference held on or about February 6, 2007 outside Smithfield's Tar Heel plant as led by "clergy, civil rights and immigrant rights leaders" when in fact it was led by Defendants. The press release also contained the following statement: "Amidst threats and intimidation, Smithfield falsely claims agreement for union election. Arrests, retaliation against employees honoring Dr. King, and threats to terminate hundreds leave workers frightened." It also referred to the working conditions at Smithfield's Tar Heel plant as "dangerous and brutal," and accused

Smithfield of a "systematic, sometimes violent, suppression of [workers'] democratic rights." (*See* Ex. 64).

208.    On or about February 5, 2007, Libby Manly and other agents of the UFCW published a press release entitled "Clergy, Consumer Advocates, Civil Rights and Immigrant Rights Leaders Condemn Smithfield Over Arrests, Intimidation of Workers, Climate of Fear" on the Internet and in the print media.  Defendants used this press release to misleadingly portray a press conference held on or about February 6, 2007 outside Smithfield's Tar Heel plant as led by "clergy, civil rights and immigrant rights leaders" when in fact it was orchestrated by Defendants.  The release also contained the following deceptive statement: "After Smithfield was found by the National Labor Relations board (NLRB) to have unlawfully threatened workers with arrest by federal immigration authorities, Immigration Customs Enforcement agents detained and arrested 21 Smithfield workers on Wednesday, Jan. 24."  The press release did not disclose the fact that the NLRB matter referred to was decided over two years before January 24, 2007 and has been appealed to the United States Court of Appeals for the Fourth Circuit. Defendants deliberately misrepresented the timing of these events to allow the inference that Smithfield orchestrated arrests of immigrant-employees in direct retaliation for an adverse administrative finding regarding the Company's treatment of immigrant-employees.  (*See* Ex. 82).

209.    On or about February 13, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield's firing of North Carolina Workers Prompts Senator Kennedy to ask Department of Homeland Security Secretary for a Temporary Suspension of Regulations" on the Internet and in the print media.    The press release misleadingly suggested that Smithfield's participation in the IMAGE program, described more

fully above, was the singular cause of a letter Senator Edward Kennedy sent to the Secretary of Homeland Security asking that proposed regulations governing social security no-match regulations be held in abeyance pending Congressional review of the regulations. (*See* Ex. 68).

210. On or about February 27, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Products Banned at Michigan Store" on the Internet and in the print media. The press release contained the false statement that Smithfield's products are "packaged with abuse." (*See* Ex. 32).

211. On or about March 12, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Workers Join Environmentalists to Testify Against Smithfield Packing's Efforts to up its Slaughter Rate by Over One Million Additional Hogs Per Year" on the Internet and in the print media. In the press release, Defendants misleadingly portrayed their efforts to interfere with Smithfield's application for an expansion of its water permit, as described fully above, as led by "workers" and "environmentalists." The press release also included the baseless statement that "It's also likely that the real number of injuries [occurring at the Tar Heel plant] is higher than that which is reported." (*See* Ex. 56).

212. On or about March 14, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Scores of Injured Workers Will Testify Against Smithfield's Attempts to Increase Production By One Million Hogs Per Year on Thursday" on the Internet and in the print media. In the press release, Defendants misleadingly portrayed their efforts to interfere with Smithfield's application for an expansion of its water permit, as described fully above, as led by "workers." (*See* Ex. 83).

213. On or about March 21, 2007, Defendant CtW published an article entitled "Smithfield Aims to Send a Million More to Hog Heaven" on the Internet via CtW's online

newsletter, CtW Connect. The article misleadingly referred to Julie Eisenberg's testimony on behalf of Defendant RAA at the March 15, 2007 Commission meeting described above as follows; "a representative of the nonprofit organization Research Associates of America who testified at the hearing agreed with the UFCW." The article also referred to Defendant RAA's report, described herein, and failed to disclose that Defendant UFCW purchased the findings and conclusions included by Defendant RAA in the report. (*See* Ex. 84).

