UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

Civil Action No. 3:07CV641

| | | |
|---|---|---|
| **SMITHFIELD FOODS, INC., and** | ) | |
| **SMITHFIELD PACKING COMPANY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| **v.** | ) | FOR DAMAGES AND |
| | ) | EQUITABLE RELIEF |
| **UNITED FOOD AND COMMERCIAL** | ) | |
| **WORKERS INTERNATIONAL UNION,** | ) | |
| **UNITED FOOD AND COMMERCIAL** | ) | |
| **WORKERS LOCAL NO. 400, CHANGE** | ) | |
| **TO WIN, RESEARCH ASSOCIATES OF** | ) | |
| **AMERICA, JOBS WITH JUSTICE, GENE** | ) | |
| **BRUSKIN, JOSEPH HANSEN, WILLIAM** | ) | |
| **T. MCDONOUGH, LEILA MCDOWELL,** | ) | |
| **PATRICK J. O'NEILL, ANDREW L.** | ) | |
| **STERN, TOM WOODRUFF,** | ) | |
| **Defendants.** | ) | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE CLAIMS FOR RELIEF ...................................................................1

JURISDICTION AND VENUE..................................................................................2

PARTIES AND NON-PARTY PARTICIPANTS...........................................................3

    I.     THE PLAINTIFFS ......................................................................................3

    II.    THE DEFENDANTS ...................................................................................4

    III.   NON-PARTY PARTICIPANTS .....................................................................8

RELEVANT TIME PERIOD ....................................................................................10

FACTS REGARDING DEFENDANTS' UNLAWFUL SCHEME ....................................10

    I.     BACKGROUND, FORMATION OF THE CONSPIRACY AND ANNOUNCEMENT
         OF THE SMITHFIELD CAMPAIGN ...........................................................10

         A.     History of Labor Union "Corporate Campaigns" ................................10

         B.     Extorting Companies for Union Recognition and
               Other Money, Property and Valuable Assets
               is Defendant UFCW's Regular Way of Doing Business ......................12

              1.     Bashas' Incorporated..................................................................13

              2.     Tesco............................................................................................15

              3.     Farmer Joe's ..............................................................................15

               4.     Food Lion.....................................................................................16

               5.     Wal-Mart ....................................................................................17

          C.     The Defendants devise their unlawful scheme to extort
               Smithfield................................................................................18

               1.     Formation of the Conspiracy ....................................................18

               2.     Announcement of the Scheme and Delivery
                    of the Threat ..............................................................................22

II.   DEFENDANTS' UNLAWFUL TACTICS AGAINST SMITHFIELD.................................23

       A.   Publication and Use of Research Associates
            of America Report................................................................................25

       B.   Interfering With Smithfield's Business Relationships ...........................28

            1.   Interference With Harris Teeter ................................................28

                 a.   Statewide Day of Action: December 2, 2006..................29

                 b.   Southeast Day of Action: March 31, 2007 .....................31

                 c.   "Calling for Justice" Rally: June 9, 2007.......................33

                 d.   Father's Day Protest: June 16, 2007 .............................34

            2.   Interference With Other Business Partners ...............................35

                 a.   New England events.......................................................35

                 b.   Other events..................................................................37

            3.   The National Boycott .................................................................38

       C.   Interfering With Smithfield's Business Relationship With
            Paula Deen ...........................................................................................41

            1.   Washington, D.C.: April 18, 2007.............................................42

            2.   Shreveport, Louisiana: June 2, 2007 .........................................43

            3.   Charlotte, North Carolina: June 30, 2007 .................................44

       D.   Sponsorship and Participation in the Passage of Public
            Condemnations of Smithfield By Cities, Townships
            and Organizations.................................................................................45

            1.   New York City, New York .........................................................45

            2.   United Church of Christ.............................................................46

            3.   Cambridge, Massachusetts.........................................................46

            4.   Somerville, Massachusetts.........................................................47

5.      Chelsea, Massachusetts..................................................47

6.      Boston, Massachusetts .................................................48

E.      Attempts to Reduce the Value of Smithfield Stock..............................50

F.      Interference With Smithfield's Annual Shareholder Meetings...........51

1.      The 2006 Meeting.........................................................51

2.      The 2007 Meeting.........................................................52

G.      Filing and/or Prosecuting Frivolous and Objectively Baseless
        Regulatory Claims and Complaints and the Taking of
        Other Action Designed to Interfere With Smithfield's
        Operations ......................................................................54

1.      Interference With Smithfield's Application for a
        State Water Permit ...............................................54

2.      Manufacturing Allegations Regarding United Nations
        "Investigation" of Smithfield ...............................56

3.      Frivolous and Objectively Baseless OSHA Complaint............58

4.      Misrepresentation of Smithfield's Participation in
        IMAGE Program .........................................................59

5.      Attempt to Prevent Smithfield's Acquisition of
        Sara Lee ...............................................................61

H.      Publication of False, Misleading, Baseless, Negative and/or
        Damaging Information on the Internet and
        in the Newspapers ............................................................63

1.      Announcement of "Justice at Smithfield Campaign" ..............64

2.      Other Press Releases.................................................67

I.      The Demand for Recognition....................................................79

J.      Effect of Defendants' Conduct.................................................81

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)**
**Against Each of the Defendants**.......................................................................**82**

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)**
**Against Each of the Defendants**.......................................................................**83**

**THIRD CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**Against Defendants CtW, RAA, JWJ and the Individual Defendants** ...................**84**

**FOURTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)**
**Against Defendants CtW, RAA, JWJ and the Individual Defendants** ...................**85**

**FIFTH CLAIM FOR RELIEF**
**Violation of N.C. Gen. Stat. § 75D-4(a)(3) by Conspiring to Violate § 75D-4(a)(1)**
**Against Each of the Defendants**.......................................................................**86**

**SIXTH CLAIM FOR RELIEF**
**Violation of N.C. Gen. Stat. § 75D-4(a)(2)**
**Against Defendants CtW, RAA, JWJ and the Individual Defendants** ...................**87**

**SEVENTH CLAIM FOR RELIEF**
**Violation of N.C. Gen. Stat. § 75D-4(a)(3) by Conspiring to Violate § 75D-4(a)(2)**
**Against Defendants CtW, RAA, JWJ and the Individual Defendants** ...................**88**

**EIGHTH CLAIM FOR RELIEF**
**Violation of N.C. Gen. Stat. § 75.1-1**
**Against Defendants UFCW, Local 400, CtW, RAA and JWJ** ................................**88**

**NINTH CLAIM FOR RELIEF**
**Tortious Interference With Business Relations**
**Against Each of the Defendants**.......................................................................**90**

**PRAYER FOR RELIEF**..........................................................................................**91**

## <u>NATURE OF THE CLAIMS FOR RELIEF</u>

1.      Plaintiffs Smithfield Foods, Inc. and Smithfield Packing Company (collectively "Smithfield" or the "Company") bring this action to vindicate their right to control and operate their meat production and processing businesses free from Defendants' extortionate conduct.

2.      For more than a decade, Defendants United Food and Commercial Workers International Union ("UFCW") and United Food and Commercial Workers Local No. 400 ("Local 400") have attempted unsuccessfully to unionize hourly employees at Smithfield's pork processing plant in Tar Heel, North Carolina, the largest of its kind in the world.  In or around September 2005, UFCW, Local 400 and their co-conspirators decided to abandon all efforts to convince Smithfield employees of the benefits of union membership in favor of a new plan aimed not at the employees, but at Smithfield itself.  Specifically, Defendants conspired to extort Smithfield's "voluntary" recognition of Defendants UFCW and Local 400 as the exclusive bargaining representatives of hourly employees at Tar Heel--regardless of the degree of actual employee support for such representation--by injuring Smithfield economically until Smithfield either agreed to Defendants' demands or was run out of business.

3.      Defendants have since subjected Smithfield to a relentless barrage of related conduct designed to destroy Smithfield's public image and inflict maximum economic damage on the Company.  Such conduct includes almost daily publication of false, misleading, baseless, negative and/or damaging information about Smithfield to countless third parties, unlawful interference with Smithfield's existing and prospective business relations, orchestration of frivolous regulatory investigations, and communications with financial analysts aimed at reducing the value of Smithfield stock.

4.      Motivated by greed, Defendants have threatened to continue this and other malicious conduct indefinitely into the future unless Smithfield gives into Defendants' demands. Defendants have promised to refrain from further economically damaging behavior upon Smithfield's agreement to recognize Defendants UFCW and Local 400 as bargaining representative of the hourly employees in Smithfield's Tar Heel plant without resorting to the National Labor Relations Board's ("NLRB") process for conducting representation elections.  As explained in depth herein, forcing Smithfield to purchase Defendants' forbearance from engaging in such publicly devastating and financially damaging conduct constitutes extortion under North Carolina and Virginia law.

5.      Smithfield brings this action for damages and injunctive relief pursuant to Pub.L.No. 91-452, codified at 18 U.S.C. § 1961 *et seq.*, N.C. Gen. Stat. § 75D-1 *et seq.*, N.C. Gen. Stat. § 75.1-1 and common law as alleged below.

## JURISDICTION AND VENUE

6.      Plaintiffs' claims for relief allege violations of Pub.L.No. 91-452, codified at 18 U.S.C. § 1961 *et seq.* (to wit: multiple, repeated, and continuous violations of N.C. Gen Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion)); violations of  N.C. Gen. Stat. § 75D-1 *et seq.*, (to wit: multiple, repeated, and continuous violations of N.C. Gen Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion)); violations of N.C. Gen. Stat. § 75.1-1 and violations of common law as alleged below.  This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1961 *et seq.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 28 U.S.C. § 1367.

7.     Personal jurisdiction and venue in this district are proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because: (i) Defendants are found in, have agents in, and/or transact their business and affairs in, this district, and (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in this district.

## PARTIES AND NON-PARTY PARTICIPANTS

### I.    THE PLAINTIFFS

8.     Plaintiff Smithfield Foods, Inc. is a Virginia corporation with its principal place of business located at 200 Commerce Street, Smithfield, Virginia, 23430.  Smithfield Foods is the world's largest pork processor and hog producer, and the world's fifth largest beef producer.  It also operates turkey processing, cattle feeding and several packaged meats businesses. Smithfield Foods' stock is publicly traded on the New York Stock Exchange under the symbol "SFD."

9.     Plaintiff Smithfield Packing Company is a Virginia corporation with its principal place of business located at 111 Commerce Street, Smithfield, Virginia, 23430.  Smithfield Packing is a wholly-owned subsidiary of Smithfield Foods.  Smithfield Packing's primary line of business includes the processing and production of fresh pork, smoked meats, bacon, cooked hams and hot dogs for retail, foodservice and deli channels.  Smithfield Packing's largest asset, and the main object of the Defendants' unlawful conspiracy,  is its pork processing plant located in Tar Heel, North Carolina.  The Tar Heel plant is the largest pork processing facility in the world.  The approximately 4,650 hourly employees who work there slaughter, process and package over 32,000 hogs per day.  Because of the sheer size of its hourly workforce, which Defendants view as a potentially massive (and lucrative) collective bargaining unit, the Tar Heel plant has been the object of Defendants' organizing efforts for over a decade.

-3-

## II.   THE DEFENDANTS

10.     Defendant United Food and Commercial Workers' International Union ("UFCW") is an unincorporated labor association with its principal place of business located at 1775 K Street, NW, Washington, D.C., 20006.   The UFCW represents units of workers and attempts to negotiate terms and conditions of employment for those workers whom it represents. Currently, Defendant UFCW represents approximately 1.4 million hourly workers across the United States.   In exchange for fees in the form of union dues, which it collects from member-workers, Defendant UFCW provides services related to the terms and conditions of employment as well as other products and services such as proprietary credit cards, telephone services, apparel, and discounts on travel.   Defendant UFCW is a chartered member of Defendant Change to Win, an affiliation of separate labor organizations described more fully herein.   Defendant UFCW transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

11.     Defendant United Food and Commercial Workers' Local 400 ("Local 400") is an unincorporated labor association with its principal place of business located at 4301 Garden City Drive, Suite 400, Landover, MD 20785-2298.   Local 400 also maintains a place of business at 210 South Ridge Street, Danville, VA 24041.   In exchange for fees in the form of union dues, which it collects from member-workers, Local 400 provides its approximately 40,000 members with services related to the terms and conditions of employment.   Defendant Local 400 is a chartered member of Defendant UFCW and is charged with the duty of administering its affairs in accordance with the UFCW Constitution and enforcing the UFCW Constitution as it affects the members of Defendant Local 400.   Defendant Local 400 transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

12.     Defendant Change to Win ("CtW") is an unincorporated labor association with its principal place of business located at 1900 L Street NW, Suite 900, Washington, DC 20036. CtW was created in or around September 2005.  It consists of the following separate labor organizations: Defendant UFCW, International Brotherhood of Teamsters, Laborers' International Union of North America, Service Employees International Union ("SEIU"), United Brotherhood of Carpenters and Joiners of America, United Farm Workers of America and UNITE HERE, all of which disaffiliated from the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") and joined CtW.  The unions that comprise CtW have approximately 6 million members.  In exchange for fees in the form of a per capita tax on members, Defendant CtW provides services, including strategic and financial advice and assistance to its affiliated member unions in an effort to increase union membership in the United States.  Its primary governing body is a "Leadership Council" consisting of the principal officer of each affiliate labor union, as well as three at-large members selected by the other members of the Leadership Council.  The Leadership Council meets every two months.  Other Executive Officers are a Chair and Secretary-Treasurer--both selected by the Leadership Council.  In addition to these executive officers, Defendant CtW's organizational structure includes a Strategic Organizing Center and the Change to Win Investment Group, which describes itself as an advisor to member unions' pension funds.  Defendant CtW transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

13.     Defendant Research Associates of America ("RAA") is Delaware corporation with its principal office located at 1420 K Street NW, Suite 300, Washington DC, 20005. Research Associates of America holds itself out to the general public as an independent research organization.  In fact, it is a surviving entity of the Food and Allied Service Trades Department

of the AFL-CIO.  Its primary business is to prepare for a fee, reports, case studies, analyses and other research-based documents about the business operations of employers at the request of various labor organizations.  Such documents do not consist of independent research, but of pre-determined and/or false, misleading or objectively baseless findings designed by Defendant RAA and the requesting labor organization to discredit or damage the targeted employer in its business, economic and public affairs.  Defendant RAA transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

14.     Defendant Jobs With Justice ("JWJ") is a Washington, DC non-profit corporation with its principal place of business located at 1325 Massachusetts, Avenue, Suite 200, Washington, DC 20005.  Its primary business, as described on its internet site, is to build "coalitions of labor, religious, student and community organizations that are committed to each other for the long haul."  JWJ maintains regional offices throughout the United States and focuses its efforts on supporting the growth of organized labor. In return for fees, JWJ contributes resources and personnel to assist in the legitimate and illegitimate activities of labor organizations.  Defendant JWJ transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

15.     Defendant Gene Bruskin is an individual.  He holds a beneficial interest in the following property: a residence located at [**REDACTED** pursuant to Local rule 7(C)(1)(e)].  He is retained by Defendants CtW and UFCW for the purpose of coordinating the day-to-day business of Defendant CtW's and Defendant UFCW's "Justice at Smithfield Campaign," described more fully herein.  Bruskin transacts business on behalf of Defendants CtW and UFCW on a national scale, including in this judicial district.

16.     Defendant Joseph Hansen is an individual and is a member of Defendant CtW's Leadership Council.  He also is the International President of Defendant UFCW.  He has an office located at 1775 K Street, NW, Washington, D.C. 20006 and another office located at 1900 L Street, NW, Suite 900, Washington, D.C. 20036.  He holds a beneficial interest in the following property: a residence located at [**REDACTED** pursuant to Local rule 7(C)(1)(e)]. Hansen transacts business on behalf of Defendants CtW and UFCW on a national and international scale, including in this judicial district.

17.     Defendant William T. McDonough is an individual and is the Executive Vice-President and Collective Bargaining Director of Defendant UFCW.  Until September 2007, he was the Organizing Director of Defendant UFCW.  He holds a beneficial interest in the following property: [**REDACTED** pursuant to Local rule 7(C)(1)(e)].  He has an office located at 1775 K Street, NW, Washington, D.C., 20006.  McDonough transacts business on behalf of Defendant UFCW on a national and international scale, including in this judicial district.

18.     Defendant Leila McDowell is an individual and is Defendant UFCW's Spokeswoman as well as the Communications Coordinator of Defendant UFCW's "Justice at Smithfield Campaign," described more fully herein.  She has an office located at 1775 K Street, NW, Washington, D.C., 20006.  She holds a beneficial interest in the following property: [**REDACTED** pursuant to Local rule 7(C)(1)(e)]  McDowell transacts business on behalf of Defendant UFCW on a national and international scale, including in this judicial district.

19.     Defendant Patrick J. O'Neill is an individual and is the Executive Vice-President and Organizing Director of Defendant UFCW.  He has an office located at 1775 K Street, NW, Washington, D.C., 20006.   He holds a beneficial interest in the following property:

[**REDACTED** pursuant to Local rule 7(C)(1)(e)].   O'Neill transacts business on behalf of Defendant UFCW on a national and international scale, including in this judicial district.

20.     Defendant Andrew L. Stern is an individual and is a member of Defendant CtW's Leadership Council.  He also is the International President of the SEIU.  He has an office located at 1900 L Street NW, Suite 900, Washington, DC 20036 and another office located at 1800 Massachusetts Avenue, NW, Washington, DC 20036.   He holds a beneficial interest in the following property: [**REDACTED** pursuant to Local rule 7(C)(1)(e)].   Stern transacts business on behalf of Defendant CtW on a national and international scale, including in this judicial district.

21.     Defendant Tom Woodruff is an individual and is the Director of Defendant CtW's Strategic Organizing Center.  He also is the Executive Vice-President of the SEIU. He has an office located at 1900 L Street NW, Suite 900, Washington, DC 20036 and another office located at 1800 Massachusetts Avenue, NW, Washington, DC 20036.   He holds a beneficial interest in the following property: [**REDACTED** pursuant to Local rule 7(C)(1)(e)].   Woodruff transacts business on behalf of Defendant CtW on a national and international scale, including in this judicial district.