214. On or about March 27, 2007, CtW employee Jason Lefkowitz published an article entitled "This Saturday, Join the Harris Teeter Day of Action" on the Internet via CtW's online newsletter, CtW Connect. The article included the claim that "employees say the company cares more about the pigs than it does about them" It also misleadingly insinuated that the "workers" were asking Harris Teeter to stop carrying Smithfield's products when in fact, and as alleged above, such demands were orchestrated and/or made by Defendants. (*See* Ex. 85).

215. On or about March 28, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Harris Teeter Target of Protests in 16 Cities For Selling Smithfield Pork From Abusive Packing Plant" on the Internet and in the print media. Defendants mischaracterized the "Southeast Day of Action" events described in the press release and referred to herein as having been planned and sponsored by "[r]eligious leaders, civil and immigrant rights groups, workers and consumers," when in fact Defendants themselves orchestrated the events. (*See* Ex. 24).

216. On or about March 30, 2007, Marc Goumbri, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Protests Against Harris Teeter for Selling Smithfield Pork From Abusive Packing Plant Grows to 22 Cities" on the Internet and in

the print media. The press release included the claim that "thousands" had signed a petition "calling for Harris Teeter to remove Smithfield problem pork." (*See* Ex. 86).

217. On or about April 4, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Presidential Candidate John Edwards Calls on CEO of Smithfield Foods to Allow a Union at its North Carolina Plant" on the Internet and in the print media. The press release misleadingly referred to the "Southeast Day of Action" referred to herein as having been led by "pastors" when in fact it was orchestrated by Defendants. (*See* Ex. 87).

218. On or about April 16, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Unions, Churches, Workers Turn up Heat on Celebrity Chef Paula Deen" on the Internet and in the print media. The press release referred to Smithfield as an "abusive pork processing company." (*See* Ex. 37).

219. On or about April 17, 2007, CtW employee Jason Lefkowitz published an article entitled "Will Paula Deen Stand For 'Clean Cuisine', or 'Queen of mean'? It Remains to Be Seen" on the Internet via CtW's online newsletter, CtW Connect. The article contained the following statement: "Paula has a lucrative endorsement contract with Smithfield Foods--and Smithfield's workers in Tar Heel, North Carolina, have been treated brutally by the company for their attempts to join together in a union." (*See* Ex. 88).

220. On or about April 20, 2007, CtW employee Jason Lefkowitz published an article entitled "See No Evil, Hear No Evil" on the Internet via CtW's online newsletter, CtW Connect. The article, referring to Smithfield's relationship with Paula Deen, included the following statement: "Paula's approach to learning that her sugar daddy regularly abuses its workers is to clap her hands over her ears and say 'I can't hear you!' I guess Upton Sinclair said it best: It is

-74-

difficult to get a man to understand something when his salary depends upon his not understanding it." (*See* Ex. 89).

221. On or about May 7, 2007, Marc Goumbri and other agents of the UFCW published an article entitled "Blacks, Latinos Mount Union Drive in North Carolina" on the Internet and in the print media. Goumbri attempted to conceal the fact that he was employed by the UFCW, instead representing himself in the article as "a writer and researcher and currently works with Research Associates of America," despite the fact that Defendant UFCW's website reflects Goumbri's electronic mail address as: mgoumbri@ufcw.org and his telephone number as: (202) 223-3111, ext. 1451, a telephone number that is registered to Defendant UFCW. (*See* Ex. 90).

222. On or about May 14, 2007, Defendant Leila McDowell, Marc Goumbri and other agents of the UFCW published a press release entitled "United Nations Investigates Smithfield Packing's Treatment of Immigrant Workers" on the Internet and in the print media. The numerous false and misleading statements contained in this press release are fully set forth above. (*See* Ex. 58).

223. On or about May 24, 2007, Jason Lefkowitz published an article entitled "Now We Know What 'Smithfield Family Values' Look Like" on the Internet via CtW's online newsletter, CtW Connect. The article contained the following outrageous statement about Smithfield's Tar Heel plant: "In the plant, the water fountains don't work, and the only water they get is dragged through waste and guts from slaughtered hogs before it reaches them." The press release also included the telephone number of Smithfield Packing Vice President Larry Johnson and encouraged readers to call and harass Mr. Johnson over Smithfield's alleged failure to provide clean drinking water to its employees. (*See* Ex. 91).