22.     All of the individual Defendants named herein may be referred to collectively from time to time herein as the "Individual Defendants."

III.   <u>NON-PARTY PARTICIPANTS</u>

23.     Defendant Anna Burger is an individual and is the Chair of Defendant CtW as well as a member of Defendant CtW's Leadership Council.   She also is the International Secretary-Treasurer of the SEIU.   She has an office located at 1900 L Street NW, Suite 900, Washington, DC 20036.

24.     Don Cash is an individual and is a member of the Executive Board of Defendant Local 400.  He has an office located at 4301 Garden City Drive, Landover, Maryland, 20785.

25.     Julie Eisenberg is an individual and is the Director of Research of Defendant RAA.  She has an office located at 1420 K Street NW, Suite 300, Washington, DC, 20005.

26.     Mark Federici is an individual and is the Director of Strategic Programs for Defendant Local 400.  He has an office located at 4301 Garden City Drive, Suite 400, Landover, MD 20785-2298.

27.     Marc Goumbri is an individual and is employed by Defendant UFCW.  He has an office located at 1775 K Street NW, Washington, DC 2006.

28.     Mikki Harris is an individual and is the Community Affairs Organizer for Defendant Local 400.  She has an office located at 4301 Garden City Drive, Suite 400, Landover, MD 20785-2298.

29.     Mark Lauritsen is an individual and is an International Vice-President of Defendant UFCW.  He has an office located at 1775 K Street, NW, Washington, D.C., 20006.

30.     Jason Lefkowitz is an individual and is the Online Campaigns Organizer for Defendant CtW.  He has an office located at 1900 L Street NW, Suite 900, Washington, DC 20036.

31.     James Lowthers is an individual and is President of Defendant UFCW Local 400. He has an office located at 4301 Garden City Drive, Suite 400, Landover, MD 20785-2298.

32.     Libby Manly is an individual and is the North Carolina Community Organizer for Defendant UFCW.  She has an office at 1408 Hillsborough Street, Raleigh, North Carolina, 27605.

33.     Donald Minor is an individual and is employed by Defendant UFCW.  He has an office located at 1775 K Street NW, Washington, DC 2006.

34.     William Patterson is an individual and is the Executive Director of the Change to Win Investment Group.  He has an office at 1900 L Street NW, Suite 900, Washington, DC 20036.

35.     Eduardo Pena is an individual and is the Assistant to the National Director of Organizing of Defendant UFCW.  He has an office at 1775 K Street, NW, Washington, D.C., 20006.

36.     Rigo Valdez is an individual and is the National Field Director of Defendant UFCW's "Justice at Smithfield Campaign."   He has an office at 1775 K Street, NW, Washington, D.C., 20006.

## RELEVANT TIME PERIOD

37.     Defendants' conspiracy to extort money and property from and to inflict damage upon Smithfield, as alleged fully herein, began in or about September 2005 and continues to date.

## FACTS REGARDING DEFENDANTS' UNLAWFUL SCHEME

**I.    BACKGROUND, FORMATION OF THE CONSPIRACY AND ANNOUNCEMENT OF THE SMITHFIELD CAMPAIGN**

**A.    History of Labor Union "Corporate Campaigns"**

38.     In or around June 2006, Defendants publicly announced commencement of a Corporate Campaign against Smithfield.  (*See* Ex. 1.)  The term "Corporate Campaign" has a generally-understood meaning in the labor relations field and "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer. . . [including] litigation, political appeals, requests that regulatory agencies investigate

and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997).

39.     The purpose of a Corporate Campaign, as explained repeatedly in published union literature, is to coerce an employer's compliance with the desires of a labor organization, regardless of the degree of employee support and without involving the NLRB, the executive agency charged with enforcement of the National Labor Relations Act against employers and labor organizations.   As such, Corporate Campaigns involve the investment of substantial resources towards events, actions and conduct that have little to no direct relation to the wages, hours, benefits and working conditions of the employees of the targeted employer.

40.     The philosophy of extorting an employer in this manner and without regard for the level of employee interest in forming or joining a labor union is articulated in the article "The Pressure is On: Organizing Without the NLRB," written by former UFCW organizer Joe Crump. In that article Crump states, "Who do we really need to convince of the advantages of being union?   Employees or employers . . . Organizing without the NLRB means putting enough pressure on employers, costing them enough time, energy and money to either eliminate them or get them to surrender to the union . . .   One of the concerns organizers might have about waging economic war on an unorganized company is that it might turn employees against the union.  I look at it this way:  If you had massive employee support, you probably would be conducting a traditional organizing campaign."  (*See* Ex. 2).

41.     The ultimate goal of a Corporate Campaign such as Defendants' scheme to extort Smithfield, is either to destroy the employer's business or to coerce the employer into "voluntary" union recognition.  Crump defined a Corporate Campaign's success in one of two

ways: "either a ratified, signed collective bargaining agreement with a previously non-union employer or a significant curtailment of a nonunion operator's business, including shutting the business down.  Neither of these outcomes will occur by relying on the NLRB."

42.     As recently as in or around August 2007, at a dinner of labor activists that took place in Chicago, Illinois and which was hosted by Defendant CtW, a representative of CtW's Strategic Organizing Center described the purpose of a Corporate Campaign in the following manner: "It's no longer sufficient to use a strike or other work disturbance to pressure a company to do the right thing.  Increasingly, it's necessary to pressure a company by causing a crisis of confidence among its customers, shareholders, directors or other constituents."  (*See* Ex. 3).

**B.     Extorting Companies for Union Recognition and Other Money, Property and Valuable Assets is Defendant UFCW's Regular Way of Doing Business**

43.     Defendant UFCW employs extortionate Corporate Campaign tactics as a regular way of doing business.  Its modus operandi involves:

44.     targeting a particular employer;

45.     carefully planning a process for discovering and disclosing negative information about the target;

46.     creating sham and/or surrogate entities through which to conceal its involvement and portray the conduct of those entities as spontaneous action by independent, socially-conscious third parties;

47.     recruiting a handful of disgruntled and/or former employees of the target employer and publicly portraying them as representative of the target employer's employees as a whole;

48.     exploiting the genuine social and political concerns of third parties with diverse interests often completely unrelated to labor concerns, by tailoring

allegations to specific audiences, including but not limited to: pandering to

civil rights organizations by characterizing the target employer as "racist;"

exposing the target employer's alleged environmental violations to recruit

the assistance of environmental groups in harassing the target; generating

fear among consumers in general with salacious allegations of unsafe or

unhealthy products sold at a target employer's retail stores; and

49.     using all available media to relentlessly harass the target employer.

50.     Other than Smithfield, past and present victims of Defendants UFCW and/or

Local 400 Corporate Campaigns include Bashas' Incorporated, Tesco, Farmer Joe's, Food Lion

and Wal-Mart.  Defendant UFCW's tactics and disparaging allegations in those campaigns are

uncannily similar to those leveled against Smithfield.

### 1.     Bashas' Incorporated

51.     After unsuccessful attempts to unionize the more than 14,000 hourly employees

of supermarkets owned by Bashas' Incorporated ("Bashas"), a family-owned chain of

approximately 166 grocery stores located in Arizona, California, and New Mexico, Defendant

UFCW instituted a coercive Corporate Campaign against Bashas to force "voluntary"

recognition.  Although Bashas repeatedly expressed willingness to participate in a secret-ballot

election conducted by the NLRB, Defendant UFCW refused to request recognition through a

NLRB election, claiming that Bashas' provided "misleading" information and engaged in

"intimidating tactics" during past NLRB elections and that only a card check procedure, in which

employees indicate their support for union representation by signing a card authorizing a union

to represent them for purposes of collective bargaining, could accurately convey employees'

wishes with respect to Defendant UFCW's representation of them without subjecting them to further intimidation and harassment.

52.     In order to carry out its campaign against Bashas', Defendant UFCW created a sham entity, called "Hungry for Respect," through which to publicly disparage Bashas' business practices while concealing Defendant UFCW's role in that effort.   Defendant UFCW publicly described "Hungry for Respect" as "a coalition of grocery store employees, their union and community allies."   In reality, only a handful of disgruntled and/or former Bashas' employees were ever involved in the campaign.   Defendant UFCW recruited these employees and misleadingly portrayed their alleged individual grievances as generally reflective of the concerns of Bashas' entire workforce.

53.     In a report dated June 2007, Defendant UFCW characterized "Hungry for Respect's" platform as based on the principles of "employee respect," "clean stores," and "healthy communities."   The report implied that Bashas' stores were non-compliant with federal and state safety standards.   Additional disparaging statements include: "The federal government is alleging that Bashas' illegally raised healthcare premiums last year. . . ;" "Bashas' employees feel powerless to address workplace problems with their supervisors;" "When Bashas' employees do speak up about problems in the workplace they are either confronted by management or their concerns fall on deaf ears;" "Bashas' management engages in intimidating, union-busting behavior when workers attempt to come together and form a union."   The report further alleged that Bashas' employees were subjected to "abuse," "harassment," and were in "fear."   (*See* Ex. 4).

54.     In or around July 2007--again under the auspices of sham entity "Hungry for Respect"--Defendant UFCW held two news conferences in which UFCW agents claimed to have

discovered 683 cans of outdated infant formula in 55 different Bashas' stores during shopping trips that took place on or about May 3-7 and June 2-3, 2007.  Defendant UFCW then distributed a flier, titled "A betrayal of a mother's trust," containing this allegation amid emotionally-charged pictures of infants.  As described below, the UFCW's infant formula maneuver is virtually identical to a 1995 allegation leveled against Food Lion supermarkets in Virginia.  (*See* Ex. 5).

### 2.     Tesco

55.     Tesco, a United Kingdom-based grocer, plans to open a number of new grocery stores in the state of Arizona.  Seeing an opportunity to add to its membership, Defendant UFCW attempted to secure representational status over Tesco employees before any employees were actually hired.  When Tesco resisted its overtures, Defendant UFCW retaliated against Tesco by attempting to interfere with the company's plans to open its Arizona stores.  Specifically, Defendant UFCW distributed disparaging flyers to thousands of Phoenix residents in or around April 2007.  The fliers implied that Tesco sold alcohol to minors and urged residents to "protect your family" by asking the Arizona State Liquor Board to block Tesco's alcohol license applications.  (*See* Ex. 6).

### 3.     Farmer Joe's

56.     Beginning in or around January 2007, Defendant UFCW began using similar tactics to force Farmer Joe's, a grocery store chain based in California, to recognize Defendant UFCW as the collective bargaining representative of its hourly employees even though Defendant UFCW never filed a petition with the NLRB to represent those employees. Defendant UFCW orchestrated numerous protests and demonstrations outside Farmer Joe's stores.    These events were conducted not by Farmer Joe's employees interested in union

representation, but by individuals hired "off the street" by Defendant UFCW and paid to stand in Farmer Joe's parking lots and pass out literature disparaging the company to customers entering the stores. These events continued for months, while participants told customers that Farmer Joe's would not allow its employees to vote on unionization. In reality, Farmer Joe's had petitioned the NLRB for an election, and Defendant UFCW had objected to that process. Defendant UFCW's representatives also falsely accused Farmer Joe's of being "racist" and of discriminating against women and minorities. (*See* Ex. 7).

57. In a press conference held on June 27, 2007 by a surrogate entity called "California Healthy Communities Network," Defendant UFCW's agents claimed to have discovered expired organic products at Farmer Joe's stores. Daniel J. Rush, who reported the story, identified himself to the media as a "private investigator." Rush in fact was formerly employed as the political director for UFCW Local Union No. 120, but failed to disclose his connection to the union. (*See* Ex. 8).

### 4. Food Lion

58. Defendants UFCW International and Local 400 instituted a Corporate Campaign against non-unionized Food Lion in the mid 1980's. They created a surrogate entity called "Consumers United With Employees" ("CUE"), described as "an association of consumer, labor, religious and civil liberties organizations." As with the other UFCW-created sham front organizations, CUE was nothing more than the UFCW itself.

59. Defendants UFCW and Local 400 engineered and planted a media story--culminating in an ABC PrimeTime Live broadcast on November 5, 1992--which claimed that Food Lion was engaging in widespread violations of federal and state wage and hour laws and that unsanitary working conditions were common in Food Lion stores. Defendant UFCW

supplied all of the information on which the ABC report was based, but was never identified as the source.  Defendants UFCW and Local 400 then repeatedly re-broadcast the Prime Time Live segment and portrayed it as having originated from an independent investigation and sources.

60.     Defendants' tactics included a deception almost identical to the infant formula allegation leveled against Bashas'.  On or around February 4, 1994, Defendants UFCW and Local 400 issued a press release regarding an alleged "independent" investigation in which it was discovered that Food Lion was selling out-dated infant formula at its stores.  (*See* Ex. 9).

61.     The Corporate Campaign against Food Lion dragged on for years and ended only as part of a settlement to a lawsuit in Federal District Court in South Carolina.  A filing with the Securities and Exchange Commission announcing the settlement reflected the fact that as part of the parties' agreement to resolve the case, Defendant UFCW agreed to discontinue its Corporate Campaign against Food Lion.  (*See* Ex. 10).

### 5.     Wal-Mart

62.     Defendant UFCW is also waging a well-publicized Corporate Campaign against Wal-Mart.  Once labeled the "Justice@Walmart" Campaign, it is now identified as "Wake-up Walmart."  Defendant UFCW registered and maintains a website, www.wakeupwalmart.com, through which it disseminates disparaging information about the company.  The website is designed to minimize the appearance of Defendant UFCW's sponsorship and responsibility for the content of the website.  The website panders to a panoply of diverse interests by offering alleged "facts" describing Wal-Mart's alleged misconduct in such areas as "crime," "healthcare," "discrimination," and "port security."

63.     The campaign includes publication of periodic press releases containing boilerplate accusations strikingly similar to allegations leveled against Smithfield and other

targets of Defendant UFCW's Corporate Campaigns.  The campaign-sponsored events likewise are similar to those conducted for the purpose of injuring Smithfield.  For example, a UFCW press release issued on December 6, 2006 announced a "National Day of Action" called "Women and Families Deserve Better than Wal-Mart," which was designed to harass and damage publicly Wal-Mart's business reputation.  (*See* Ex. 11).  As discussed more fully herein, Defendant UFCW had only four days previously conducted a similar "Day of Action" against Smithfield.

64.    The website proclaims that "concerned citizens and community leaders" are responsible for various Corporate Campaign activities and describes the "Wake up Wal-Mart" campaign as "a grassroots movement which will represent the best America has to offer."  It further states, "We are grassroots leaders, community groups and activists."  The website is organized to minimize the one true goal of the campaign--unionization of Wal-Mart's employees.  (*See* Ex. 12).

### C.    The Defendants devise their unlawful scheme to extort Smithfield

#### 1.    Formation of the Conspiracy

65.    Defendants UFCW and Local 400 have sought to represent the employees at Smithfield's Tar Heel, North Carolina pork processing plant since approximately 1994. Unionizing the plant would result in potentially millions of dollars of dues revenues to Defendants UFCW and Local 400.  Because of the sheer size of its hourly workforce and the significant political and financial windfall that a union would obtain from winning the right to represent that workforce, the Tar Heel plant has been a target of the UFCW since Smithfield opened its doors in 1992.  It is an equally important prize to Defendant CtW, with whom Defendant UFCW has been affiliated since in or around September 2005 as a charter member,

-18-

because of the larger significance to the labor movement in general of successfully organizing the largest asset of a major southern employer.

66.    After several unsuccessful attempts to achieve a majority vote of the hourly employees through the NLRB election process, the Defendants decided to abandon their attempts to represent Tar Heel's employees through NLRB channels and devised an unlawful scheme to extort Smithfield's agreement to "voluntarily" recognize Defendants UFCW and Local 400 as the exclusive bargaining agents of the hourly employees at Smithfield's Tar Heel plant. Specifically, the Defendants conspired to utilize the resources of Defendants CtW, UFCW, Local 400 and to purchase the additional assistance of Defendants RAA and JWJ, to engage in a wide-ranging campaign of extortion of Smithfield.  The Defendants conspired to use their position and power to attempt to bring unbearable public, social and financial pressure on Smithfield by repeatedly portraying in a misleading or negative light Smithfield's business and operating practices, unlawfully interfering with Smithfield's existing and prospective business relations, sponsoring and participating in the passage of public condemnations and product boycotts by cities, towns and organizations, knowingly and maliciously publishing false, misleading, baseless, negative and/or damaging information about Smithfield to financial analysts, customers, and the general public, interfering with Smithfield's annual shareholder meetings, and filing or prosecuting frivolous and objectively baseless regulatory claims and complaints and taking other actions designed to interfere with Smithfield's business operations.

67.    Although Defendants did not announce publicly their corporate campaign against Smithfield until June 2006, the conspiracy was in fact hatched in or around September 2005. Shortly after the creation of Defendant CtW as described above, its Leadership Council, which includes as members Defendants Joseph Hansen and Andrew Stern, authorized the adoption of

the "Justice at Smithfield Campaign" as an official CtW campaign.  They also approved the Defendants' utilization of the "Justice at Smithfield Campaign" as the primary means through which to initiate and carry out the extortionate scheme described above.  Defendants UFCW and Local 400 created the "Justice at Smithfield" concept in or around 2003.  The "Justice at Smithfield Campaign" is actually nothing more than the Defendants themselves.  Nevertheless, and in keeping with Defendant UFCW's past Corporate Campaign modus operandi, the "Justice at Smithfield Campaign" was fabricated to appear publicly as a "social movement" behind which Defendants could safely publicize false, misleading, baseless, negative and/or damaging information about Smithfield and engage in the extortionate conduct alleged herein in a manner that concealed the extent of their involvement, while simultaneously making it appear that neutral third parties were actually running the campaign.  (*See* Ex. 13).