224. On or about May 24, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers File OSHA Complaint Over Lack of Clean Drinking Water and Safety Hazards" on the Internet and in the print media. The press release included the baseless claim that a Smithfield employee had passed out while at work because the Company refused to provide him drinking water for six hours. (*See* Ex. 92).

225. On or about May 30, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Shreveport Community, Faith, Civil Rights Leaders and Workers Tell Celebrity Chef Paula Deen That 'It Ain't All About the Cookin'" on the Internet and in the print media. The press release misleadingly portrayed a demonstration at a Paula Deen event planned for June 2, 2007 and referred to herein as being led by "Shreveport community, faith, civil rights leaders and workers" when in fact it was orchestrated by Defendants. (*See* Ex. 40).

226. On or about June 1, 2007, CtW employee Jason Lefkowitz published an article entitled "A Death In Tar Heel" on the Internet via CtW's online newsletter, CtW Connect. The article contained the false and malicious statement that Smithfield management had contributed to the death of a former employee who suffered from type 1 diabetes: "Smithfield put him on a job from which he could not be relieved to take his required insulin." (*See* Ex. 93).

227. On or about June 4, 2007, Isabell Moore, Marc Goumbri and other agents of the UFCW published a press release entitled "'Calling' For Justice Rally Asks Harris Teeter to Remove Smithfield Tar Heel Pork: A High Tech Cell Phone Protest in Asheville" on the Internet and in the print media. The press release referred to Smithfield as a company with "a long history of mistreating workers." (*See* Ex. 26).

228.    On or about June 13, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Intimidates Workers Over Drinking Water and Safety Investigation" on the Internet and in the print media. The press release falsely and maliciously reported that Smithfield "colluded" with the North Carolina Occupational Safety and Health Administration to procure a fraudulent result in a state-level investigation of drinking water and other alleged safety problems. (*See* Ex. 94).

229.    On or about June 14, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Prayers For Our Papas: Father's Day Protest at Harris Teeter" on the Internet and in the print media. The press release referred to Smithfield's Tar Heel plant as an "abusive plant" and misleadingly referred to the demonstration scheduled to take place at the home of Harris Teeter President Fred Morganthall, referred to herein, as led by "children of Smithfield workers, parents, consumers from across North Carolina" when in fact it was orchestrated by Defendants. (*See* Ex. 95).

230.    On or about June 20, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers to Meet With Presidential Candidate Senator John Edwards: Senator Edwards Will Call on Company to Give Workers the Right to Organize" on the Internet and in the print media. The press release included the claim that "Smithfield elections, marred with violence, intimidation, threats and other unlawful acts by the company demonstrate the need for the Senate to pass the Employee Free Choice Act this week." (*See* Ex. 96).

231.    On or about June 26, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Paula Deen Stirs Controversy in Charlotte" on the Internet and in the print media. The press release included the claim that Paula Deen had "stirred

controversy" in Charlotte and misrepresented demonstration activities at a Paula Deen event planned for June 30 2007, as alleged herein, as originating with "families of Smithfield workers" when in fact the events were originated by Defendants. The press release also referred to a letter allegedly written to Paula Deen by Presidential Master Chef Talli Council in which he allegedly asked her to end her partnership with Smithfield. The release omitted any reference to Defendants UFCW and Local 400 or to the union-related goal of the demonstrations. (*See* Ex. 41).

232. On or about June 27, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Presidential Master Chef asks Deen to end Smithfield Partnership" on the Internet and in the print media. The press release referred to the "tragic circumstances of workers at the Smithfield plant," and reported that Presidential Master Chef Talli Counsel "has ended all use of the Smithfield products, and will urge fellow chefs and culinary associations to take a very serious look at this situation." (*See* Ex. 97).

233. On or about June 28, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Paula Deen Demonstration Over Abusive Pork Plant" on the Internet and in the print media. The press release included the claim that demonstration activities at a Paula Deen event planned for June 30, 2007 were a planned "Paula Deen Demonstration Over Abusive Pork Plant" and again misrepresented the demonstration as originating with Smithfield workers when in fact the events were originated by Defendants. The press release also referred to a letter allegedly written to Paula Deen by Presidential Master Chef Talli Council in which he allegedly asked her to end her partnership with Smithfield. The release omitted any reference to Defendants UFCW and Local 400 or to the union-related goal of the demonstrations. (*See* Ex. 41).