68.     To create the appearance that the "Justice at Smithfield Campaign" is a collective effort of like-minded individuals and/or religious and civil rights groups, Defendants recruited and secured the assistance and support of numerous unwitting participants, referenced herein, by publishing false, misleading, baseless, negative and/or damaging information about Smithfield to said unwitting participants in order to obtain their participation in the Defendants' extortionate scheme.  Defendants misled such third parties, including members of religious organizations, civil rights groups, and student social activists, into believing that the campaign events were designed to address issues of particular concern to each third party.  The Defendants' purpose in using third parties in this manner was to create a public perception that the majority of their unlawful and extortionate conduct originated with the unwitting participants, and not the Defendants.

69.     To facilitate their plan, Defendants CtW and UFCW hired Defendant Gene Bruskin in or around January 2006 to coordinate the day-to-day affairs of the scheme.  The scheme is coordinated on a strategic level by Defendant CtW's Strategic Organizing Center, which is headed by Defendant Tom Woodruff, and by Defendant UFCW's Organizing Department, which until September 2007 was headed by Defendant William McDonough and which presently is headed by Defendant Patrick J. O'Neill.  In addition and as alleged more fully below, Defendant UFCW secured the participation of co-conspirators, Defendants RAA and JWJ, by offering them significant financial incentive to participate in the scheme described above.  Specifically, Defendant UFCW paid to JWJ at least $92,579.00 in 2005 and 2006 and at least $1,987,808.00 to Defendant RAA in 2005 and 2006.  (*See* Ex. 14).  The Individual Defendants assigned or delegated to numerous agents and employees of Defendants CtW, UFCW, Local 400 and JWJ the task of carrying out the events more fully described herein, on a day-to-day basis.

70.     Ultimately, the Defendants' plan was to drive Smithfield out of business unless it acquiesced in their demand for recognition of Defendants UFCW and Local 400 as collective bargaining representative of the Company's hourly employees at Tar Heel and to forego the NLRB election process or any other accepted or favored means of organizing a group of employees into a labor union. In fact, one of the Defendants' demands of the Company, stated in no uncertain terms and described in detail below, was that the Defendants and Smithfield engage in a categorically unlawful process to facilitate the creation of a labor union at Tar Heel.  Thus, the ultimate purpose of Defendants' unlawful scheme was to force Smithfield, at the point of an economic bayonet, to allow the deception of its employees and participate in a scheme to allow Defendants UFCW and UFCW Local 400 to represent those employees, and as a byproduct, to

acquire unlawfully and through a pattern of extortionate conduct, Smithfield's money and property as well as an interest in Smithfield's business.

**2.**     **Announcement of the Scheme and Delivery of the Threat**

71.     In or around May 2006, during an organizing convention held in Las Vegas, Defendant CtW announced the launch of a massive organizing campaign targeting several key industries.  The initiative was called "Make Work Pay."  In conjunction with this announcement, CtW also announced that it was a co-sponsor, along with Defendants UFCW and Local 400, of a "priority" campaign against Smithfield.   In addition, Defendant CtW's web site, www.changetowin.org, listed the "Justice at Smithfield Campaign" as one of its campaigns.  (*See* Ex. 15).

72.     In or around June 2006, Defendants UFCW and Local 400 officially and publicly announced their efforts to significantly increase the activity of the "Justice at Smithfield Campaign."  Defendants caused to be published information over the internet, radio and newspapers announcing this activity as the "A Change to Win Week."  Defendants' press releases during this time period described the "Justice at Smithfield Campaign" as "the largest manufacturing organizing drive by any union in over a decade."  In fact, the campaign, as described above, was not intended by Defendants to be an "organizing drive," but instead was intended to be used as a sham to mask publicly the Defendants' unlawful conspiracy to extort the Company.

73.     During this time,  Defendants caused to be published a series of malicious statements about Smithfield.  In an interview conducted in Washington, D.C. on or about June 22, 2006, Defendant Joseph Hansen publicly stated that "a climate of fear" pervaded the workforce at Smithfield's Tar Heel plant and that Smithfield "rule[d] by terror." Hansen further

-22-

admitted that Defendant CtW was a co-sponsor, along with Defendants UFCW and Local 400, of the "Justice at Smithfield Campaign."  During the interview, Hansen also made the following implicit threat to cause economic harm to Smithfield: "We want to educate consumers and let them make their own judgments about what to do.  This isn't just about economics anymore." (*See* Ex. 1).  In fact, Hansen had no desire to educate the public; his goal was to destroy the goodwill and trust of Smithfield's customers and consumers.

74.     Several press releases issued by Defendant Leila McDowell in or around this period of time included a description of Smithfield as a "racist, anti-immigrant company that feels they can terrorize workers at will."  (*See* Exs. 71-75).  McDowell knew that this statement was objectively baseless when she included it in the press releases.

75.     Defendants also clearly articulated their intent to continue their scheme until Smithfield acquiesced in Defendants' unlawful demands.  Defendant Leila McDowell published orally a statement to a number of news media outlets that the events of "A Change to Win Week" were "just the beginning" of Defendants' extortionate campaign against Smithfield.  (*See* Ex. 16).

## II.   DEFENDANTS' UNLAWFUL TACTICS AGAINST SMITHFIELD[1]

76.     Each of the actions and events described below constitutes a threat communicated with the intention wrongfully to obtain objects of value, acquittances and/or advantages from Smithfield and is chargeable as extortion under North Carolina law and punishable by imprisonment for more than one year.  (N.C. Gen. Stat. §  14-118.4).

---

[1] Because of the complicated and prolonged nature of the Defendants' schemes, this Complaint presents the factual allegations by subject matter, rather than by date.

77.     Each of the actions and events described below constitutes a threat to injure Smithfield's character and property and/or to accuse Smithfield of an offense, undertaken with the specific intent to extort money, property, and pecuniary benefit from Smithfield and is chargeable as both attempted extortion and extortion under Virginia law and punishable by imprisonment for more than one year.  (Va. Code Ann. §§  18.2-59, 18.2-26(3)).

78.     The specific things of value, acquittances, advantages, property, money, and/or pecuniary benefits demanded by Defendants include, but are not limited to:

> 79.     Smithfield's agreement to recognize Defendants UFCW and Local 400 as the exclusive bargaining agents of Tar Heel employees without evidence of majority employee support,

> 80.     Smithfield's relinquishment of substantial autonomy and control over its business operations;

> 81.     Resulting lucrative gain from union dues from approximately 4,650 prospective new UFCW members employed by Smithfield;

> 82.     Resulting gain of considerable strategic and financial leverage when negotiating on behalf of other units of Smithfield employees currently represented by other local unions of Defendant UFCW;

> 83.     Resulting contributions to Defendants' pension plans; and

> 84.     Resulting increased salaries to the Individual Defendants.

85.     Each of the actions and events described below was undertaken either by the Defendants themselves, or by and through their agents and with their actual knowledge, approval and/or ratification, in furtherance of the unlawful conspiracy alleged herein to extort money and property from Smithfield and to acquire unlawfully an interest in the Smithfield Enterprises as

described below, by interfering unlawfully with Smithfield's relations with its shareholders, customers, business partners, lenders and the general public and inflicting economic damage upon Smithfield.  These actions and events were not isolated, but were related in that each has the same or similar purpose, participants, victims, and methods of commission and are designed to obtain the same result.

86.     Accordingly, such actions are part of a pattern of repeated conduct, directed by Defendants against Smithfield, in a closed, but substantial, period of time, commencing in or about September 2005 and continuing through and including the present.  Each of the acts posed a distinct threat of long-term continued criminal activity because Defendants' past conduct, by its nature, projects into the future with a threat of repetition.  The actions taken by Defendants in furtherance of this pattern reflect their regular way of doing business.

87.     Defendants are not currently the collective bargaining agent for the employees at Smithfield's Tar Heel plant and have no legal right to engage in collective bargaining with, or make demands of, Smithfield on behalf of those employees.  None of the events described below constitute legitimate union organizing activity, nor are they conducted in the context of a traditional labor dispute.  As such, Defendants' conduct as alleged herein has nothing whatsoever to do with the terms and conditions of employment of the employees at Smithfield's Tar Heel plant.

### A.     Publication and Use of Research Associates of America Report

88.     In or around August 2006, Defendant UFCW released to the public a report prepared by Defendant Research Associates of America, entitled "Packaged With Abuse: Safety and Health Conditions at Smithfield Packing's Tar Heel Plant." (the "Report") (*See* Ex. 17).  The UFCW updated and "re-released" the Report in or around January 2007.  (*See* Ex. 18).

Defendants CtW, UFCW and the Individual Defendants commissioned Defendant RAA to prepare the Report in furtherance of the conspiracy alleged herein.  As noted above, Defendant UFCW paid to Defendant RAA $1,987,808.00 (One Million, Nine Hundred Eighty-Seven Thousand, Eight-Hundred Eight Dollars) in 2005 and 2006.  Some or all of those payments were made in return for the preparation by Defendant RAA of the Report.  As part of the Defendants' ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants intentionally and maliciously caused to be published in the Report false, misleading and baseless information about the working conditions at Smithfield's Tar Heel plant.

89.     Defendants CtW, UFCW and the Individual Defendants used Defendants RAA as their surrogate in preparing the Report in order to lend the appearance of credibility and accuracy to certain false or misleading "findings" and "conclusions" about the working conditions at the Tar Heel plant and the Company's treatment of the workforce.  In fact, Defendant RAA did not conduct the majority of the research and interviews it cited in the report as anecdotal evidence of Smithfield's allegedly unsafe and unlawful practices at Tar Heel.  Endnote two of the Report indicates that "much of what follows was derived from hundreds of interviews with current and past Smithfield workers conducted by the staff of the United Food and Commercial Workers Union," and several other groups.  (Ex. 18 at endnote 2).

90.     The entire basis for the Report was to facilitate the Defendants' collective desire to portray Smithfield's Tar Heel plant as an unsafe workplace in which safety laws and standards were habitually and intentionally violated, as part of their effort to damage Smithfield's business reputation.

91.     The Report contained numerous blatant misrepresentations of fact.  For example, Smithfield's workers compensation program is administered by Gallagher-Bassett, a third party

claims administrator, which makes all determinations regarding whether workplace accidents involving Tar Heel employees are compensable under North Carolina law.  Despite the fact that Defendants were fully aware that Smithfield plays no role in the adjudication and administration of the workers' compensation claims of its employees, the Report falsely accused Smithfield of routinely and illegally denying, or causing to be denied, the workers compensation claims of its injured employees.

92.     When Defendants could not explain away the truth about Smithfield's safety and workers' compensation record, they simply fabricated false, misleading and baseless information and included it in the report.  For example, the Tar Heel plant has the lowest incident of workers' compensation claims of any Smithfield facility, including its unionized facilities.   Unable to skew such a statistic to appear favorable to the premise motivating the report, Defendants drew their own baseless conclusion about it: "This data reaffirms the assertion that workers at Tar Heel are actively discouraged from filing workers' compensation claims, and claims that are filed are often denied.  The workers at unionized Smithfield plants are more likely to know their rights under workers' compensation laws and are not afraid to file claims when injured."  (Ex. 18 at p. 12).

93.     The Report concluded by reporting a number of baseless "findings": that Smithfield engaged in systematic violations of workplace safety laws, misinformed its employees regarding their rights under workers' compensation laws, routinely discouraged them from filing such claims, unlawfully denied such claims and sought to terminate employees who were injured while at work.  These "findings" were not based on objective evidence, but instead were based on Defendant UFCW's "interviews" with past and present Smithfield employees. Such conduct was motivated by Defendants' collective desire to misrepresent working

conditions at Tar Heel in furtherance of the conspiracy alleged herein to extort money and property from Smithfield and to inflict damage upon Smithfield.

94.     The Report included a recommendation that called for Smithfield to work with a "third party, agreed upon with the UFCW, to conduct a wall-to-wall inspection of the plant." Such a "recommendation," which in fact was a predetermined extortionate demand of Defendants disguised as an "independent" suggestion, reinforced the ongoing desire of the Defendants to acquire an interest in Smithfield's business operations through a pattern of unlawful and extortionate conduct.

95.     Following Defendant UFCW's publication of the Report, Defendants misrepresented its nature, causing to be published numerous statements referring to the Report as an independent study and to Defendant RAA as an independent research organization.  In fact, the Report became the lynchpin of Defendants' ceaseless public accusations that Smithfield's Tar Heel plant is an unsafe workplace where safety and other laws are routinely violated. Defendants engaged in such conduct in an effort to mislead the public into believing that the report contained accurate findings and statistics regarding Smithfield's Tar Heel plant when, in fact, the Report contained false, misleading and baseless information about Smithfield's Tar Heel Plant and was prepared in furtherance of the conspiracy alleged herein.

### B.     Interfering With Smithfield's Business Relationships

#### 1.     Interference with Harris Teeter

96.     Harris Teeter is one of Smithfield's largest customers.  Smithfield bacon and other pork products are stocked in Harris Teeter stores throughout the Southeast.  Fully knowledgeable of Smithfield's successful business relationship with Harris Teeter, Defendants specifically focused on destroying this relationship as part of their extortionate scheme and have

continually and repeatedly attempted to cause Harris Teeter to cease doing business with Smithfield.

### a.        Statewide Day of Action: December 2, 2006

97.    Defendants orchestrated, sponsored, and caused to take place simultaneous protests at eleven Harris Teeter grocery stores across the state of North Carolina on Saturday, December 2, 2006, between 11 a.m. and 12 p.m.   Besides Defendants, participants in the planning and/or effectuation of these events included Mark Federici, Mikki Harris, Libby Manly, Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW and Local 400.   The goal of this activity was to injure Smithfield by convincing Harris Teeter and its customers to discontinue purchasing Smithfield products.

98.    Defendants caused to be published information over the internet advertising the protest activities as a "Statewide Day of Action at Harris Teeter," and calling for demonstrations to take place at Harris Teeter stores in Asheville, Charlotte, Durham, Fayetteville, Greensboro, Hickory, High Point, Raleigh, Rocky Mount, Wilmington and Winston-Salem, North Carolina. Defendants also announced such events during a press conference that took place on or about November 30, 2006, in Charlotte, North Carolina.

99.    In advertising and soliciting support for, and participation in, said protest activities, Defendants intentionally and maliciously caused to be published false, misleading, and baseless information about Smithfield.   Defendants published a document advertising the "Day of Action," titled "There's Blood on Smithfield Products."   (*See* Ex. 19).   The title of the document was specifically calculated by Defendants to disgust and alarm consumers and to cause irreparable damage to Smithfield's reputation.   The document included several malicious and damaging claims: that Smithfield uses "violence, threats and intimidation against workers,"

has a "dangerous workplace," "routinely fires injured workers and denies their workers compensation claims," and "stirs racial tensions among African-American and Latino workers." The advertisement misrepresented the "Day of Action" events as having been planned and sponsored by "a statewide coalition of faith-based and community organizations" and described Defendant UFCW as merely "supporting" the effort.  In fact, Defendant UFCW and its co-conspirators coordinated and carried out the events.  UFCW employee Libby Manley is listed in the advertisement as the individual to contact for additional information about the advertised events.

100.    A press release issued by Defendants similarly attempted to conceal Defendants' involvement by mischaracterizing the "Day of Action" as having been sponsored by "[r]eligious leaders, civil and immigrant rights groups, and consumer advocates."  The press release also falsely stated that Smithfield workers are subjected to "ongoing mistreatment and abuse."  (*See* Ex. 20).

101.    Participants at each of the events distributed to third party grocery shoppers, Harris Teeter employees, and media representatives a handbill containing false and factually baseless statements.  The handbill describes Smithfield as "a company that mistreats workers," and states that Smithfield uses "threats and intimidation to suppress workers' rights," treats workers "like they are disposable," "denies [workers'] legitimate workers' compensation claims," and "has stirred racial tensions among African-American and Latino workers in an effort to keep workers divided."  The handbill omits any reference to Defendant UFCW or the union-related goal of the demonstrations.   (*See* Ex. 21).

102.    Defendants procured the participation of approximately 100 participants at the demonstration at 500 Oberlin Road in Raleigh.  One attendee delivered a letter asking Harris

Teeter to discontinue stocking and selling Smithfield products.  Participants in the demonstration also included Barbara Zelter of the North Carolina Council of Churches.  The participants made damaging statements and misleading characterizations about Smithfield, including the statement that Smithfield products are "packaged with abuse."  Participants further stated that the workplace at Smithfield had "slippery floors, dangerous blades, infectious diseases, fast-moving butchering lines" and that employees were "abandon[ed]" by Smithfield when injured.  (*See* Ex. 22).

### b.      Southeast Day of Action: March 31, 2007

103.    Defendants sponsored and caused to take place a series of protests at Harris Teeter grocery stores across the Southeast region of the United States simultaneously occurring on March 31, 2007.  Besides Defendants, participants in the planning and/or effectuation of these events included Don Cash, Mark Federici, Mark Goumbri, Mikki Harris, Libby Manly, Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW, Local 400, and JWJ.  The goal of this activity was to injure Smithfield by convincing Harris Teeter and its customers to discontinue purchasing Smithfield products.

104.    Defendants caused to be published information over the internet advertising the protest activities as a "Southeast Day of Action at Harris Teeter," and calling for protest activities to take place at Harris Teeter stores in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Hickory, High Point, Raleigh, Rocky Mount, Wilmington and Winston-Salem, North Carolina, Arlington, Virginia, Nashville, Tennessee, and Charleston and Florence, South Carolina.  (*See* Ex. 23).

105.    In advertising and soliciting support for, and participation in, said protest activities, Defendants intentionally caused to be published misleading information.  In a press

release issued on March 28, 2007, and listing Defendant Leila McDowell as "contact" for additional information, Defendants mischaracterized the Southeast Day of Action events as having been planned and sponsored by "[r]eligious leaders, civil and immigrant rights groups, workers and consumers," when in fact Defendants themselves orchestrated the events. (*See* Ex. 24).