234. On or about July 5, 2007, Defendant Leila McDowell and other members of the UFCW published a press release entitled "Presidential Master Chef is Still Waiting for Paula Deen's Response to his Letter" on the Internet and in the print media. The press release included the claim that Smithfield "has been mired in controversy including a series of legal rulings that found it assaulted, intimidated, illegally fired and used racial slurs against its workers. Human Rights Watch has written two reports citing widespread abuses at the world's largest pork plant." (*See* Ex. 98).

235. On or about July 27, 2007, Julie Eisenberg and other agents of Defendant RAA published a press release entitled "Legal Challenge to Smithfield's Hog Production Increase Filed Today: Widespread Environmental Hazards and Lack of Worker Safety Cited" on the Internet and in the print media. The press release failed to disclose that many of the statistics regarding Smithfield's safety and injury standards were taken from Defendant RAA's concocted report, referred to herein. (*See* Ex. 99).

236. On or about August 7, 2007, Defendant Lelia McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers Walk Out and Hold Sit-in over Lack of Drinking Water Today" on the Internet and in the print media. The press release included the misleading claim that "forty percent of the livestock workers" at Smithfield's Tar Heel plant engaged in a dispute with Smithfield management after they were not provided sanitary drinking water. (*See* Ex. 100).

## I. The Demand for Recognition

237. Defendants attempted to culminate their unlawful and extortionate scheme against Smithfield during a series of meetings that took place in August and September 2007. During this time period, officials employed by Defendant UFCW, including Defendant Patrick O'Neill,

met with Smithfield officials, including Jere Null and Jeff Gough, Vice President of Human Resources for Smithfield Packing, in private meetings that took place in Richmond, Virginia. Defendants in these meetings offered to discontinue the corporate campaign and all extortionate conduct involved upon Smithfield's agreement to take certain actions, or to refrain from taking certain actions, that Smithfield had no legal obligation to take or refrain from taking.

238. During the meeting that took place on or about August 14, 2007, Defendants reiterated that they had no intention of participating in a NLRB-sanctioned, secret-ballot vote of hourly employees at the Tar Heel plant regarding whether they wanted Defendants UFCW and Local 400 to be their collective bargaining representative. Instead, Defendants demanded that the Company agree to a sham "election" whereby the outcome would be determined in advance and agreed upon privately by Defendant UFCW and Smithfield. Defendants' intention was to force the Company to agree that it would declare the UFCW the "winner" of the "election" regardless whether a majority of Tar Heel employees actually voted for Defendants UFCW and Local 400 to be their collective bargaining representatives. Defendants made it clear to Null and Gough that they would ceaselessly continue their extortionate scheme against Smithfield unless and until Smithfield acquiesced in their demands.

239. Smithfield has refused to participate in the process described above. Since that time Defendants have responded with another, equally unattractive condition for ceasing their extortionate conduct. In another meeting between UFCW officials, including Defendant O'Neill, and Smithfield officials, including Null and Gough, which took place on or about September 16, 2007, Defendants demanded that, as an alternative to the process described above, Smithfield agree to an "election" conducted at the Tar Heel plant by an independent third party, but not the NLRB. Defendants demanded the additional condition that Smithfield remain "neutral" during

the period immediately preceding the vote by refraining from having any contact of any nature with its employees regarding the election while simultaneously allowing Defendants full access to Smithfield's Tar Heel employees to convince them of the benefits of union membership. Defendants also reiterated during this meeting that under no circumstances would Defendants agree to a NLRB-sponsored election and that Defendants' unlawful scheme would continue unless and until Smithfield agreed to the Defendants' terms.

240.    Another alternative condition offered by the Defendants was that Smithfield sit idly by while allowing Defendants to accost the Tar Heel employees to sign cards authorizing Defendants UFCW and Local 400 to represent them for purposes of collective bargaining, and to require Smithfield to recognize Defendants UFCW and Local 400 as the bargaining agent of the Tar Heel employees on that basis.  Smithfield has expressed to Defendants that this alternative is equally unacceptable.