106.   An Associated Press Article dated March 30, 2007 reported on the planned demonstrations. The article contains Defendant UFCW's acknowledgement that the targeting of Harris Teeter was part of a unionization effort and quotes Defendant Leila McDowell as stating, "Smithfield is not listening, so we're going to have to go after their pocketbook"--an explicit admission of Defendants' unlawful scheme to inflict economic injury on Smithfield. (*See* Ex. 25).

107.   To generate support and publicity for their efforts, Defendants falsely reported that their Harris Teeter-directed efforts had rendered successful results. A March 30, 2007 Associated Press article reported, "The union claims Harris Teeter meat managers have started to replace Smithfield products, but spokeswoman Jennifer Panetta denied that the grocer has a policy to limit Smithfield pork." (*See* Ex. 25). Defendants' March 28, 2007 press release similarly stated, "We are encouraged by the progress we have seen Harris Teeter make in removing Smithfield Tar Heel pork," which in addition to falsely representing that Harris Teeter had in fact removed Smithfield products, also falsely implied that Harris Teeter supported Defendants' conduct. (*See* Ex. 24).

108.   The protest events were led by agents of Defendants UFCW and JWJ, and included as participants Dan Duncan, President of the Northern Virginia Labor Council, Marcel

Reid, President of the D.C. Chapter of the Association of Community Organizations for Reform Now ("ACORN") and members of the Interfaith Worker Justice.

109.    Participants at each of the events distributed to third party grocery shoppers, Harris Teeter employees, and media representatives a handbill containing false and factually baseless statements.  The handbill describes Smithfield as "a company that mistreats workers," and states that Smithfield uses "threats and intimidation to suppress workers' rights," treats workers "like they are disposable," "denies [workers'] legitimate workers' compensation claims," and "has stirred racial tensions among African-American and Latino workers in an effort to keep workers divided."  The handbill omits any reference to UFCW or the union-related goal of the demonstrations.   (*See* Ex. 21).

### c.        "Calling for Justice" Rally: June 9, 2007

110.    On June 9, 2007, from 2:00 p.m. to 3:00 p.m., Defendants sponsored and caused to take place a protest at a Harris Teeter grocery store located at 1378 Hendersonville Road, Asheville, North Carolina. Besides Defendants, participants in the planning and/or effectuation of these events included Mark Federici, Mikki Harris, Libby Manly, Isabell Moore, Eduardo Pena, Rigo Valdez and other agents of UFCW and Local 400.  The goal of this activity was to injure Smithfield by convincing Harris Teeter and its customers to discontinue purchasing Smithfield products.

111.    Defendants advertised the protest activities as a "Calling For Justice Rally," which would involve participants standing outside Harris Teeter and calling from their cellular telephones the Hendersonville Road store, as well as Harris Teeter headquarters, and demanding that Harris Teeter remove Smithfield products from its shelves.

112.    Defendants issued a press release, dated June 4, 2007, which misrepresented the rally as having been organized by "Asheville area students, clergy, immigrants' rights advocates, [and] civil rights leaders," when in fact Defendants themselves orchestrated the event.  The press release lists "contact" information for two individuals, Isabell Moore and Marc Goumbri, both of whom are employed by Defendant UFCW.  (*See* Ex. 26).

### d.    Father's Day Protest: June 16, 2007

113.    On or about June 16, 2007, Defendants orchestrated, sponsored and caused to take place a demonstration at the home residence of Fred J. Morganthall II, who is the President of Harris Teeter. Mr. Morganthall lives in the Charlotte, North Carolina area.  Besides Defendants, participants in the planning and/or effectuation of this event included Mark Federici, Mikki Harris, Libby Manly, Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW and Local 400.  The goal of this activity was to injure Smithfield by convincing Harris Teeter and its customers to discontinue purchasing Smithfield products.

114.    A    document    was    published    on    Defendant    UFCW's    website, www.smithfieldjustice.com, entitled "Prayers for Our Papas," which included the following statements: "Workers at Smithfield Packing in Tar Heel are abused!"  "Smithfield uses threats and intimidation to suppress workers' rights," "Workers are treated as disposable."   The document included instructions to all participants on where to meet for the demonstration.  It also offered transportation to the event.  (*See* Ex. 27).

115.    In addition, an article posted on Defendant UFCW's website misrepresented the nature of the event as originating with the "children of Smithfield workers," when in fact the event was created and orchestrated by Defendants.  The article described the children's alleged intent to deliver a Father's Day card to Mr. Morganthall and stated that the card included

-34-

"messages from the children of Smithfield workers urging the supermarket chain to join them in demanding an end to the abuse of their fathers and all Tar Heel plant workers by dropping Smithfield Tar Heel products from their store, because they are packaged with abuse." Neither the article nor the document described in paragraph 113 above disclosed the nature of Defendants' involvement in the events. (*See* Ex. 28).

116. The protest events were led by UFCW agents as well as several unwitting participants, including but not limited to John Autry, a candidate for the United States House of Representatives, North Carolina District 8, and members of the Southern Faith Labor and Community Alliance. During the demonstration, Defendants and other individuals present demanded that Harris Teeter no longer purchase products from Smithfield.

### 2. Interference With Other Business Partners

#### a. New England Events

117. The Defendants have set their sights well beyond Smithfield's relationship with Harris Teeter. Defendants have focused a concerted amount of effort in eliminating Smithfield's business interests in the New England area. Aware of the traditional pro-union climate in this area, Defendants have gone to great lengths to carry out their extortionate scheme against Smithfield in this region.

118. On or about December 10, 2006, Defendants sponsored and caused to take place a protest at a Johnny's Foodmaster store located in Somerville, Massachusetts. Johnny's Foodmaster is a customer of, and purchases food products for resale from, Smithfield. The protest events were orchestrated and/or led by agents of UFCW and JWJ, including Donald Minor. Defendant UFCW issued a press release advertising the event and including the statement that Smithfield was "implicated in worker cruelty" and that workers at Smithfield's

Tar Heel plant "face degrading and dangerous working conditions."   During the protest, participants demanded that Johnny's Foodmaster no longer purchase products from Smithfield. (*See* Ex. 29).

119.   Defendants, through UFCW agent Donald Minor, agents of UFCW Local Union No. 1445 and agents of JWJ, have orchestrated, sponsored or caused to take place many other protest events outside the stores of Smithfield customers.   On or about August 1, 2007, Defendants UFCW and JWJ orchestrated, sponsored and caused to take place a series of protests outside numerous grocery stores in the Boston, Massachusetts area, including but not limited to, Market Basket, Shaws, Stop & Shop and Star Markets.   All of these stores are customers of, and purchase food products for resale from, Smithfield.   During these protests, agents of Defendant JWJ asked store managers and other employees in each of the stores to remove Smithfield products from their shelves.

120.   Following these events, Defendant JWJ published an article on the internet on or about August 22, 2007, claiming that "products made in the Tar Heel Smithfield plant had been pulled from the shelves of Shaws, Stop & Shop and Johnny's Foodmaster" as a result of their efforts described above.   The article included the claim that "these stores got the message that pork products produced in Smithfield's Tar Heel plant are not welcome in Massachusetts." Finally, the article identified several additional Smithfield customers, including Market Basket, Hannafords and Roche Brothers, as targets for future demonstrations from agents of Defendant JWJ.   (*See* Ex. 30).

121.   True to their word, on or about August 28, 2007, agents of JWJ engaged in a protest outside a Market Basket store in Somerville, Massachusetts.   Agents of Defendant UFCW also enlisted the participation of Somerville Aldermen Bob Trane and Rebecca Gerwitz.

During the protest, participants demanded that Market Basket no longer purchase products from Smithfield.  (*See* Ex. 31).

### b.      Other Events

122.     In or around February 2007, Defendant UFCW encouraged Jean Henry, the owner and operator of the Jefferson Market and Restaurant, located in Ann Arbor, Michigan, to suspend her purchase of Smithfield products for her store.  Ms. Henry agreed to ban Smithfield products from her store and to cease doing business with Smithfield after agents of Defendant UFCW told her that Smithfield violated the human rights of the employees at its Tar Heel plant.  Defendants UFCW and Leila McDowell publicized Ms. Henry's decision to cease doing business with Smithfield on a UFCW internet site and by issuing a press release on or about February 27, 2007. The press release contained the false statement that Smithfield's products are "packaged with abuse."  (*See* Ex. 32).

123.     On or about June 30, 2007, Defendants orchestrated, sponsored and caused to take place a protest at a Publix supermarket in Atlanta, Georgia.  Publix is a customer of, and purchases food products for resale from, Smithfield.  The protest events were led by UFCW and JWJ agents, including but not limited to Chioke Perry and Treston Davis-Faulkner.  During the protest activity, these and other individuals present met with supermarket management and demanded that Publix no longer purchase products from Smithfield.  (*See* Ex. 33).

124.     On or about July 14, 2007, Defendants orchestrated, sponsored and caused to take place two protests in the Nashville, TN area.  One occurred outside a H.G. Hills supermarket at approximately 11:00 a.m., and the other occurred outside a Publix supermarket at approximately 1:00 p.m.  H.G. Hills and Publix are customers of, and purchase food products for resale from,

Smithfield.  The protest events were led by UFCW and JWJ agents, who demanded that H.G. Hills and Publix no longer purchase products from Smithfield.  (*See* Exs. 33, 34).

### 3.    The National Boycott

125.    In or around August 2007 Defendant UFCW issued a nationwide directive to all of its affiliated local unions regarding the commencement of a "National Boycott" of Smithfield products.   Each affiliated local was directed to contact the retail establishments carrying Smithfield products within the local's jurisdiction.  The message to these establishments was to be simple: discontinue selling Smithfield products or face demonstration and protest activity that would alienate customers and drive away business.

126.    Defendant UFCW's malicious directive to its affiliated locals is already in motion across the country.  As an example, on or about August 29, 2007, Fred Steiniger, who is the Assistant to the President of UFCW Local Union 342, which operates out of Mineola, New York, delivered a letter to an executive of King Kullen, a food retail establishment that is a customer of, and purchases food products for resale from, Smithfield.  (*See* Ex. 35).  In that letter, Steiniger states that "A National Boycott of [Smithfield] products is being put into effect all across the country by the [UFCW] International.  Therefore, the Union is requesting all companies cease using all Smithfield Products and push its customers to alternative name brands. Any Company that does not participate in sending Smithfield a message, will leave no alternative but to have the Union leaflet your customers."  The letter included the false statement that Smithfield "has consistently violated the law."  Defendant UFCW has directed the issuance of countless similar communications by its affiliated local unions to Smithfield's customers across the United States.

127.    Defendants buttressed this behind-the-scenes effort to effect nationwide damage on Smithfield's business relations with a very public call to consumers across the United States to report to Defendant UFCW whether their local grocer or supermarket continues to stock Smithfield products, and then to boycott those products.  A page on Defendant UFCW's "Justice at Smithfield" website, www.smithfieldjustice.com/howtohelp.php, instructs readers how to identify Smithfield pork products packaged at the Company's Tar Heel plant.  The web page contains a listing of the most commonly produced Tar Heel products as well as a listing of the unique product code stamped on all products distributed from Tar Heel.  The web page then instructs the reader to send the following message to the manager of the store in which a Smithfield product has been found:

> Dear:
>
> I am writing you this letter because as a member of this community and as loyal customer of your supermarket, I am concerned with the Smithfield pork products that you carry.  The products with establishment codes 79-C and 18079 come from Smithfield Packing Co. in Tar Heel, North Carolina.  I found out about the conditions in which these products were made, and I want you to be aware of these conditions as well.
>
> I have recently learned about the injustices and the human rights abuses that take place at Smithfield's hog processing plant in Tar Heel, NC.  The men and women who work at this plant process 32,000 hogs a day.  This means that they have to work under excruciating conditions in order to put food on our plates.  In fact, according to Smithfield's own OSHA logs, worksite injuries have skyrocketed by 200% since 2003.  Smithfield Packing Co. uses its employees as if they were disposable for when they get injured on the job, they are terminated a lot of times rather than being offered workers compensation.
>
> Smithfield Packing Co, also has intimidated its workforce though racial epithets and threats of termination for demanding basic rights on the job such as health and safety, and dignity and respect on the job.  In fact, the roughly

5,500 workers of this plant have found themselves in a long labor dispute with this company.  They have lost two elections due to illegal activities by the company including illegal terminations, threatening the workers with plant closure and with job loss.  Following the vote, workers were also threatened with violence in retaliation for their union activities.  The human rights abuses were so extreme at this facility that Human Rights Watch conducted a report on worksite abuse with a special emphasis on Smithfield Packing Co.

When I found out about these conditions, I was appalled and I believe that it is our civic responsibility to stand up against such injustices and human rights abuses.  As a  customer of your supermarket and as a resident of this community, I am kindly asking you to make the right decision by refusing to carry Smithfield pork products with establishment codes 18079 and 79-C for Bacon until the abuses at this facility come to an end.  You can find more information on this issue at www.smithfieldjustice.com

Sincerely,

Name

Address

Phone Number

128.    Defendant UFCW's web page further instructs readers to notify Defendant UFCW of any such communication shared with the manager by emailing to smithfield@ufcw.org the following communication:

I contacted my local supermarket about Smithfield products from the Tar Heel Plant. Here are the details:

STORE NAME:

STORE ADDRESS:

STORE MANAGER/CONTACT NAME:

MY NAME:

MY CITY AND STATE:

MY EMAIL ADDRESS:

SMITHFIELD PRODUCTS I WITNESSED AT STORE:
ANY ADDITIONAL FEEDBACK:

129.    Finally, Defendant UFCW's web page instructs readers to download and disseminate a flier that includes the statements that "Smithfield's products in your grocer's meatcase are PACKAGED WITH HUMAN RIGHTS ABUSES" and that "There's BLOOD on these Smithfield products."  (*See* Ex. 36).

130.    Defendant UFCW's "National Boycott" and internet instruction site were commenced as part of the Defendants' ongoing effort to interfere unlawfully with Smithfield's relations with its shareholders, customers, business partners, lenders and the general public and to inflict economic injury upon Smithfield.

**C.      Interfering With Smithfield's Business Relationship With Paula Deen**

131.    Paula Deen is a celebrity chef and is the star of a television program called "Paula's Home Cooking" that currently airs on the Food Network television station.   Her cookbooks and recipes are featured in numerous media outlets and publications.  In or around September 2006, Deen entered a contractual agreement with Smithfield.   As part of that agreement, Deen promotes Smithfield-branded products on her cooking show.  In addition, her likeness is reproduced on the packaging of select Smithfield products that are distributed for resale to Smithfield's customers and business partners.   Fully aware of this relationship, Defendants engaged in a series of actions designed to intentionally and maliciously interfere with and damage Smithfield's relationship with Deen to cause her to end her partnership with Smithfield.

132.    In support of her recently released book entitled "It Ain't All About the Cookin'," Deen participated in a national tour called the "Paula Deen Live Tour."  Deen appeared at book

signing and other related events in a number of cities across the United States.  As more fully alleged below, the Defendants orchestrated, sponsored and caused to take place a series of demonstrations at "Paula Deen Live Tour" events in several cities.  Such conduct was designed to intentionally and maliciously interfere with and damage Smithfield's relationship with Deen to cause her to end her partnership with Smithfield.

### 1.      Washington, D.C.: April 18, 2007

133.    On or about April 18, 2007, Defendants orchestrated, sponsored and caused to take place a demonstration in and around a Paula Deen promotional event in Washington, DC. Besides Defendants, participants in the planning and/or effectuation of this event included Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW and Local 400.  Defendants caused to be published information over the internet advertising the demonstration. In advertising and soliciting support for, and participation in, said demonstration, Defendants referred to Smithfield as an "abusive pork processing company" and advertised the event as a "prayer vigil" during which "women workers" from Smithfield would deliver a letter to Deen asking her to end her relationship Smithfield.  (*See* Ex. 37).

134.    The demonstration activities were led by UFCW agents, who demanded that Paula Deen end her contractual relationship with Smithfield.  Defendants' agents also entered the book signing event in an apparent effort to present Paula Deen with a letter, allegedly signed by Smithfield workers, which asked her to end her partnership with Smithfield.

135.    Participants in the demonstration distributed to attendees of  Deen's book signing event and to media representatives a handbill containing malicious and factually baseless statements. (*See* Ex. 38).  The handbill includes the statement that employees at Smithfield's Tar Heel plant "are enduring unbearable working conditions.  Workers suffer crippling injuries due

to excessive line speeds and inadequate training." The handbill specifically referenced statistics included in Defendant RAA's sham Report, described above, and misleadingly referred to the Report as "based on federal government data" while failing to reveal the true nature of the Report.  The handbill also asks: "Is this the type of family values we want to be promoting? Violence, racism, unbearable working conditions.  As fans of Paula Deen and advocates for human decency, we ask Paula to stop promoting products that are packaged with abuse."  The handbill omits any reference to UFCW or the union-related goal of the demonstrations.

136.    Following the demonstration, Defendant UFCW published a "Report of the April 18 Vigil" in its website.  The report contained an admission that "activists" had distributed the malicious and misleading handbill described above.  It also accused Deen of refusing to accept the "workers'" letter described above and included the statement that "she chose to side with Smithfield against its abused workforce."  (*See* Ex. 39).

### 2.    Shreveport, Louisiana: June 2, 2007

137.    On or about June 2, 2007, Defendants orchestrated, sponsored and caused to take place a demonstration in and around a Paula Deen promotional event in Shreveport, Louisiana. Besides Defendants, participants in the planning and/or effectuation of this event included Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW and Local 400.  Defendants caused to be published information over the internet advertising the demonstration.  A press release issued by Defendants misleadingly portrayed the demonstration as being led by "Shreveport community, faith, civil rights leaders and workers" when in fact it was orchestrated by Defendants.

138.    The demonstration activities were led by agents of Defendant UFCW, who demanded that Paula Deen end her contractual relationship with Smithfield.  (*See* Ex. 40).