241.    As recently as October 3, 2007, Defendants have reiterated to Smithfield that they will not participate in a NLRB-conducted election and that they will not discontinue their devastating and unlawful scheme without Smithfield's express agreement to acquiesce in Defendants' demands as described above.

## J.    Effect of Defendants' Conduct

242.    The Defendants' actions as described throughout have had a lasting and irreparable effect on Smithfield.  In addition to millions of dollars in lost or reduced business, lost contracts and lost promotional and advertising opportunities, the Smithfield brand name has been significantly tarnished.  Defendants have caused many of Smithfield's customers and business partners, as well as an uncountable number of formerly loyal consumers, to believe that it is a disreputable company that operates an unsafe workplace, mistreats its workers and

regularly violates the law. (*See, e.g.,* Ex. 101). Many of Defendants' extortionate acts have painted a revolting and visceral picture of Smithfield's business and human relations practices. Predictably, this has led to a devastating loss of goodwill in the marketplace. As alleged throughout, this has been the precise result desired by Defendants. And worse, it is clear from Defendants' actions and words that they have no intention of stopping until Smithfield surrenders to their extortionate demands. Without the Court's intervention, Smithfield will continue to suffer significant harm at the hands of Defendants and their unlawful scheme.

## FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a))
### Against Each of the Defendants

243. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

244. Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

245. Each of the Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(a), and 1962(d).

246. UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(a), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

247. Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), that is, Defendants conspired among themselves that income would be received, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A) in which Defendants participated as principals within the meaning of 18 U.S.C. § § 1961(1), 1961(5), and 1962(a), to wit: multiple, repeated, and continuous violations of

N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

248. As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)) Against Each of the Defendants

249. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

250. Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

251. Each of the Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(b), and 1962(d).

252. Smithfield Foods, Inc. and Smithfield Packing Company are corporations organized and existing under the laws of Virginia and are "enterprises" within the meaning of is 18 U.S.C. § § 1961(4) and 1962(b), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

253. Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b), that is, Defendants conspired among themselves to acquire or maintain, directly or indirectly, an interest in or control of the Smithfield Foods Enterprise and the Smithfield Packing Enterprise through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat.

§ 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

254.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## THIRD CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(c))
### Against Defendants CtW, RAA, JWJ and the Individual Defendants

255.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

256.    Each of the Plaintiffs is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

257.    Each of the individual Defendants is a "person" under 18 U.S.C. § § 1961(3) and 1962(c).

258.    The Individual Defendants and Defendants Research Associates of America, Change to Win and Jobs With Justice are "persons" under 18 U.S.C. § § 1961(3) and 1962(c).

259.    UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(c), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

260.    Each of the individual Defendants, along with Defendants Research Associates of America, Change to Win and Jobs With Justice, were and are associated with the enterprises and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprises in relationship to the Plaintiffs through a pattern of activity unlawful

-84-

under 18 U.S.C. § § 1961(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

261.    Each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) committed by the Defendants, including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## FOURTH CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)) Against Defendants CtW, RAA, JWJ and the Individual Defendants

262.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

263.    Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

264.    Each of the Individual Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(c), and 1962(d).

265.    Defendants Research Associates of America, Change to Win and Jobs With Justice are "persons" under 18 U.S.C. § § 1961(3), 1962(c), and 1962(d).

266.    UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(c), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

267.    Each of the Individual Defendants, as well as Defendants Research Associates of America, Change to Win and Jobs With Justice were and are associated with the enterprises and conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c), that is, the

Defendants conspired to conduct or participate, directly or indirectly, in the management and operation of the affairs of UFCW International and Local 400 in relationship to the Plaintiffs through a pattern of activity unlawful under 18 U.S.C. § § 1961(1)(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

268.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## FIFTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75D-4(a)(3) by Conspiring to violate § 75D-4(a)(1)) Against Each of the Defendants

269.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

270.    Smithfield Foods, Inc. and Smithfield Packing Company are corporations organized and existing under the laws of Virginia and are "enterprises" within the meaning of N.C. Gen. Stat. § 75D-3(a).