-43-

### 3.   Charlotte, North Carolina: June 30, 2007

139.   On or about June 30, 2007, Defendants orchestrated, sponsored and caused to take place a demonstration in and around a Paula Deen promotional event in Charlotte, North Carolina.  Besides Defendants, participants in the planning and/or effectuation of this event included Mark Federici, Mikki Harris, Libby Manly, Eduardo Pena, Rigo Valdez and other agents of Defendants UFCW and Local 400.  Defendants caused to be published two press releases advertising the planned demonstrations, on or about June 26, 2007 and on or about June 28, 2007.  The press release dated June 26th claimed that Paula Deen had "stirred controversy" in Charlotte and misrepresented the protest activities planned for June 30th as originating with "families of Smithfield workers" when in fact the events were originated by Defendants.  The press release dated June 28th claimed that the events of June 30th were a planned "Paula Deen Demonstration Over Abusive Pork Plant" and again misrepresented the demonstration as originating with Smithfield workers when in fact the events were originated by Defendants.  Both press releases also referred to a letter allegedly written to Paula Deen by Presidential Master Chef Talli Council in which he allegedly asked her to end her partnership with Smithfield.  The releases omit any reference to Defendants UFCW and Local 400 or to the union-related goal of the demonstrations.  (*See* Ex. 41).

140.   The demonstration activities were led by UFCW agents as well as several unwitting participants, including but not limited to members of the North Carolina General State Baptist Convention.  During the demonstration activities, these and other individuals present demanded that Paula Deen end her contractual relationship with Smithfield.

### D.   Sponsorship and Participation in the Passage of Public Condemnations of Plaintiffs By Cities, Townships and Organizations

### 1.   New York City, New York

141.    In or around September 2006, agents of Defendants UFCW and JWJ encouraged members of the New York City Council to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.   Upon information and belief, agents of Defendants UFCW and JWJ met with members of the Council, including but not limited to Council Member Miguel Martinez, Council Member Eric N. Gioia, Council Member Robert Jackson, Council Member Melissa Mark-Viverito, Council Member Leroy G. Comrie Jr., Council Member Helen D. Foster, Council Member Vincent J. Gentile, Council Member Alan J. Gerson, Council Member Letitia James, Council Member Oliver G. Koppell, Council Member Rosie Mendez and Council Member Annabel Palma, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.

142.    On or about October 25, 2006, at a regularly scheduled meeting of the Council, the Council Members introduced Resolution 582-06, a resolution "calling on the City of New York to cease purchasing products from Tar Heel, North Carolina's Smithfield Packing Company, and urging supermarkets operating in our city to cease purchasing Smithfield products from Tar Heel, North Carolina."   The resolution was referred to the Council's Committee on Civil Rights for further consideration.   Upon information and belief, some or all of the language of said resolution was prepared in advance by agents of Defendants UFCW and JWJ and was not prepared by members of the Council or their agents.   (*See* Ex. 42).

### 2.    United Church of Christ

143.    In or around May 2007, Defendants encouraged members of the Potomac Association of the Central Atlantic Conference of the United Church of Christ ("UCC") to effect and publish a resolution condemning Smithfield.   Upon information and belief, Defendants met

with members of the UCC, including but not limited to the Reverend Grayson Hagler, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield.

144.    The UCC published a "Resolution on Worker Justice at Smithfield" on or about May 24, 2007.  Upon information and belief, some or all of the language of said resolution was prepared in advance by Defendants and was not prepared by members of the UCC.  Defendants published the text of the resolution on Defendant UFCW's website.  (*See* Ex. 43).

### 3.    Cambridge, Massachusetts

145.    In or around June 2007, agents of Defendant UFCW, including but not limited to Donald Minor, and agents of Defendant JWJ, encouraged members of the City Council of Cambridge, Massachusetts to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.  Upon information and belief, Donald Minor and/or other agents of Defendants UFCW and JWJ, met with members of the Cambridge City Council, including but not limited to Mayor Kenneth E. Reeves, Vice-Mayor Timothy J. Toomey, Jr., Councilor Marjorie C. Decker, Councilor Anthony D. Galluccio, and Councilor Michael A. Sullivan, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.

146.    The Cambridge City Council published Policy Order Resolution O-17 on or about June 4, 2007, condemning Smithfield's alleged workplace practices at the Tar Heel facility. Upon information and belief, some or all of the language of said resolution was prepared in advance by Donald Minor and/or other agents of Defendants UFCW and JWJ and was not

prepared by members of the Cambridge City Council or their agents.  Defendants published the text of the resolution on Defendant UFCW's website.  (*See* Ex. 44).

### 4. Somerville, Massachusetts

147.  In or around June 2007, agents of Defendant UFCW, including but not limited to Donald Minor and other agents of Defendants UFCW and JWJ, encouraged members of the Board of Aldermen of Somerville, Massachusetts ("Board") to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction. Upon information and belief, Donald Minor and/or other agents of Defendants UFCW and JWJ, met with members of the Board, including but not limited to Mayor Joe Curtatone and Alderman Rebekah Gewirtz, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.

148.  On or about June 14, 2007, at a regularly scheduled meeting of the Board, Mayor Curtatone requested approval of a resolution "to ban purchases from the Smithfield Packing Co.'s Tar Heel Division."  The resolution was placed on file.  Upon information and belief, some or all of the language of said resolution was prepared in advance by Donald Minor and/or other agents of Defendant UFCW and was not prepared by members of the Board or their agents.  (*See* Ex. 45).

### 5. Chelsea, Massachusetts

149.  In or around June 2007, agents of Defendant UFCW, including but not limited to Donald Minor and other agents of Defendants UFCW and JWJ, encouraged members of the City Council of Chelsea, Massachusetts to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.  Upon information and belief,

Donald Minor and/or other agents of the UFCW, as well as agents of JWJ, met with members of the Cambridge City Council, including but not limited to Councilor At-Large Roy A. Avellaneda and Council President Roseann T. Bongiovanni, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.

150.    The Chelsea City Council published a resolution regarding Smithfield on or about June 25, 2007.  The resolution condemned Smithfield for its alleged workplace practices and encouraged "all supermarkets and vendors in Chelsea to boycott the sales of Smithfield meat products in their stores."  Upon information and belief, some or all of the language of said resolution was prepared in advance by Donald Minor and/or other agents of Defendant UFCW and was not prepared by members of the Chelsea City Council or their agents. Defendants published the text of the resolution on Defendant UFCW's website.   (*See* Ex. 46).

### 6.    Boston, Massachusetts

151.    In or around July 2007, agents of Defendant UFCW, including but not limited to Donald Minor and other agents of Defendants UFCW and JWJ, encouraged members of the City Council of Boston, Massachusetts to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.  Upon information and belief, Donald Minor and/or other UFCW and JWJ agents met with members of the Boston City Council, including but not limited to Council President Maureen E. Feeney, Councilor Rob Consalvo, Councilor Chuck Turner, Councilor Sal LaMattina, Councilor At-Large Felix D. Arroyo, Councilor At-Large Sam Yoon and Councilor At-Large Stephen J. Murphy, and exerted pressure on them to persuade them to effect and publish a resolution condemning Smithfield and banning the sale of its products within its municipal jurisdiction.

152.    The Boston City Council published a resolution on or about August 1, 2007 resolving that the City of Boston should "review its purchasing of any products from the Smithfield Packing Company in Tar Heel, North Carolina (Smithfield USDA number - 18079 and, for bacon, 79-c) and suspend these purchases."  Some or all of the language of said resolution was prepared in advance by Donald Minor and/or other agents of Defendant UFCW and was not prepared by members of the Boston City Council or their agents.  Defendants published the text of the resolution on Defendant UFCW's website.  (*See* Ex. 47).

153.    In a meeting with a Smithfield representative that took place after the passage of the resolution, Maureen Feeney told Smithfield's representative that she had been approached by a "UFCW official" who handed to her a copy of the resolution language, already drafted, and asked her to support a boycott of Smithfield products.  Feeney told Smithfield's representative that the Council felt like it had to pass the resolution once it had been approached by the "UFCW official," insinuating that Boston was a pro-union city and that there could be repercussions for the Council if it rejected Defendants' request.

154.    The Defendants' efforts in Boston have had a damaging effect.  On or about September 26, 2007, Thomas Menino, the Mayor of Boston, wrote a letter to C. Larry Pope, Chief Executive Officer of Smithfield Foods, and Joseph Luter III, Chairman of the Board of Smithfield Foods, in which he expressed "serious concerns regarding the recent violation of federal labor laws by Smithfield Foods, Inc."  Mayor Menino referenced the typical litany of allegations used by Defendants in their public statements about Smithfield's alleged workplace practices, as alleged repeatedly herein.  He further noted that "as a result" of Smithfield's alleged conduct, "the City of Boston has passed a resolution suspending the purchase of Smithfield products.  It also encourages supermarkets within the city to consider doing the same until the

workers of Smithfield Foods, Inc. can work in a safe environment with dignity and respect."

(*See* Ex. 48).

### E.    Attempts to Reduce the Value of Smithfield Stock

155.    On or about September 18, 2006, Defendants caused to be mailed a form letter containing disparaging information about Smithfield to specifically-targeted financial analysts. The targeted analysts were persons who specialized in providing financial analysis and coverage on publicly-traded companies in the food industry, including Smithfield Foods.  Certain of the analysts maintained and published a purchase rating on Smithfield Foods stock.  The form letter was signed by Defendant Gene Bruskin and written on "Justice @ Smithfield" letterhead, with a return address listed at 303 E. 4th Avenue in Red Springs, North Carolina.  The bottom of the pre-printed letterhead identifies Defendant UFCW as responsible for the content in the letter, and lists Defendant UFCW's address at 1775 K Street in Washington, DC.  (*See, e.g.*, Ex. 49).

156.    The letter invites each recipient to view the content of Defendant UFCW's website, www.smithfieldjustice.com, and references unidentified "newspaper clipping" enclosures purportedly regarding the Tar Heel plant.  The letter mischaracterizes the "Justice at Smithfield Campaign" as a "heightened effort by the workers at Smithfield's Tar Heel, North Carolina pork processing plant to organize a union."  In reality, and as alleged fully above, the "Justice at Smithfield Campaign" is an effort spearheaded not by Smithfield employees, but by the Defendants and their agents.  The letter disparages Smithfield by describing Smithfield-employee relations as "characterized by unlawful assaults, firings, racial manipulation, intimidation, and threatening arrest by Federal immigration authorities by Smithfield."

157.    Recipients of the letter included Farha Aslam, the Vice President of Equity Research of Stephens, Inc; William Chappell of Suntrust Robinson Humphrey; John Feeney of

Wachovia Securities; Diane Geissler of Merrill Lynch; Christine McCracken of Cleveland Research Company; John McMillan of the former Prudential Equity Group; Tim Ramey of DA Davidson & Company; Andrew Wolf of BB&T Capital Markets, and Pablo Zuanic of JP Morgan.

158.    Although self-characterized as an effort to "educate consumers," the letter's obvious purpose was to negatively influence its recipients' analysis and coverage of Smithfield Foods stock and thereby to injure Smithfield by causing a reduction the value of Smithfield stock.

**F.      Interference With Smithfield's Annual Shareholder Meetings**

**1.      The 2006 Meeting**

159.    On August 30, 2006, Smithfield Foods held its annual shareholder meeting for 2006 in Richmond, VA.  As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted a protest against Smithfield that took place at the shareholder meeting.  Participants in the planning and/or effectuation of the protest included Mark Federici, Mikki Harris, Eduardo Pena, Rigo Valdez, and other agents of Defendants CtW, UFCW, Local 400, and JWJ. Defendants publicized their plans to stage their protest activities on the radio, internet and newspapers.  In doing so, Defendants misrepresented the protest as being led by "leading civil rights and immigrant rights groups" when in fact the events were led by Defendants.  A press release prepared by Defendants regarding these events revealed the annual salary of Joseph Luter III, Chairman of Smithfield Foods' Board of Directors and former Chief Executive Officer.  (*See* Ex. 50).

160.    At the protest, Defendant Gene Bruskin delivered the following threatening statement to Smithfield through the press: "We've come here to send a message to Smithfield Foods while their board of directors and top executives gather to talk about their success and growth of the multibillion-dollar company.   We want to remind them that there are people suffering every day in the largest meatpacking plant in the world."  The statement served as a reminder to Smithfield that Defendants would continue their unlawful and extortionate conduct indefinitely and into the future until Smithfield agreed to Defendants' demands.  (*See* Ex. 51).

### 2.    The 2007 Meeting

161.    On August 29, 2007, Smithfield Foods held its annual shareholder meeting for 2007 in Williamsburg, VA.  As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted a protest against Smithfield that took place at the shareholder meeting.  Participants in the planning and/or effectuation of the protest included Anna Burger, Mark Federici, Nazey Gulec, Mikki Harris, James Lowthers, Libby Manly, Eduardo Pena, Rigo Valdez, members of UFCW Local Unions 27 and 1776, and other agents of the Defendants.

162.    To generate publicity and support for their protest, Defendants arranged for free bus transportation to Williamsburg from Philadelphia, PA, Wilmington, DE, Washington, DC, Silver Spring, MD, Durham/Chapel Hill/Raleigh, NC, Greensboro/Henderson, NC, Lumberton/Fayetteville/Rocky Mount, NC, Charlotte/Statesville, NC and Richmond, VA for all members of the public who wished to participate in the rally and protest activities of Defendants. Defendants also publicized their plans to stage their rally and protest activities on the radio, internet and newspapers.  Defendants also published on Defendant UFCW's website several versions of a flier advertising the protest.  All of the fliers claimed that Smithfield was

responsible for: "widespread environmental degradation; retaliation against workers who stand up for their rights; assaults and false arrests of workers; a record of racial tension between African American and Latino workers."  (*See* Ex. 52).

163.    The protest events were led by UFCW agents as well as several unwitting participants, including but not limited to members of the National Organization for Women, members of the Community Action Coalition and members of Pax Christi USA.

164.    During the protest activities, Anna Burger led a group of individuals who interrupted Smithfield's shareholder meeting and attempted to deliver a "petition" to the Chief Executive Officer of the Company demanding a "union contract at Smithfield's Tar Heel, NC, plant."  (*See* Ex. 53).  Further evidencing the Defendants' ongoing conspiracy to unlawfully extort Smithfield and to inflict damage on Smithfield, UFCW agents participating in the events described herein held signs stating "Break open Smithfield's piggy bank."  James Lowthers also made a public statement that revealed the extent of the threat to Smithfield of Defendants' ongoing unlawful scheme: "UFCW is committed to this fight.  If it takes 10 years, it will take 10 years."  (*See* Ex. 54).

165.    Further evidencing the Defendants' refusal to be governed by the NLRB process, Eduardo Pena published a statement to the print media present that Defendant UFCW was unwilling to participate in an election conducted by the NLRB.

166.    Further evidencing the Defendants' intent to harass Smithfield's executives and directors, Defendants positioned outside the shareholder meeting a 20-foot-tall inflatable rat wearing a nametag that read: "Joe Luter."

167.    Following the protest, Defendants published a press release on Defendant UFCW's website that misleadingly characterized the events as having been led by "one thousand

workers, religious and civil rights leaders and activists" when in fact the protest was led by Defendants.   The article also included the false statement that participants in the protest presented the Chief Executive Officer of Smithfield Foods with a petition "representing a strong majority of workers in the plant" which demanded a union and a union contract.   The press release further evidenced Defendants' intent to continue its unlawful scheme, as it quoted "supporters" who "promised to continue to stand alongside the Tar Heel workers until the battle is won."  (*See* Ex. 55).

> **G.     Filing and/or Prosecuting Frivolous and Objectively Baseless Regulatory Claims and Complaints and the Taking of Other Action Designed to Interfere With Smithfield's Business Operations**

> **1.     Interference With Smithfield's Application for a State Water Permit**

168.    In early 2007, Smithfield sought the renewal and expansion of its National Pollutant Discharge Elimination System permit from the North Carolina Environmental Management Commission, Division of Water Quality (the "Commission").   On or about March 15, 2007, a public hearing was held before the Commission to address Smithfield's application to expand its rights under the permit.   As part of their ongoing scheme to extort money and property from Smithfield and to inflict damage upon Smithfield, Defendants orchestrated, sponsored and conducted activities at the meeting designed to cause the Commission to deny Smithfield's application.

169.    A press release prepared by Defendant Leila McDowell and dated March 12, 2007, attempts to disguise Defendants' interference in the permit application as an effort spearheaded by "environmentalists" when in fact Defendants were responsible for orchestrating the activity.  (*See* Ex. 56).

170.    During the hearing, Julie Eisenberg addressed the Commission on behalf of Defendant RAA.  She characterized Defendant RAA only as a non-profit entity and concealed its connections with Defendant UFCW and the other Defendants.  She mischaracterized Defendant RAA's conclusions as statistically sound and objective, when in fact Defendant UFCW paid for and pre-determined the results of the purported analysis, as detailed herein.  Eisenberg claimed that "increasingly dangerous conditions" were present at the Tar Heel plant, claimed that such conditions were attributable to an increase in the plant's production capacity, and claimed that these alleged conditions were a "warning sign" to the Commission that Smithfield's permit should not be granted.  Defendants published a voice recording of Eisenberg's remarks to the Commission on Defendant UFCW's website:

www.smithfieldjustice.com/publichearing_events.php. (*See also* Ex. 57).

171.    Libby Manly also addressed the Commission and made disparaging statements regarding the conditions at the Tar Heel plant.  Among the many salacious statements she made during the meeting, Manly baselessly claimed that granting Smithfield's permit application would do "tremendous damage" to "Smithfield workers and to the environment."  Manly also claimed that "Smithfield workers have suffered unspeakable abuse at every turn," that "Smithfield workers endure unbearable working conditions that leave many maimed or working through excruciating pain for fear of being fired if they report their injuries," that "injured workers are routinely kicked to the curb with nothing," and that Smithfield "already value[s] profit over people."  Defendants published a voice recording of Manly's remarks to the Commission on Defendant UFCW's website:

www.smithfieldjustice.com/publichearing_events.php.  (*See also* Ex. 57).