271.    Each of the Defendants conspired among themselves within the meaning of N.C. Gen. Stat. § 75D-4(a)(3) to violate N.C. Gen. Stat. § 75D-4(a)(1), that is, Defendants conspired among themselves to acquire or maintain, directly or indirectly, an interest in or control of the Smithfield Foods Enterprise and the Smithfield Packing Enterprise through a pattern of activity unlawful under N.C. Gen. Stat. § 75D-3(c)(1), to wit: multiple, repeated, and continuous

violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

272.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. § 75D-8(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

### SIXTH CLAIM FOR RELIEF
#### (Violation of N.C. Gen. Stat. § 75D-4(a)(2))
#### Against Defendants CtW, RAA, JWJ and the Individual Defendants

273.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

274.    UFCW and Local 400 constitute "enterprises" within the meaning of N.C. Gen. Stat. § 75D-3(a).

275.    Each of the Individual Defendants, along with Defendants Research Associates of America, Change to Win and Jobs With Justice, were and are associated with the UFCW and Local 400 enterprises and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the UFCW and Local 400 enterprises in relationship to the Plaintiffs through a pattern of activity unlawful under N.C. Gen. Stat. § 75D-3(c)(1), to wit: multiple, repeated, and continuous violations of N.C.Gen Stat.§ 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

276.    Each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. § 75D-8(c) by reason of the violation of N.C. Gen. Stat. § 75D-4(a)(2) committed by the Defendants, including but not limited to lost or reduced sales and

distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## SEVENTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75D-4(a)(3) by Conspiring to Violate § 75D-4(a)(2)) Against Defendants CtW, RAA, JWJ and the Individual Defendants

277.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

278.    UFCW International and Local 400 constitute "enterprises" within the meaning of N.C. Gen. Stat. § 75D-3(a).

279.    Each of the Individual Defendants, as well as Defendants Research Associates of America, Change to Win and Jobs With Justice were and are associated with the enterprises and conspired among themselves within the meaning of N.C. Gen. Stat. § 75D-4(a)(3) to violate N.C. Gen. Stat. § 75D-4(a)(1), that is, the Defendants conspired to conduct or participate, directly or indirectly, in the management and operation of the affairs of UFCW International and Local 400 in relationship to the Plaintiffs through a pattern of activity unlawful under N.C. Gen. Stat. § 75D-3(c)(1), to wit: multiple, repeated, and continuous violations of N.C.Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

280.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. § 75D-8(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## EIGHTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75.1-1) Against Defendants UFCW, Local 400, CtW, RAA and JWJ

281.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

282.    Defendants have engaged in numerous unfair acts and practices in violation of N.C. Gen. Stat. § 75.1-1.

283.    Defendants' business activities have affected interstate commerce, including commerce in North Carolina.

284.    Defendants have used and continue to use their power and position inequitably to coerce Smithfield to yield to their demands and recognize Defendants UFCW and Local 400 as the exclusive bargaining representative of Smithfield's hourly employees at the Tar Heel plant, thereby providing sufficient commercial and economic benefit to Defendants UFCW, Local 400, CtW and RAA. This coercive conduct included:

285.    Interfering with Smithfield's relationship with Harris Teeter and other business partners;

286.    Interfering with Smithfield's relationship with Paula Deen;

287.    Sponsoring and participating in the passage of public condemnations of Smithfield by cities, townships and organizations;

288.    Attempting to reduce the value of Smithfield Foods' stock;

289.    Interfering with Smithfield's annual shareholder meeting;

290.    Filing objectively baseless regulatory claims and complaints, and taking other action designed to interfere with Smithfield's operations;

291.    Creating a sham report that falsely conveyed the impression that Smithfield habitually violated safety and workers compensation laws.

292.    Demanding that Smithfield circumvent the NLRB secret-ballot election

process, by deceptive or unreliable means, to allow the

formation of a union at the Tar Heel facility.

293.    Defendants' conduct is further unfair in that it is unethical, oppressive,

unscrupulous, and injurious to consumers and competition.

294.    Defendants' conduct proximately harmed Smithfield by causing, inter alia, lost or

reduced sales and distribution and lost or reduced promotional and/or advertising opportunities,

and substantial and irreparable loss of goodwill and business opportunity with consumers and

customers.