172.    Both Eisenberg and Manly knowingly and maliciously misrepresented the nature of the information contained in Defendant RAA's Report, the state of working conditions at Tar Heel, and the allegedly damaging effect that the granting of Smithfield's application would have on the state of North Carolina.  Defendants' actions in this regard were undertaken in an effort to interfere unlawfully with Smithfield's application for said permit, to cause said permit to be denied, and to inflict economic injury upon Smithfield.

###    2.    Manufacturing Allegations Regarding United Nations "Investigation" of Smithfield

173.    In or around spring of 2007, Dr. Jorge Bustamente, a Special Rappaorteur for the United Nations Human Rights Commission ("UN Commission"), conducted a fact finding mission in the United States on the situation of the human rights of migrant workers in the United States.  As stated by Soussarn Raadi-Azarakhchi, the Chief of the Special Procedure Branch of the UN Commission, the purpose of Dr. Bustamente's visit was "to witness first hand the situation of migrants at the borders and in immigration detention facilities and discuss migrant rights related issues with US officials, experts and advocates from the civil society."

174.    Seizing on the opportunity to advance its unlawful and extortionate scheme and to further injure Smithfield, Defendants arranged for two Smithfield employees, Tereza Nieto and Guadalupe Valdez, to meet with Dr. Bustamente during his visit to the United States. Defendants then plotted to knowingly and maliciously misrepresent publicly the nature of Dr. Bustamente's meeting with Nieto and Valdez as a formal United Nations investigation into Smithfield's treatment of immigrant and migrant workers.

175.    Rather than portray the facts of each individual's workers compensation case to Dr. Bustamente, Defendants schemed to provide him with false, misleading and baseless information regarding each individual and about Smithfield.  Upon securing the meeting with Dr.

Bustamante, Defendants UFCW and Leila McDowell caused to be published a press release, dated May 14, 2007, entitled: "United Nations Investigates Smithfield Packing's Treatment of Immigrant Workers." (*See* Ex. 58). This statement was patently false. Smithfield has never been under investigation by the UN Commission, nor has any complaint been made to the UN Commission regarding Smithfield or its treatment of migrant workers. At no time did any employee or representative of the United Nations or the UN Commission inform Smithfield that it was being investigated for any reason. At absolutely no time was Dr. Bustamante charged with or assigned the responsibility of conducting an investigation of Smithfield.

176.   The press release described above also portrayed Dr. Bustamente's meeting with Nieto and Valdez as a "hearing," claimed that they would be giving "testimony," and claimed that the "hearing will probe how immigrant workers are being treated at the world's largest pork processing plant." The press release also described Nieto and Valdez as "former" employees. As to Nieto, this statement was false. On or about May 16, 2007, Nieto remained employed with Smithfield. Nevertheless, Defendants' press release included the false statement that Nieto was "forced to quit following an injury at the plant." The press release also misrepresented the nature of Nieto's and Valdez's injuries as well as Smithfield's treatment of them following their injuries.

177.   Dr. Bustamente met with Nieto and Valdez on or about May 16, 2007, at the headquarters office of the AFL-CIO. Upon information and belief, agents of Defendant UFCW were present and controlled Dr. Bustamente's access to Nieto and Valdez. At no time during the meeting did Nieto or Valdez provide "testimony" to Dr. Bustamente, either in oral or written, or sworn or unsworn, format. Their meeting with Dr. Bustamente did not take place in the form or

context of a "hearing."  No transcript of the meeting was taken.  Dr. Bustamente met with each individual for roughly ten minutes.

178.    Defendants' malicious intent regarding these matters was proven by written correspondence between Smithfield and the United Nations.  On or about May 16, 2007, Smithfield's Executive Vice President, Jere Null, sent a letter to the Honorable Ban Ki-moon, Secretary General of the United Nations. Null enclosed a copy of the Defendants' press release referenced above and suggested that Defendants were misrepresenting the nature of Dr. Bustamente's visit to the United States and his meeting with Nieto and Valdez.  (*See* Ex 59).  On or about June 12, 2007, Null received a letter from Soussan Raadi-Azarakhchi, Chief of the Special Procedure Branch of the UN Commission.  Raadi-Azarakhchi acknowledged Null's letter to the Secretary General and confirmed that "the purpose of [Dr. Bustamente's] meeting was not to conduct an investigation into Smithfield Packing Company."  Raadi-Azarakhchi further stated that Smithfield's "concerns have been duly noted."  (*See* Ex. 60).

### 3.    Frivolous and Objectively Baseless OSHA Complaint

179.    On or about May 25, 2007, investigators from the North Carolina Department of Labor arrived at the Tar Heel plant unannounced for the purpose of investigating a complaint alleging violations of occupational safety and health standards, including allegations of unsanitary drinking water.  Smithfield had no prior notice of the investigation.  On that date, the investigators conducted an inspection of the facility.  The investigators returned to the plant on or about May 29, 2007 to continue their investigation and inspection of the Tar Heel workplace. Thereafter, the investigators informed Smithfield that they had found no evidence of a workplace condition that violated state workplace safety law.  (*See* Ex. 61).

180.    Not satisfied with this result, the Defendants orchestrated the filing of a frivolous and objectively baseless complaint with the Federal Occupational Safety and Health Administration.  The complaint purported to be filed by Smithfield employees, but was actually conceived, prepared and filed by Defendants. The aforementioned complaint contained frivolous accusations against Smithfield and was filed in furtherance of the Defendants' scheme to extort money and property from Smithfield and to inflict damage upon Smithfield. In particular, the complaint accused Smithfield of obstructing the North Carolina Department of Labor investigation that took place on May 25 and 29, 2007 and further accused both Smithfield and the North Carolina Department of Labor of colluding to intimidate the employees who filed the original complaint. Defendants also issued a press release on or about June 13, 2007 that accused Smithfield of unlawfully interfering with a state inspection.  (*See* Ex. 62).

### 4.    Misrepresentation of Smithfield's Participation in IMAGE Program

181.    In or around June 2006, seeking to avoid a catastrophic disruption of both business operations and the lives of employees similar to that which occurred when the U.S. Immigration and Customs Enforcement ("ICE") arrested over 1200 employees of meatpacking company Swift & Co. in a series of raids on Swift facilities in December 2006, Smithfield agreed to participate in the ICE Mutual Agreement Between Government and Employers program ("IMAGE").  The program calls on a participating employer to submit the I-9 employee eligibility verification forms of its employees to ICE.  ICE reviews the information submitted as part of its enforcement of U.S. immigration policy.  As part of its participation in the IMAGE program, Smithfield has submitted to ICE the I-9 documentation of its active employees for ICE's independent review and auditing purposes.  Smithfield plays absolutely no role in determining whether the documentation submitted contains evidence of immigration violations

by its employees, nor does it play any role whatsoever in any enforcement action deemed by ICE to be necessary to enforce U.S. immigration law.

182.    Seizing on the opportunity to advance its unlawful and extortionate scheme and to further injure Smithfield, Defendants caused to be published numerous false, misleading and baseless statements about the nature of Smithfield's participation in the IMAGE program. Specifically, on or about January 29, 2007, Defendant Leila McDowell caused to be published the following objectively baseless statement to the news media: "Whether ICE is consciously in collusion or not, Smithfield could very easily manipulate the process and can use it as a tool to intimidate and threaten workers, which it has done in the past."  (*See* Ex. 63).  On or about February 1, 2007, Libby Manly caused to be published a press release that included the following characterization of Smithfield's participation in the IMAGE program: "Workers face a company engaged in the systematic, sometimes violent, suppression of their democratic rights." (*See* Ex. 64).  Mark Lauritsen went so far as to publicly accuse Smithfield of being in direct collusion with the Department of Homeland Security to use the IMAGE program to eliminate targeted Smithfield employees from the workforce: "[They] were worried about people organizing a union, and the government said, 'here are the tools to take care of them.'"  (*See* Ex. 65).

183.    On or about November 17, 2006, Gene Bruskin published the following false and malicious statement in a UFCW press release: "Smithfield is clearly using the 'no match' issue as a means to terrorize immigrant workers regardless of their legal status with the express purpose of suppressing the worker-led organizing that is reaching across racial lines in unprecedented numbers."  (*See* Ex. 66).  On or about January 25, 2007, Bruskin caused to be published the following baseless statement to the news media: "Smithfield has a history of using

threats of arrest by immigration authorities to intimidate workers and this is a continuation of that pattern."   Bruskin also caused to be published the following statement to the news media: "The entire community has been terrorized. . . Many of these workers have given their life blood to this company for as long as 6 years and now are being summarily handed over to be arrested and discarded.  It is unconscionable and continues Smithfield's pattern of callous disregard for the well being of its workers."  (*See* Ex. 67).

184.    In or about February 2007, Senator Edward Kennedy, in a letter delivered to Department of Homeland Security Secretary Michael Chertoff, asked that the proposed regulations regarding social security no-match regulations be held in abeyance pending Congressional review.  On or about February 13, 2007, Defendant Gene Bruskin caused to be published the following false and misleading characterization of Senator Kennedy's letter: "We applaud the Senator's initiative.  It is an important step in stopping Smithfield from using its cooperation with IMAGE as a smokescreen to intimidate workers."  (*See* Ex. 68).

185.    All of the aforementioned actions of the Defendants were undertaken knowingly, intentionally and maliciously, and in an effort to interfere unlawfully with Smithfield's relations with its shareholders, customers, business partners and lenders and to inflict economic injury upon Smithfield.

### 5.    Attempt to Prevent Smithfield's Acquisition of Sara Lee

186.    On or about June 26, 2006, Sara Lee Corporation ("Sara Lee"), Smithfield Foods, and Tarvalón, S.L., a then wholly-owned subsidiary of Smithfield (n/k/a Groupe Smithfield Holdings, S.L.), entered into an Agreement for the sale and purchase of the European Meats Business of Sara Lee Corporation.  Pursuant to their agreement, Smithfield, indirectly through

Tarvalón, S.L. agreed to purchase substantially all of Sara Lee's European Meats Business, which has locations in France, The Netherlands, Belgium, Germany, Portugal, Italy and the UK.

187.   Prior to the consummation of the transaction, Smithfield was required under applicable law to notify and/or consult with local works councils in The Netherlands, Belgium and France.  In fact, Smithfield was actually required to obtain the unconditional positive advice or neutral advice of the works councils in The Netherlands in order for the transaction to close. In an effort to prevent Smithfield's acquisition of Sara Lee Foods by causing those works councils to alter or withhold their advice regarding the transaction, Defendants forwarded handbills to said councils for distribution to their respective memberships.  The handbills purported to be sent by the employees at Smithfield's Tar Heel plant when in fact they were created and distributed by Defendants and their agents.  The handbills accused Smithfield of engaging in "illegal tactics" during prior NLRB elections at the Tar Heel plant and stated that Smithfield was found liable for "filming the activities of the union and its employees and also of physically assaulting an employee."  (*See* Ex. 69).

188.   Defendants also dispatched Mark Lauritsen to the 25th Congress meeting of the International Union of Food, Agricultural, Hotel, Restaurant, Catering, Tobacco and Allied Workers' Associations ("IUF"), which took place in Geneva, Switzerland from March 19-22, 2007.  At the meeting, Lauritsen shared information about the Defendants' unlawful scheme with other attendees, in an effort to cause them to oppose Smithfield's acquisition of Sara Lee Foods. Specifically, Lauritsen gave a videotaped interview in which he claimed that: "Smithfield is a notorious violator of human rights."  He also accused Smithfield of "routinely violat[ing] the laws of the United States" and "denying justice to workers in North Carolina for years." Lauritsen further claimed that Smithfield is "a company that not only affects workers adversely,

but adversely impacts the environments of the communities where they operate."   Regarding
Smithfield's attempt to acquire Sara Lee, Lauritsen commented: "As they work on this
acquisition, we are working with our European counterparts to make sure that this type of labor
relations doesn't expand throughout the world."   Finally, Lauritsen left no doubt as to
Defendants' attempts to expand the scope of their unlawful scheme: "We're working to make
sure that they don't export this labor relations model throughout the world as they expand into
Europe, into Romania, Poland, France and all the other acquisitions that they're making
throughout Europe."   (*See* Ex. 70).  Defendants published Lauritsen's interview on Defendant
UFCW's website, www.smithfieldjustice.com/marklauritsen_event.php.

### H.   Publication of False, Misleading, Baseless, Negative and/or Damaging Information on the Internet and in the Newspapers

189.   The Defendants have advanced their unlawful and extortionate scheme by
repeatedly staging "newsworthy" events, as alleged herein, and promoting those events through
press releases to the media that contained false, misleading, baseless, negative or damaging
information regarding Smithfield.   The Defendants have also caused to be published several
false, misleading, baseless, negative or damaging statements on Defendant CtW's internet
newsletter, CtW Connect.   In addition, Defendants have repeatedly disseminated such press
releases to numerous print and television media outlets so that their role in the spread of such
information is not apparent or is minimized.   In this way, the information contained therein
appeared to have originated from an objective and legitimate media source.  Defendants' endless
stream of press releases is designed to have a cumulative effect on the public.   Specifically,
Defendants' hoped that their many accusations and allegations against Smithfield, if repeated
often enough and in enough places, would result in the general public believing not only the
information being disseminated, but in the idea that the "Justice at Smithfield Campaign" was a

worthy and legitimate cause.  In fact, each and every press release was specifically calculated by Defendants to further articulate their threat to destroy Smithfield's business and public relations unless it acquiesced in their demands.

### 1.    Announcement of "Justice at Smithfield Campaign"

190.    In or around June 2006, Defendants issued a barrage of press releases in numerous markets designed to gain as much publicity as possible for their public announcement of the "A Change to Win Week" described above.  (*See* Exs. 1, 16).  After having invented the notion that the "Justice at Smithfield Campaign" was a coordinated effort of civil rights, immigrant rights, faith, student, and labor groups, when in fact it was just a sham used to mask Defendants' unlawful conspiracy,   Defendants saturated the print media with statements supporting this subterfuge in the below round of press releases.  Defendants' object in doing so was to condition the media and the public to believe that the "Justice at Smithfield Campaign" was a legitimate and cooperative effort of the groups referenced in the press releases so that they would be more inclined to view Defendants' subsequent malicious actions as the earnest and well intentioned efforts of a variety of groups not related to Defendants.

191.    In or around June 2006, Defendant Leila McDowell and other agents of UFCW published a press release entitled "D.C. Immigrant Rights Groups Help Lead National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media. Defendants included in the release the false statement that "there's blood on [Smithfield's] bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place on or about June 22, 2007 in Washington D.C. as led by "local immigrant rights, civil rights, faith and labor leaders groups" when in fact it was   devised   and   orchestrated   by   Defendants.    The   press   release   contained   the   following

statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon."  (*See* Ex. 71).

192.   In or around June 2006, Defendant Leila McDowell published a press release entitled "Atlanta Churches, Civil Rights Groups Throw Support to Immigrant Workers in Landmark Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media.  Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place in Atlanta on or about June 22, 2007 as led by "civil rights groups, area black churches, immigrant rights organizations and labor leaders groups" when in fact it was devised and orchestrated by Defendants.  The press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon."  (*See* Ex. 72).

193.   In or around June 2006, Defendant Leila McDowell published a press release entitled "Chicago Immigrant Rights Coalition Lead National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media.  Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed a rally scheduled to take place in Chicago on or about June 20, 2007 as led by "immigrant rights, civil rights, faith and labor leaders groups" when in fact it was devised and orchestrated by Defendants.     The

press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon."  (*See* Ex. 73).

194.    In or around June 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Immigrant Workers Help Launch Landmark National Campaign Against Nation's Largest Pork Processing Plant" on the Internet and in the print media.  Defendants included in the release the false statement that "there's blood on that bacon," accused Smithfield of allowing "sweatshop conditions" in its Tar Heel plant, and misleadingly portrayed the events of "A Change to Win Week" as led by "immigrant rights organizations" when in fact such events were devised and orchestrated by Defendants. The press release also contained the following statement: "This is a chance to say no to a racist, anti-immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon."  (*See* Ex. 74).

195.    In or around June 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Foods Faces New Challenge With National Consumer Education Campaign to be Launched Against the Company" on the Internet and in the print media.  Defendants included the false statement that Smithfield Foods had announced "a 99% decline in 4th quarter profits." Defendants also misleadingly portrayed the "national consumer education campaign" as led by "immigrant rights, civil rights, faith, labor and student groups" when in fact such events were devised and orchestrated by Defendants.  The press release also contained the following statement: "This is a chance to say no to a racist, anti-

immigrant company that feels they can terrorize workers at will.  We are issuing a moral appeal to consumers and supermarkets to think twice about purchasing Smithfield products.  We are telling people to say no to blood on their bacon."  (*See* Ex. 75).

196.    In or around June 2006 Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield's Fight With Workers Expands to Europe" on the Internet and in the print media.  The press release contained the following statement from Mark Lauritsen: "Our workers are appalled by Smithfield's systematic abuse of employees in Tar Heel who are forced to labor in an environment of intimidation, violence and fear." Defendants also misleadingly portrayed Smithfield as "the target of protests in the U.S., begun in June, by faith, civil rights and religious organizations" when in fact Smithfield was the target of Defendants' unlawful extortion scheme.  (*See* Ex. 76).

### 2.    Other Press Releases

197.    On or about August 30, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Leading Civil Rights and Immigrant Rights Groups to Protest Smithfield Packing's Abuse of Workers at Annual Shareholder Meeting in Richmond" on the Internet and in the print media.  The press release revealed the annual salary of Joseph Luter III.  (*See* Ex. 50).

198.    On or about November 15, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Pork Will Be Off the Holiday Tables of Thousands of Families" on the Internet and in the print media.  The press release described an "innovative holiday campaign" designed to take Smithfield products off the tables of consumers during the Thanksgiving holiday.  Defendants failed to disclose the fact that Defendants devised the scheme discussed in the press release.  The press release also contained the following

statement from Defendant Gene Bruskin: "Pork from this [Tar Heel] plant represents the pain of thousands of workers who have been permanently injured and fired as a result.  This is a company that systematically and cruelly violates the rights of its hard working employees."  (*See* Ex. 77).