295.    As a result, Defendants' conduct violates N.C. Gen. Stat. § 75.1-1.

## NINTH CLAIM FOR RELIEF
### (Tortious Interference With Business Relations)
### Against Each of the Defendants

296.    Plaintiffs reallege and incorporate by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

297.    Smithfield has valid business contracts and/or the prospective likelihood of future

contracts with its customers and business partners.  Smithfield had contractual rights pursuant to

said contracts and/or the expectation of future contractual rights.

298.    Each of the Defendants was fully aware of the existence of these contractual

relationships and/or Smithfield's expectation of future contractual relationships..

299.    Each of the Defendants, by the conduct alleged above, intentionally and

maliciously induced some or all of Smithfield's customers and business partners listed herein to

not perform valid and existing contracts with Smithfield and/or to decline to enter into future

contractual relationships with Smithfield.

300.    Defendants had absolutely no legal justification to induce said customers and business partners listed herein to not perform valid and existing contracts with Smithfield or to decline to enter into future contractual relationships with Smithfield.

301.    The failure of said business partners to perform valid and existing contracts with Smithfield, and/or to enter into future contractual relationships with Smithfield, has caused Smithfield actual damages, including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants, jointly and severally, as follows:

1.    Compensatory and consequential damages to Plaintiffs' business and property, including but not limited to, lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, in an amount to be proven at trial, but at least in excess of $5,900,000 owing to the acts and omissions of the Defendants;

2.    An additional amount to be proven at trial for the substantial and irreparable loss of goodwill and business opportunity with consumers and customers suffered by Plaintiffs as a result of the acts and omissions of the Defendants;

3.    Threefold the damages sustained by the Plaintiffs as a result of the acts and omissions of the Defendants, including but not limited to the cost of investigations, the costs of this suit (including reasonable attorneys' fees) and post-judgment interest;

4.    Exemplary and/or punitive damages for the Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill

will and intent to injure the Plaintiffs; or the Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

      5.      Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendants from continuing their scheme to extort Smithfield into meeting their demands as follows:

      a.      Enjoining Defendants from publishing in any format statements, reports, or press releases designed to mislead the public and unlawfully interfere with Plaintiffs' business relations;

      b.      Enjoining Defendants from continuing to unlawfully interfere with Plaintiffs' business relations through demonstrations and other activity at Paula Deen events; at or about which Defendants cause to be published information about Plaintiffs designed to cause Paula Deen to end her business relationships with Plaintiffs

      c.      Enjoining Defendants from continuing to unlawfully interfere with Plaintiffs' business relations through demonstrations and other activity at stores that sell Plaintiffs' products; at or about which Defendants cause to be published information about Plaintiffs designed to cause Plaintiffs' business partners to cease doing business with Plaintiffs or to cause consumers to cease purchasing Plaintiffs' products;

      d.      Enjoining Defendants from continuing to harass Plaintiffs' independent directors and executives;

      e.      Enjoining Defendants from participating in the drafting, encouraging, sponsorship and/or passage of public condemnations of Plaintiffs by cities, townships or other organizations;

    f.  Enjoining Defendants from interfering with Plaintiffs' legitimate business operations, including but not limited to the operation of its Tar Heel, North Carolina plant;

    g.  Requiring Defendants to publish the judgment against them so as to redress the damage that they have caused to Smithfield's business reputation;

    h.  Imposing reasonable restrictions on the future activities and conduct of any of the Defendants in regards to Plaintiffs.

   6.  Reasonable attorneys' fees and costs; and

   7.  Any other and further relief as the Court deems just and proper.

Dated: October 17, 2007

Respectfully Submitted,

SMITHFIELD FOODS, INC.
SMITHFIELD PACKING COMPANY

By: _____

Attorneys for Plaintiffs:

Thomas G. Slater Jr., Esq. (VSB No. 05915)
Gregory B. Robertson, Esq. (VSB No. 015681)
Kurt G. Larkin, Esq. (VSB No. 70730)
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200
(804) 788-8218 Fax


Of Counsel:

G. Robert Blakey, Esq.*
(*pro hac motion to be filed*)
Notre Dame Law School
Notre Dame, Indiana 46556
(219) 631-5717


* Notre Dame Law School is used solely for purposes of address.