199.    On or about November 17, 2006, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield, Tar Heel Workers Continue Walk Out at World's Largest Pork Plant for Second Day" on the Internet and in the print media.  As alleged herein, the press release contained the following maliciously false statement from Defendant Gene Bruskin: "Smithfield is clearly using the 'no match' issue as a means to terrorize immigrant workers regardless of their legal status with the express purpose of suppressing the worker-led organizing that is reaching across racial lines in unprecedented numbers."  (*See* Ex. 66).

200.    On or about November 27, 2006, Libby Manly published a press release entitled "Clergy and Civil Rights Leaders Call on Harris Teeter to Stop Selling Smithfield's Problem Pork" on the Internet and in the print media.  The press release included the misleading statement that "clergy and civil rights leaders" were orchestrating the events to take place at Harris Teeter stores on or about December 2, 2006 when in fact such events were orchestrated and led by Defendants.  (*See* Ex. 20).

201.    On or about December 6, 2006, agents of Defendant UFCW reproduced a press release entitled "Area Fifth Graders call on Supermarkets to Drop Pork Products From Company Implicated in Worker Cruelty, Join Nationwide Campaign, Will Meet Children of Abused Meatpackers."  The press release misleadingly portrayed a protest at a Johnny's Foodmaster

store, described above, as led by fifth grade children, when in fact it was orchestrated by Defendants.  (*See* Ex. 29).

202.    On or about January 10, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Walk Out Looming at Smithfield Packing Over Martin Luther King Holiday" on the Internet and in the print media.  The press release insinuated that a massive dispute existed between employees at Smithfield's Tar Heel plant and Smithfield's management.  (*See* Ex. 78).

203.    On or about January 12, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Packing Will Punish Workers Who Celebrate Martin Luther King Day, Company Says" on the Internet and in the print media.  The press release insinuated that a massive dispute existed between employees at Smithfield's Tar Heel plant and Smithfield's management.   The press release also contained the following statement from Defendant Gene Bruskin: "Smithfield Packing has abused these workers for years.  When your child is sick, if you stay home you are punished.  When you are injured you are often fired."   (*See* Ex. 79).

204.    On or about January 15, 2007, Defendant Leila McDowell, Libby Manly and other agents of the UFCW published a press release entitled "Workers' No Shows Cut Production in Half at Smithfield" on the Internet and in the print media.  The press release insinuated that Smithfield's production at its Tar Heel plant had been "cut in half." as a result of an alleged massive dispute between employees at Smithfield's Tar Heel plant and Smithfield's management.  (*See* Ex. 80).

205.    On or about January 17, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers MLK Protest Cut Production

Twenty-Seven Percent" on the Internet and in the print media.  Apparently unable to get their "facts" straight, Defendants suddenly modified their earlier allegation regarding the production rate at Smithfield's Tar Heel plant and included in this press release the statement that Smithfield's production at its Tar Heel plant had "dropped from 33,000 to 24,000 hogs for the day" as a result of an alleged massive dispute between employees at Smithfield's Tar Heel plant and Smithfield's management.  (*See* Ex. 81).

206.    On or about January 25, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Union Condemns Arrests of Workers at Smithfield Plant in North Carolina as a Continuing Pattern of Terrorizing Workers and Their Communities" on the Internet and in the print media.  As alleged above, the press release contained the following statement from Defendant Gene Bruskin: "Smithfield has a history of using threats of arrest by immigration authorities to intimidate workers and this is a continuation of that pattern." (*See* Ex. 67).

207.    On or about February 1, 2007, Libby Manly and other agents of the UFCW published a press release entitled "Clergy, Civil Rights and Immigrants Rights Leaders Condemn Arrests and Intimidation of Workers, Gather in Front of Smithfield Hog Plant" on the Internet and in the print media.  Defendants used this press release to misleadingly portray a press conference held on or about February 6, 2007 outside Smithfield's Tar Heel plant as led by "clergy, civil rights and immigrant rights leaders" when in fact it was led by Defendants.  The press release also contained the following statement: "Amidst threats and intimidation, Smithfield falsely claims agreement for union election.  Arrests, retaliation against employees honoring Dr. King, and threats to terminate hundreds leave workers frightened."  It also referred to the working conditions at Smithfield's Tar Heel plant as "dangerous and brutal," and accused

Smithfield of a "systematic, sometimes violent, suppression of [workers'] democratic rights." (*See* Ex. 64).

208.   On or about February 5, 2007, Libby Manly and other agents of the UFCW published a press release entitled "Clergy, Consumer Advocates, Civil Rights and Immigrant Rights Leaders Condemn Smithfield Over Arrests, Intimidation of Workers, Climate of Fear" on the Internet and in the print media.  Defendants used this press release to misleadingly portray a press conference held on or about February 6, 2007 outside Smithfield's Tar Heel plant as led by "clergy, civil rights and immigrant rights leaders" when in fact it was orchestrated by Defendants.  The release also contained the following deceptive statement: "After Smithfield was found by the National Labor Relations board (NLRB) to have unlawfully threatened workers with arrest by federal immigration authorities, Immigration Customs Enforcement agents detained and arrested 21 Smithfield workers on Wednesday, Jan. 24."  The press release did not disclose the fact that the NLRB matter referred to was decided over two years before January 24, 2007 and has been appealed to the United States Court of Appeals for the Fourth Circuit. Defendants deliberately misrepresented the timing of these events to allow the inference that Smithfield orchestrated arrests of immigrant-employees in direct retaliation for an adverse administrative finding regarding the Company's treatment of immigrant-employees.  (*See* Ex. 82).

209.   On or about February 13, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield's firing of North Carolina Workers Prompts Senator Kennedy to ask Department of Homeland Security Secretary for a Temporary Suspension of Regulations" on the Internet and in the print media.  The press release misleadingly suggested that Smithfield's participation in the IMAGE program, described more

fully above, was the singular cause of a letter Senator Edward Kennedy sent to the Secretary of Homeland Security asking that proposed regulations governing social security no-match regulations be held in abeyance pending Congressional review of the regulations.  (*See* Ex. 68).

210.    On or about February 27, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Products Banned at Michigan Store" on the Internet and in the print media.  The press release contained the false statement that Smithfield's products are "packaged with abuse."  (*See* Ex. 32).

211.    On or about March 12, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Workers Join Environmentalists to Testify Against Smithfield Packing's Efforts to up its Slaughter Rate by Over One Million Additional Hogs Per Year" on the Internet and in the print media.  In the press release, Defendants misleadingly portrayed their efforts to interfere with Smithfield's application for an expansion of its water permit, as described fully above, as led by "workers" and "environmentalists."  The press release also included the baseless statement that "It's also likely that the real number of injuries [occurring at the Tar Heel plant] is higher than that which is reported."  (*See* Ex. 56).

212.    On or about March 14, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Scores of Injured Workers Will Testify Against Smithfield's Attempts to Increase Production By One Million Hogs Per Year on Thursday" on the Internet and in the print media.  In the press release, Defendants misleadingly portrayed their efforts to interfere with Smithfield's application for an expansion of its water permit, as described fully above, as led by "workers."  (*See* Ex. 83).

213.    On or about March 21, 2007, Defendant CtW published an article entitled "Smithfield Aims to Send a Million More to Hog Heaven" on the Internet via CtW's online

newsletter, CtW Connect.  The article misleadingly referred to Julie Eisenberg's testimony on behalf of Defendant RAA at the March 15, 2007 Commission meeting described above as follows; "a representative of the nonprofit organization Research Associates of America who testified at the hearing agreed with the UFCW."  The article also referred to Defendant RAA's report, described herein, and failed to disclose that Defendant UFCW purchased the findings and conclusions included by Defendant RAA in the report.  (*See* Ex. 84).

214.    On or about March 27, 2007, CtW employee Jason Lefkowitz published an article entitled "This Saturday, Join the Harris Teeter Day of Action" on the Internet via CtW's online newsletter, CtW Connect.  The article included the claim that "employees say the company cares more about the pigs than it does about them"  It also misleadingly insinuated that the "workers" were asking Harris Teeter to stop carrying Smithfield's products when in fact, and as alleged above, such demands were orchestrated and/or made by Defendants.  (*See* Ex. 85).

215.    On or about March 28, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Harris Teeter Target of Protests in 16 Cities For Selling Smithfield Pork From Abusive Packing Plant" on the Internet and in the print media. Defendants mischaracterized the "Southeast Day of Action" events described in the press release and referred to herein as having been planned and sponsored by "[r]eligious leaders, civil and immigrant rights groups, workers and consumers," when in fact Defendants themselves orchestrated the events.  (*See* Ex. 24).

216.    On or about March 30, 2007, Marc Goumbri, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Protests Against Harris Teeter for Selling Smithfield Pork From Abusive Packing Plant Grows to 22 Cities" on the Internet and in

the print media.  The press release included the claim that "thousands" had signed a petition "calling for Harris Teeter to remove Smithfield problem pork."  (*See* Ex. 86).

217.    On or about April 4, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Presidential Candidate John Edwards Calls on CEO of Smithfield Foods to Allow a Union at its North Carolina Plant" on the Internet and in the print media.  The press release misleadingly referred to the "Southeast Day of Action" referred to herein as having been led by "pastors" when in fact it was orchestrated by Defendants.  (*See* Ex. 87).

218.    On or about April 16, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Unions, Churches, Workers Turn up Heat on Celebrity Chef Paula Deen" on the Internet and in the print media.  The press release referred to Smithfield as an "abusive pork processing company."  (*See* Ex. 37).

219.    On or about April 17, 2007, CtW employee Jason Lefkowitz published an article entitled "Will Paula Deen Stand For 'Clean Cuisine', or 'Queen of mean'?  It Remains to Be Seen" on the Internet via CtW's online newsletter, CtW Connect.  The article contained the following statement: "Paula has a lucrative endorsement contract with Smithfield Foods--and Smithfield's workers in Tar Heel, North Carolina, have been treated brutally by the company for their attempts to join together in a union."  (*See* Ex. 88).

220.    On or about April 20, 2007, CtW employee Jason Lefkowitz published an article entitled "See No Evil, Hear No Evil" on the Internet via CtW's online newsletter, CtW Connect.  The article, referring to Smithfield's relationship with Paula Deen, included the following statement: "Paula's approach to learning that her sugar daddy regularly abuses its workers is to clap her hands over her ears and say 'I can't hear you!'  I guess Upton Sinclair said it best: It is

difficult to get a man to understand something when his salary depends upon his not understanding it." (*See* Ex. 89).

221.    On or about May 7, 2007, Marc Goumbri and other agents of the UFCW published an article entitled "Blacks, Latinos Mount Union Drive in North Carolina" on the Internet and in the print media.  Goumbri attempted to conceal the fact that he was employed by the UFCW, instead representing himself in the article as "a writer and researcher and currently works with Research Associates of America," despite the fact that Defendant UFCW's website reflects Goumbri's electronic mail address as: mgoumbri@ufcw.org and his telephone number as: (202) 223-3111, ext. 1451, a telephone number that is registered to Defendant UFCW.  (*See* Ex. 90).

222.    On or about May 14, 2007, Defendant Leila McDowell, Marc Goumbri and other agents of the UFCW published a press release entitled "United Nations Investigates Smithfield Packing's Treatment of Immigrant Workers" on the Internet and in the print media.  The numerous false and misleading statements contained in this press release are fully set forth above.  (*See* Ex. 58).

223.    On or about May 24, 2007, Jason Lefkowitz published an article entitled "Now We Know What 'Smithfield Family Values' Look Like" on the Internet via CtW's online newsletter, CtW Connect.  The article contained the following outrageous statement about Smithfield's Tar Heel plant: "In the plant, the water fountains don't work, and the only water they get is dragged through waste and guts from slaughtered hogs before it reaches them."  The press release also included the telephone number of Smithfield Packing Vice President Larry Johnson and encouraged readers to call and harass Mr. Johnson over Smithfield's alleged failure to provide clean drinking water to its employees.  (*See* Ex. 91).

224.   On or about May 24, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers File OSHA Complaint Over Lack of Clean Drinking Water and Safety Hazards" on the Internet and in the print media.  The press release included the baseless claim that a Smithfield employee had passed out while at work because the Company refused to provide him drinking water for six hours.  (*See* Ex. 92).

225.   On or about May 30, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Shreveport Community, Faith, Civil Rights Leaders and Workers Tell Celebrity Chef Paula Deen That 'It Ain't All About the Cookin'" on the Internet and in the print media.  The press release misleadingly portrayed a demonstration at a Paula Deen event planned for June 2, 2007 and referred to herein as being led by "Shreveport community, faith, civil rights leaders and workers" when in fact it was orchestrated by Defendants.  (*See* Ex. 40).

226.   On or about June 1, 2007, CtW employee Jason Lefkowitz published an article entitled "A Death In Tar Heel" on the Internet via CtW's online newsletter, CtW Connect.  The article contained the false and malicious statement that Smithfield management had contributed to the death of a former employee who suffered from type 1 diabetes: "Smithfield put him on a job from which he could not be relieved to take his required insulin."  (*See* Ex. 93).

227.   On or about June 4, 2007, Isabell Moore, Marc Goumbri and other agents of the UFCW published a press release entitled "'Calling' For Justice Rally Asks Harris Teeter to Remove Smithfield Tar Heel Pork: A High Tech Cell Phone Protest in Asheville" on the Internet and in the print media.  The press release referred to Smithfield as a company with "a long history of mistreating workers."  (*See* Ex. 26).

228.   On or about June 13, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Intimidates Workers Over Drinking Water and Safety Investigation" on the Internet and in the print media.  The press release falsely and maliciously reported that Smithfield "colluded" with the North Carolina Occupational Safety and Health Administration to procure a fraudulent result in a state-level investigation of drinking water and other alleged safety problems.  (*See* Ex. 94).

229.   On or about June 14, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Prayers For Our Papas: Father's Day Protest at Harris Teeter" on the Internet and in the print media.  The press release referred to Smithfield's Tar Heel plant as an "abusive plant" and misleadingly referred to the demonstration scheduled to take place at the home of Harris Teeter President Fred Morganthall, referred to herein, as led by "children of Smithfield workers, parents, consumers from across North Carolina" when in fact it was orchestrated by Defendants.  (*See* Ex. 95).

230.   On or about June 20, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers to Meet With Presidential Candidate Senator John Edwards: Senator Edwards Will Call on Company to Give Workers the Right to Organize" on the Internet and in the print media.  The press release included the claim that "Smithfield elections, marred with violence, intimidation, threats and other unlawful acts by the company demonstrate the need for the Senate to pass the Employee Free Choice Act this week."  (*See* Ex. 96).

231.   On or about June 26, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Paula Deen Stirs Controversy in Charlotte" on the Internet and in the print media. The press release included the claim that Paula Deen had "stirred

controversy" in Charlotte and misrepresented demonstration activities at a Paula Deen event planned for June 30. 2007, as alleged herein, as originating with "families of Smithfield workers" when in fact the events were originated by Defendants.  The press release also referred to a letter allegedly written to Paula Deen by Presidential Master Chef Talli Council in which he allegedly asked her to end her partnership with Smithfield.   The release omitted any reference to Defendants UFCW and Local 400 or to the union-related goal of the demonstrations.   (*See* Ex. 41).

232.    On or about June 27, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Presidential Master Chef asks Deen to end Smithfield Partnership" on the Internet and in the print media.  The press release referred to the "tragic circumstances of workers at the Smithfield plant," and reported that Presidential Master Chef Talli Counsel "has ended all use of the Smithfield products, and will urge fellow chefs and culinary associations to take a very serious look at this situation."  (*See* Ex. 97).

233.    On or about June 28, 2007, Defendant Leila McDowell and other agents of the UFCW published a press release entitled "Paula Deen Demonstration Over Abusive Pork Plant" on the Internet and in the print media.  The press release included the claim that demonstration activities at a Paula Deen event planned for June 30, 2007 were a planned "Paula Deen Demonstration Over Abusive Pork Plant" and again misrepresented the demonstration as originating with Smithfield workers when in fact the events were originated by Defendants.  The press release also referred to a letter allegedly written to Paula Deen by Presidential Master Chef Talli Council in which he allegedly asked her to end her partnership with Smithfield.   The release omitted any reference to Defendants UFCW and Local 400 or to the union-related goal of the demonstrations.   (*See* Ex. 41).

234.    On or about July 5, 2007, Defendant Leila McDowell and other members of the UFCW published a press release entitled "Presidential Master Chef is Still Waiting for Paula Deen's Response to his Letter" on the Internet and in the print media.  The press release included the claim that Smithfield "has been mired in controversy including a series of legal rulings that found it assaulted, intimidated, illegally fired and used racial slurs against its workers.  Human Rights Watch has written two reports citing widespread abuses at the world's largest pork plant." (*See* Ex. 98).

235.    On or about July 27, 2007, Julie Eisenberg and other agents of Defendant RAA published a press release entitled "Legal Challenge to Smithfield's Hog Production Increase Filed Today: Widespread Environmental Hazards and Lack of Worker Safety Cited" on the Internet and in the print media.  The press release failed to disclose that many of the statistics regarding Smithfield's safety and injury standards were taken from Defendant RAA's concocted report, referred to herein.  (*See* Ex. 99).

236.    On or about August 7, 2007, Defendant Lelia McDowell and other agents of the UFCW published a press release entitled "Smithfield Workers Walk Out and Hold Sit-in over Lack of Drinking Water Today" on the Internet and in the print media.  The press release included the misleading claim that "forty percent of the livestock workers" at Smithfield's Tar Heel plant engaged in a dispute with Smithfield management after they were not provided sanitary drinking water.  (*See* Ex. 100).

### I.    The Demand for Recognition

237.    Defendants attempted to culminate their unlawful and extortionate scheme against Smithfield during a series of meetings that took place in August and September 2007. During this time period, officials employed by Defendant UFCW, including Defendant Patrick O'Neill,

met with Smithfield officials, including Jere Null and Jeff Gough, Vice President of Human Resources for Smithfield Packing, in private meetings that took place in Richmond, Virginia. Defendants in these meetings offered to discontinue the corporate campaign and all extortionate conduct involved upon Smithfield's agreement to take certain actions, or to refrain from taking certain actions, that Smithfield had no legal obligation to take or refrain from taking.

238.    During the meeting that took place on or about August 14, 2007,  Defendants reiterated that they had no intention of participating in a NLRB-sanctioned, secret-ballot vote of hourly employees at the Tar Heel plant regarding whether they wanted Defendants UFCW and Local 400 to be their collective bargaining representative.  Instead, Defendants demanded that the Company agree to a sham "election" whereby the outcome would be determined in advance and agreed upon privately by Defendant UFCW and Smithfield.  Defendants' intention was to force the Company to agree that it would declare the UFCW the "winner" of the "election" regardless whether a majority of Tar Heel employees actually voted for Defendants UFCW and Local 400 to be their collective bargaining representatives.  Defendants made it clear to Null and Gough that they would ceaselessly continue their extortionate scheme against Smithfield unless and until Smithfield acquiesced in their demands.

239.    Smithfield has refused to participate in the process described above.  Since that time Defendants have responded with another, equally unattractive condition for ceasing their extortionate conduct.  In another meeting between UFCW officials, including Defendant O'Neill, and Smithfield officials, including Null and Gough, which took place on or about September 16, 2007, Defendants demanded that, as an alternative to the process described above, Smithfield agree to an "election" conducted at the Tar Heel plant by an independent third party, but not the NLRB.  Defendants demanded the additional condition that Smithfield remain "neutral" during

the period immediately preceding the vote by refraining from having any contact of any nature with its employees regarding the election while simultaneously allowing Defendants full access to Smithfield's Tar Heel employees to convince them of the benefits of union membership. Defendants also reiterated during this meeting that under no circumstances would Defendants agree to a NLRB-sponsored election and that Defendants' unlawful scheme would continue unless and until Smithfield agreed to the Defendants' terms.

240.    Another alternative condition offered by the Defendants was that Smithfield sit idly by while allowing Defendants to accost the Tar Heel employees to sign cards authorizing Defendants UFCW and Local 400 to represent them for purposes of collective bargaining, and to require Smithfield to recognize Defendants UFCW and Local 400 as the bargaining agent of the Tar Heel employees on that basis.  Smithfield has expressed to Defendants that this alternative is equally unacceptable.

241.    As recently as October 3, 2007, Defendants have reiterated to Smithfield that they will not participate in a NLRB-conducted election and that they will not discontinue their devastating and unlawful scheme without Smithfield's express agreement to acquiesce in Defendants' demands as described above.

**J.    Effect of Defendants' Conduct**

242.    The Defendants' actions as described throughout have had a lasting and irreparable effect on Smithfield.  In addition to millions of dollars in lost or reduced business, lost contracts and lost promotional and advertising opportunities, the Smithfield brand name has been significantly tarnished.  Defendants have caused many of Smithfield's customers and business partners, as well as an uncountable number of formerly loyal consumers, to believe that it is a disreputable company that operates an unsafe workplace, mistreats its workers and

regularly violates the law.  (*See, e.g.,* Ex. 101).  Many of Defendants' extortionate acts have painted a revolting and visceral picture of Smithfield's business and human relations practices.  Predictably, this has led to a devastating loss of goodwill in the marketplace.  As alleged throughout, this has been the precise result desired by Defendants.  And worse, it is clear from Defendants' actions and words that they have no intention of stopping until Smithfield surrenders to their extortionate demands.  Without the Court's intervention, Smithfield will continue to suffer significant harm at the hands of Defendants and their unlawful scheme.

## FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a))
### Against Each of the Defendants

243.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

244.    Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

245.    Each of the Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(a), and 1962(d).

246.    UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(a), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

247.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), that is, Defendants conspired among themselves that income in the form of union dues, other bargaining concessions and otherwise would be received by defendants UFCW and UFCW Local 400, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A) in which all Defendants participated as principals within the meaning of 18 U.S.C. § § 1961(1), 1961(5), and 1962(a), to wit: multiple, repeated, and

continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

248.    An object of the said conspiracy was and is that income, or the proceeds of income, received by defendants UFCW and UFCW Local 400 be used or invested in the operation of the said enterprises for numerous legitimate and illegitimate purposes including, inter alia, the conduct of additional extortionate corporate campaigns, payment of salaries and fees to the other defendants for the purpose of engaging in further corporate campaigns and otherwise and the ongoing operation of the UFCW and UFCW local 400 enterprises.

249.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b))
### Against Each of the Defendants

250.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

251.    Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

252.    Each of the Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(b), and 1962(d).

253.    Smithfield Foods, Inc. and Smithfield Packing Company are corporations organized and existing under the laws of Virginia and are "enterprises" within the meaning of is

18 U.S.C. § § 1961(4) and 1962(b), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

254.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b), that is, Defendants conspired among themselves to acquire or maintain, directly or indirectly, an interest in or control of the Smithfield Foods Enterprise and the Smithfield Packing Enterprise through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§  18.2-59, 18.2-26(3)(attempted extortion and extortion).

255.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

### THIRD CLAIM FOR RELIEF
**(Violation of 18 U.S.C. § 1962(c))**
**Against Defendants CtW, RAA, JWJ and the Individual Defendants**

256.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

257.    Each of the Plaintiffs is a "person" under 18 U.S.C. §§  1961(3) and 1964(c).

258.    Each of the individual Defendants is a "person" under 18 U.S.C. § § 1961(3) and 1962(c).

259.    The Individual Defendants and Defendants Research Associates of America, Change to Win and Jobs With Justice are "persons" under 18 U.S.C. § § 1961(3) and 1962(c).

260.    UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(c), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

261.    Each of the individual Defendants, along with Defendants Research Associates of America, Change to Win and Jobs With Justice, were and are associated with the enterprises and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprises in relationship to the Plaintiffs through a pattern of activity unlawful under 18 U.S.C. § § 1961(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

262.    Each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) committed by the Defendants, including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## FOURTH CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)) Against Defendants CtW, RAA, JWJ and the Individual Defendants

263.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

264.    Each of the Plaintiffs is a "person" under 18 U.S.C. § § 1961(3) and 1964(c).

265.    Each of the Individual Defendants is a "person" under 18 U.S.C. § § 1961(3), 1962(c), and 1962(d).

-85-

266.    Defendants Research Associates of America, Change to Win and Jobs With Justice are "persons" under 18 U.S.C. § § 1961(3), 1962(c), and 1962(d).

267.    UFCW International and Local 400 constitute "enterprises" within the meaning of 18 U.S.C. § § 1961(4) and 1962(c), which enterprises were engaged in activities affecting interstate commerce at all times relevant to this Complaint.

268.    Each of the Individual Defendants, as well as Defendants Research Associates of America, Change to Win and Jobs With Justice were and are associated with the enterprises and conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c), that is, the Defendants conspired to conduct or participate, directly or indirectly, in the management and operation of the affairs of UFCW International and Local 400 in relationship to the Plaintiffs through a pattern of activity unlawful under 18 U.S.C. § § 1961(1)(A), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§  18.2-59, 18.2-26(3)(attempted extortion and extortion).

269.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

### FIFTH CLAIM FOR RELIEF
**(Violation of N.C. Gen. Stat. §  75D-4(a)(3) by Conspiring to violate §  75D-4(a)(1))
Against Each of the Defendants**

270.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

271.    Smithfield Foods, Inc. and Smithfield Packing Company are corporations organized and existing under the laws of Virginia and are "enterprises" within the meaning of N.C. Gen. Stat. §  75D-3(a).

272.    Each of the Defendants conspired among themselves within the meaning of N.C. Gen. Stat. §  75D-4(a)(3) to violate N.C. Gen. Stat. §  75D-4(a)(1), that is, Defendants conspired among themselves to acquire or maintain, directly or indirectly, an interest in or control of the Smithfield Foods Enterprise and the Smithfield Packing Enterprise through a pattern of activity unlawful under N.C. Gen. Stat. §  75D-3(c)(1), to wit: multiple, repeated, and continuous violations of N.C. Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§  18.2-59, 18.2-26(3)(attempted extortion and extortion).

273.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. §  75D-8(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## SIXTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. §  75D-4(a)(2))
### Against Defendants CtW, RAA, JWJ and the Individual Defendants

274.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

275.    UFCW and Local 400 constitute "enterprises" within the meaning of N.C. Gen. Stat. §  75D-3(a).

276.    Each of the Individual Defendants, along with Defendants Research Associates of America, Change to Win and Jobs With Justice, were and are associated with the UFCW and

Local 400 enterprises and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the UFCW and Local 400 enterprises in relationship to the Plaintiffs through a pattern of activity unlawful under N.C. Gen. Stat. §  75D-3(c)(1), to wit: multiple, repeated, and continuous violations of N.C.Gen Stat.§  14-118.4 (extortion) and Va. Code Ann. §§  18.2-59, 18.2-26(3)(attempted extortion and extortion).

277.    Each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. §  75D-8(c) by reason of the violation of N.C. Gen. Stat. § 75D-4(a)(2) committed by the Defendants, including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## SEVENTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. §  75D-4(a)(3) by Conspiring to Violate § 75D-4(a)(2)) Against Defendants CtW, RAA, JWJ and the Individual Defendants

278.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

279.    UFCW International and Local 400 constitute "enterprises" within the meaning of N.C. Gen. Stat. §  75D-3(a).

280.    Each of the Individual Defendants, as well as Defendants Research Associates of America, Change to Win and Jobs With Justice were and are associated with the enterprises and conspired among themselves within the meaning of N.C. Gen. Stat. §  75D-4(a)(3) to violate N.C. Gen. Stat. §  75D-4(a)(1), that is, the Defendants conspired to conduct or participate, directly or indirectly, in the management and operation of the affairs of UFCW International and Local 400 in relationship to the Plaintiffs through a pattern of activity unlawful under N.C. Gen.

Stat. § 75D-3(c)(1), to wit: multiple, repeated, and continuous violations of N.C.Gen. Stat. § 14-118.4 (extortion) and Va. Code Ann. §§ 18.2-59, 18.2-26(3)(attempted extortion and extortion).

281.    As a result, each of the Plaintiffs has suffered substantial injury to its business or property within the meaning of N.C. Gen. Stat. § 75D-8(c), including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## EIGHTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75.1-1)
### Against Defendants UFCW, Local 400, CtW, RAA and JWJ

282.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

283.    Defendants have engaged in numerous unfair acts and practices in violation of N.C. Gen. Stat. § 75.1-1.

284.    Defendants' business activities have affected interstate commerce, including commerce in North Carolina.

285.    Defendants have used and continue to use their power and position inequitably to coerce Smithfield to yield to their demands and recognize Defendants UFCW and Local 400 as the exclusive bargaining representative of Smithfield's hourly employees at the Tar Heel plant, thereby providing sufficient commercial and economic benefit to Defendants UFCW, Local 400, CtW and RAA. This coercive conduct included:

286.    Interfering with Smithfield's relationship with Harris Teeter and other business partners;

287.    Interfering with Smithfield's relationship with Paula Deen;

288.   Sponsoring and participating in the passage of public condemnations of Smithfield by cities, townships and organizations;

289.   Attempting to reduce the value of Smithfield Foods' stock;

290.   Interfering with Smithfield's annual shareholder meeting;

291.   Filing objectively baseless regulatory claims and complaints, and taking other action designed to interfere with Smithfield's operations;

292.   Creating a sham report that falsely conveyed the impression that Smithfield habitually violated safety and workers compensation laws.

293.   Demanding that Smithfield circumvent the NLRB secret-ballot election process, by deceptive or unreliable means, to allow the formation of a union at the Tar Heel facility.

294.   Defendants' conduct is further unfair in that it is unethical, oppressive, unscrupulous, and injurious to consumers and competition.

295.   Defendants' conduct proximately harmed Smithfield by causing, inter alia, lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

296.   As a result, Defendants' conduct violates N.C. Gen. Stat. § 75.1-1.

## NINTH CLAIM FOR RELIEF
### (Tortious Interference With Business Relations)
### Against Each of the Defendants

297.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

298.    Smithfield has valid business contracts and/or the prospective likelihood of future contracts with its customers and business partners.  Smithfield had contractual rights pursuant to said contracts and/or the expectation of future contractual rights.

299.    Each of the Defendants was fully aware of the existence of these contractual relationships and/or Smithfield's expectation of future contractual relationships..

300.    Each of the Defendants, by the conduct alleged above, intentionally and maliciously induced some or all of Smithfield's customers and business partners listed herein to not perform valid and existing contracts with Smithfield and/or to decline to enter into future contractual relationships with Smithfield.

301.    Defendants had absolutely no legal justification to induce said customers and business partners listed herein to not perform valid and existing contracts with Smithfield or to decline to enter into future contractual relationships with Smithfield.

302.    The failure of said business partners to perform valid and existing contracts with Smithfield, and/or to enter into future contractual relationships with Smithfield, has caused Smithfield actual damages, including but not limited to lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants, jointly and severally, as follows:

1.    Compensatory and consequential damages to Plaintiffs' business and property, including but not limited to, lost or reduced sales and distribution and lost or reduced

promotional and/or advertising opportunities, in an amount to be proven at trial, but at least in excess of $5,900,000 owing to the acts and omissions of the Defendants;

2.      An additional amount to be proven at trial for the substantial and irreparable loss of goodwill and business opportunity with consumers and customers suffered by Plaintiffs as a result of the acts and omissions of the Defendants;

3.      Threefold the damages sustained by the Plaintiffs as a result of the acts and omissions of the Defendants, including but not limited to the cost of investigations, the costs of this suit (including reasonable attorneys' fees) and post-judgment interest;

4.      Exemplary and/or punitive damages for the Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will and intent to injure the Plaintiffs; or the Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

5.      Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendants from continuing their scheme to extort Smithfield into meeting their demands as follows:

    a.      Enjoining Defendants from publishing in any format statements, reports, or press releases designed to mislead the public and unlawfully interfere with Plaintiffs' business relations;

    b.      Enjoining Defendants from continuing to unlawfully interfere with Plaintiffs' business relations through demonstrations and other activity at Paula Deen events; at or about which Defendants cause to be published information about Plaintiffs designed to cause Paula Deen to end her business relationships with Plaintiffs

        c.       Enjoining Defendants from continuing to unlawfully interfere with Plaintiffs' business relations through demonstrations and other activity at stores that sell Plaintiffs' products; at or about which Defendants cause to be published information about Plaintiffs designed to cause Plaintiffs' business partners to cease doing business with Plaintiffs or to cause consumers to cease purchasing Plaintiffs' products;

        d.       Enjoining Defendants from continuing to harass Plaintiffs' independent directors and executives;

        e.       Enjoining Defendants from participating in the drafting, encouraging, sponsorship and/or passage of public condemnations of Plaintiffs by cities, townships or other organizations;

        f.       Enjoining Defendants from interfering with Plaintiffs' legitimate business operations, including but not limited to the operation of its Tar Heel, North Carolina plant;

        g.       Requiring Defendants to publish the judgment against them so as to redress the damage that they have caused to Smithfield's business reputation;

        h.       Imposing reasonable restrictions on the future activities and conduct of any of the Defendants in regards to Plaintiffs.

     6.       Reasonable attorneys' fees and costs; and

     7.       Any other and further relief as the Court deems just and proper.

Dated: February 4, 2008

Respectfully Submitted,

SMITHFIELD FOODS, INC.
SMITHFIELD PACKING COMPANY

By: _____

Attorneys for Plaintiffs:

Thomas G. Slater Jr., Esq. (VSB No. 05915)
Gregory B. Robertson, Esq. (VSB No. 015681)
Kurt G. Larkin, Esq. (VSB No. 70730)
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200
(804) 788-8218 Fax

Of Counsel:

G. Robert Blakey, Esq.*
(*pro hac motion to be filed*)
Notre Dame Law School
Notre Dame, Indiana 46556
(219) 631-5717

* Notre Dame Law School is used solely for purposes of address.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Robert Weinberg
*rweinberg@bredhoff.com*
Andrew Roth
*aroth@bredhoff.com*
Robert Alexander
*ralexander@bredhoff.com*
Matthew Clash-Drexler
*mcdrexler@bredhoff.com*
Charlotte Garden
*cgarden@bredhoff.com*
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC 20005
Tel.: 202-842-2600
Fax: 202-842-1888

*Counsel for Defendants United Food and Commercial Workers International Union, Joseph Hansen, William McDonough, Patrick J. O'Neill, Gene Bruskin, Leila McDowell, Andrew L. Stern, and Tom Woodruff*

Paul W. Jacobs, II
*pjacobs@cblaw.com*
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Tel.: (804) 697-4100
Fax.: (804) 697-4112

*Counsel for all Defendants*

Robert F. Muse
*rmuse@steinmitchell.com*
Robert L. Bredhoff
*rbredhoff@steinmitchell.com*
Joshua A. Levy
*jlevy@steinmitchell.com*
STEIN, MITCHELL & MEZINES, LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washingtn, D.C. 20036
Tel: (202) 737-7777
Fax: (202) 296-8312

*Counsel for Defendant Research Associates of America*

Patrick J. Szymanski
*patrick.szymanski@changetowin.org*
General Counsel
Change to Win
1900 L Street, N.W., Suite 900
Washington, D.C. 20036
Tel.: 202-721-6035
Fax: 202-721-0661

*Counsel for Defendant Change to Win*

Carey R. Butsavage
*cbutsavage@butsavage.com*
Butsavage & Associates, P.C.
1920 L Street, NW
Suite 301
Washintgon, D.C. 20036
Tel.: 202-861-9700
Fax: 202-861-9711

*Counsel for Defendants UFCW Local 400 and*
*Jobs With Justice*

                                                   /s/
                                           Kurt G. Larkin, Esq.
                                           VSB No. 70730
                                           Attorney for Plaintiffs
                                           **HUNTON & WILLIAMS LLP**
                                           Riverfront Plaza, East Tower
                                           951 East Byrd Street
                                           Richmond, Virginia 23219-4074
                                           (804) 788-8200 (tel.)
                                           (804) 343-4903 (fax)
                                           *klarkin@hunton.com*