

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SMITHFIELD FOODS, INC.
and SMITHFIELD PACKAGING
COMPANY,

    Plaintiffs,

v.                  Civil Action No. 3:07cv641

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment (Docket No. 89) filed by Defendants Andrew Stern ("Stern"), Thomas Woodruff ("Woodruff"), Jobs with Justice ("JWJ"), Research Associates of America ("RAA"), Local 400, Change to Win ("CtW"), and Leila McDowell ("McDowell"). For the reasons set forth below, the Motion for Summary Judgment will be denied.

## BACKGROUND

Smithfield Foods, Inc. is a Virginia corporation with its principal place of business in Smithfield, Virginia. Amended Compl. at ¶ 8. Smithfield Packaging Company is a wholly-owned subsidiary of Smithfield Foods. Id. at ¶ 9. Smithfield's largest asset is its pork processing plant in

Tar Heel, North Carolina.  Id.  The Tar Heel plant is the world's largest pork processing plant and employs approximately 4,650 hourly employees.  According to the Complaint, the UFCW has been unsuccessfully trying for well over a decade to become the bargaining representative for the employees of the Tar Heel plant.  Id.

The National Labor Relations Act ("NLRA") 29 U.S.C.A § 158(a)(3) permits a union to become a collective bargaining representative for an employer's employees if the union prevails in an election certified by the National Labor Relations Board ("NLRB").  The NLRA also permits an employer, under certain circumstances, to voluntarily recognize a union. See 29 U.S.C.A. § 158(a)(3) (2008).

According to the Complaint, the UFCW publicly announced a "corporate campaign" against Smithfield in June 2006.  Corporate campaigns include a "wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state and federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." Food Lion, Inc. v. UFCW, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997).  The

2

alleged object of the Defendants' campaign against Smithfield was either to force Smithfield to recognize the UFCW as the collective bargaining representative of the employees at the Tar Heel plant and agree to a first contract or to force the Plaintiffs to become so unprofitabple as to necessitate cessation of business operations. (Amended Compl. at ¶¶ 38-41).

## DISCUSSION

I.       **The Standard For Assessing A Motion For Summary Judgment Under Fed. R. Civ. Pro. 56(c)**

Summary judgment is appropriate where there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See id.

Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to

3

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

A party cannot, however, "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp., 477 U.S. at 327. These precepts and standards govern the resolution of the Defendants' Motion. Swann v. City of Richmond, 498 F. Supp. 2d 847, 853 (E.D. Va. 2007).

## II. The Defendants' Factual Exposition

The Defendants' Motion for Summary Judgment present three allegedly undisputed material facts which uniformly apply to all seven Defendants. First, the Defendants posit that all seven Defendants believed that the purpose of the Smithfield Campaign was to ensure "a fair [election]

4

process . . . [for] the workers to make a choice about a union," not to be recognized as the collection bargaining representative and secure a first contract. (Def's Mot. at 1). Second, it is said that all seven Defendants "did not participate in any discussions and did not enter into any agreements with any other Defendant about whether UFCW's Smithfield Campaign would generate any income, or about how any income that might be generated would be used or invested." See Def's Mot. at 2. Third, it is asserted that all seven Defendants "did not participate in, and [were] not involved in the planning for, any of the meetings between UFCW and Smithfield that took place on August 20, 2007, August 30, 2007, and October 3, 2007. Nor do any of the Defendants know of what was discussed at those meetings." Id.

The Defendants also identified other relevant allegedly undisputed facts which differ dramatically with respect to each of the seven Defendants.

**A. Allegedly Undisputed Facts Respecting Stern's Role In The Smithfield Campaign**

Stern is the President of the Service Employees International Union ("SEIU"). Since 2005, Stern has been a member of the Leadership Council of CtW, which is CtW's governing body. Stern is not an employee or officer of

UFCW or Local 400, and has played no role in creating any aspect of the Smithfield Campaign.  Stern has attended no rallies or demonstrations in support of the Tar Heel workers, has provided no advice to the campaign, and has drafted no written communications about the campaign. (Def's Mot. at 1, 2).

### B. Allegedly Undisputed Facts Respecting Woodruff's Role In The Smithfield Campaign

Woodruff is the Executive Vice President of the SEIU. He has also served as the Director of the Strategic Organizing Center ("SOC") for CtW.  Woodruff is not an officer or employee of the UCFW or Local 400.  Woodruff's direct involvement in the Smithfield Campaign is limited to his attendance at one campaign rally in June 2006. Woodruff has played no role in creating or directing the campaign.  (Def's Mot. at 2, 3).

### C. Allegedly Undisputed Facts Respecting JWJ'S Role In The Smithfield Campaign

JWJ is a nonprofit corporation and is a separate legal entity from the UFCW.  JWJ plays no role in directing the affairs of the UFCW or Local 400.  JWJ was heavily involved in the campaign against Smithfield and assisted the campaign by, *inter alia*, distributing fliers, talking to grocery store managers, encouraging various city councils to pass resolutions condemning Smithfield's treatment of

6

its employees, inviting individuals to attend the Paula Deen rallies, and encouraging individuals to rally at Smithfield's annual shareholder meetings. (Def's Mot. at 4-6).

### D. Allegedly Undisputed Facts Respecting RAA's Role In The Smithfield Campaign

RAA is a nonprofit corporation which provides research to labor organizations that contract with it. Since August 2005, RAA has contracted with the UFCW and has been paid a fixed monthly amount for its research services. At the request of the UFCW, RAA prepared a high-profile report entitled "Packaged With Abuse," which "exposed" the health and safety conditions at Smithfield's Tar Heel plant. JWJ was heavily involved in the campaign against Smithfield and assisted the campaign by, *inter alia*, drafting the Packaged With Abuse report, sending letters disparaging Smithfield's business practices to financial analysts, speaking about the Tar Heel plant at public hearings, and drafting letters to Smithfield officials. (Def's Mot. at 7, 8).

### E. Allegedly Undisputed Facts Respecting RAA's Role In The Smithfield Campaign

Local 400 is a chartered local affiliate of UFCW and represents approximately 35,000 members in the retail/food service industry. Local 400 was heavily involved in the campaign against Smithfield and assisted the campaign by,

*inter alia*, disseminating information to turn out supporters at campaign events, participating in various rallies, handing out leaflets at grocery stores, visiting grocery stores within Local 400's jurisdiction, communicating with municipal bodies in Local 400's jurisdiction about the nature of the campaign, and providing logistical support for the worker's rally at Smithfield's 2007 shareholder meeting. (Def's Mot. at 8-10).

### F. Allegedly Undisputed Facts Respecting CTW's Role In The Smithfield Campaign

CtW is an alliance of seven national and international unions formed in September 2005. CtW's governing body is the Leadership Council, which consists of the principal officers of its affiliated unions, including the UFCW. CtW was heavily involved in the campaign against Smithfield and assisted the campaign by, *inter alia*, prominently listing the campaign on its website, sending emails to members on its "e-activist" list, working with the various unions which comprise CtW to support various campaign events, sending letters to the Smithfield Audit Committee, speaking to various publications, and responding to the UFCW for advice concerning the internet component of the campaign. (Def's Mot. at 10-12).

8

### G. Allegedly Undisputed Facts Respecting McDowell's Role In The Smithfield Campaign

McDowell is a self-employed "Strategic Communication Consultant." Beginning in April 2006, McDowell and the UFCW entered into a series of consulting agreements through which McDowell agreed to serve as the Communications Coordinator for the UFCW's campaign against Smithfield. McDowell was heavily involved in the campaign against Smithfield and assisted the campaign by, *inter alia*, proposing communications strategies, drafting press releases and advertisements, and communicating with journalists regarding the activities of the campaign. Gene Bruskin, the National Director of the Smithfield Campaign, supervised and approved all of McDowell's work. (Def's Mot. at 12-14).

### II. Smithfield's Factual Exposition

Smithfield embraces much of the Defendants' factual exposition, particularly with respect to the significant roles that RAA, JWJ, Local 400, CtW, and McDowell played in carrying out the campaign against Smithfield. Smithfield does, however, contest the assertion that all of the Defendants believed that the purpose of the Smithfield Campaign was only to achieve a "fair" election process, and that the Defendants were "unaware" of how the UFCW planned

9

to use the income which it eventually hoped to derive upon the successful completion of the campaign.  (Plt's Opp. at 2).

Smithfield also offered evidence augmenting the factual record with respect to these seven Defendants. Specifically, Smithfield points to deposition testimony and physical evidence to provide the following additional facts.

## A.  Stern's Alleged Role In The Smithfield Campaign

Stern's position on the Leadership Council gave him, along with the other members of the Council, the authority to veto any aspect of the Smithfield Campaign.  In 2005, CtW agreed to support the Smithfield Campaign, and Stern knew that the goal of the campaign was to force the recognition of the UFCW as the union representative of the employees at the Tar Heel plant.  Beginning in late 2005, CtW's Leadership Council was provided with reports and updates on the campaign, and the campaign was discussed at a number of Leadership Council meetings.  (Plt's Opp. at 2, 3, 5, 6).

## B.  Woodruff's Alleged Role In The Smithfield Campaign

Woodruff's role as the Director of the SOC provided him with unique insight into the campaign.  Seventy-five percent of the revenues that CtW receives from member

10

unions are dedicated to the SOC, which the SOC then
allocates to ongoing corporate campaigns. In 2005,
Woodruff received a request from the President of UFCW,
seeking help to "rollout" the Smithfield Campaign.
Beginning in late 2005, various meetings and correspondence
document Woodruff's involvement in the campaign. Woodruff
was also regularly provided with oral updates on the
progress of the campaign. (Pltf's Opp. at 2-6).

   C. CtW's Alleged Role In The Smithfield Campaign

       CtW is undeniably focused on aggressive membership
growth. Accordingly, CtW's affiliates report to the
Leadership Council about their "important" corporate
campaigns. In 2005, CtW agreed to logistically support the
Smithfield Campaign. There were numerous meetings at CtW
discussing campaign strategies. CtW provided leadership
and direction on many tactics of the campaign and spent
substantial sums of money on advertising for the campaign.
CtW received updates from the President of UFCW, detailing
the attempts of the campaign to "damage" Smithfield's
corporate reputation. CtW was also perhaps most
significantly involved in the campaign through its website,
which was used to educate the public about the campaign,
provide information on the campaign's activities, and
electronically "rally" the campaign's supporters. CtW's

11

employees were responsible for creating the "Paula Deen component" of the Smithfield Campaign. CtW was also provided with regular reports on the campaign by RAA. (Pltf's Opp. at 2-9).

### D. JWJ's Alleged Role In The Smithfield Campaign

JWJ knew that the focus of the campaign was to use "threats . . . escalation . . . and political pressure" to obtain union recognition.   To this end, JWJ contacted supermarkets to convince them to drop Smithfield's products.  JWJ publicized any success that they had with this tactic.  JWJ also worked extensively with the UFCW to get various city councils to pass resolutions condemning Smithfield.   JWJ planned campaign activities and participated in conference calls with the UFCW.  JWJ and the UFCW are also financially intertwined.  The UFCW holds an *ex officio* seat on JWJ's Board and pays JWJ $15,000 annually.  JWJ uses these contributions to help cover its expenses.  (Pltf's Opp. at 9-12).

### E. RAA's Alleged Role In The Smithfield Campaign

RAA understood that the Smithfield Campaign's main goal was "recognition" and a "union contract."   RAA employees have testified that they believed that the campaign would not come to an end until UFCW became the sole representative of the employees at the Tar Heel plant.

12

RAA's authorship of the "Packaged With Abuse" report publicly cast Smithfield in a highly negative light. One of RAA's employees, Julie Eisenberg, spent the vast majority of her time (80-90%) on the Smithfield Campaign, drafting letters, press releases, and regulatory complaints on behalf of the campaign. (Pltf's Opp. at 12-14).

**F. Local 400's Alleged Role In The Smithfield Campaign**

Local 400 knew that the "essential nature" of the Smithfield Campaign was to "obtain a union contract." Local 400 was seriously involved in many of the "aggressive" tactics of the campaign and sought to organize its constituent members to support the campaign. UFCW instructed JWJ to obtain Local 400's approval before planning events at certain grocery stores. Local 400 knew that the UFCW would benefit financially if the campaign succeeded. Local 400 is active in the campaign to this day. (Pltf's Opp. at 14-17).

**G. McDowell's Alleged Role In The Smithfield Campaign**

Leila McDowell has repeatedly stated that the goal of the Smithfield Campaign is for the UFCW to gain a "union contract." McDowell was heavily involved in, and was responsible for the creation of, many of the aggressive tactics employed by the campaign. McDowell participated in UFCW strategic planning meetings regarding the Smithfield

13

Campaign, knew that the success of the campaign would financially benefit the UFCW, and was highly compensated by the UFCW for her role in the campaign. (Pltf's Opp. at 17-19).

### III. Summary Judgment With Respect To Stern And Woodruff

The Defendants contend that both Stern and Woodruff's factual connection to the present matter is so attenuated as to warrant summary judgment on the claims against them. The Defendants argue that "no rational factfinder could conclude, other than through mere speculation or the building of one inference upon another, that Stern and Woodruff participated or agreed to participate in any extortionate activity." (Def's Mot. at 17).

In light of the *record as a whole*, however, both Stern and Woodruff have sufficient ties to the Smithfield Campaign so that a reasonable juror could find them to be active participants in the allegedly extortionate pattern of conduct undertaken by the UFCW. Stern's position on the Leadership Council of CtW provided him with a deep understanding of the activities and the goals of the campaign. Id. at 29. Also, through his seat on the Leadership Council, Stern was actively involved in the process of *approving* the campaign as a high priority of

14

CtW.   Id.   Additionally,  through  Woodruff's  role  on  the SOC, an entity which derived indirect funding from UFCW and which  financially  supported  the  Smithfield  Campaign, Woodruff was provided with reports on the campaign, and he planned meetings where the campaign was discussed.  See id. While none of this evidence is dispositive, when viewing the legitimate inferences from the foregoing evidence in the light most favorable to Smithfield, summary judgment must be denied on this issue.  See, e.g., Johnson v. Jones, 515 U.S. 304, 307 (1995) (denying summary judgment where there was "sufficient circumstantial evidence supporting [the plaintiff's] theory of the case.").

IV. **Summary Judgment On Count One Of The Complaint With Respect To All Seven Defendants**

Count One of the Amended Complaint alleges a violation of  18  U.S.C.  §  1962(d)  by  conspiring  to  violate Section 1962(a).  Under  Section 1962(d),  "It  shall  be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." See 18 U.S.C. § 1962(d) (2006).  To prevail under 18 U.S.C. § 1962(a), Smithfield must prove that:  (1) the Defendants derived income from a pattern of racketeering activity; (2) the income was used or invested, directly or indirectly, in the establishment or operation; (3) of an enterprise; (4)

15

which is engaged in or the activities of which affect interstate or foreign commerce. <u>United States v. Vogt</u>, 910 F.2d 1184, 1193 (4th Cir. 1990).

Smithfield is not required to prove the existence of a conspiracy through direct evidence. <u>United States v. Posada-Rios</u>, 158 F.3d 832, 857 (5th Cir. 1998). Because conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established *solely* by circumstantial evidence. <u>Id.</u> Consequently, "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances." <u>United States v. Maltos</u>, 985 F.2d 743, 746 (5th Cir. 1992) (citation omitted).

The Defendants contend that there "can be no RICO conspiracy against any Defendant in the absence of evidence that the Defendants knew of and agreed to the commission of at least two predicate crimes with the requisite relatedness and continuity, as well as that the Defendants knew of and agreed to the other elements of a substantive RICO offense." Def's Mot. at 18. Under this rationale, the Defendants assert that summary judgment must be granted because: (1) "there was no agreement by these Defendants to do something the law forbids;" and (2) "there is no

16

evidence that any of the Defendants herein agreed to derive income from the activities" forming the basis of Smithfield's conspiracy claim." (Def's Mot. at 19, 20).

As a matter of law, the Defendants' contention that each Defendant must have "kn[own] of and agreed" to "each element of the RICO predicate offense" to be liable under 18 U.S.C. § 1962(d) is plainly wrong. Indeed, in Salinas v. United States, 522 U.S. 52, 63 (1997), the Supreme Court held that to be found guilty of a RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme. See also United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (stating that "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts . . . to be found guilty of the racketeering conspiracy, for it suffices that he adopt the goal of furthering or facilitating the criminal endeavor"). Therefore, "[t]he [Plaintiffs] need not establish that each conspirator had knowledge of all of the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan." United States v. Tillett, 763 F.2d 628, 632 (4th Cir. 1985) (detailing the requirements of Section 1962(d)) (emphasis added). These

17

legal principles are embedded in the instruction given to juries and in the law of conspiracy generally.

Smithfield has presented sufficient proof of a RICO conspiracy with respect to all of the Defendants. All seven Defendants were intimately involved with the organizations charged with furthering the alleged extortionate scheme, all of the Defendants knew the main goal of the Smithfield Campaign, and five of the Defendants were highly active in the corporate campaign at the grass-roots level. On this record, there is a genuine dispute of material fact whether the Defendants truly believed that UFCW sought a "fair" election process, and whether the Defendants ever intended to derive income from their organizational support of the financially-intertwined UFCW. Therefore, summary judgment will be denied on this Count. See France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (when assessing a motion for summary judgment, "[w]hether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial.").

18

V.   **Summary Judgment On Count Two Of The Complaint With Respect To All Seven Defendants**

Count Two alleges a violation of 18 U.S.C. § 1962(d) by conspiring to violate Section 1962(b).  To establish a violation of Section 1962(b), Smithfield must prove that: (1) the Defendants engaged in a pattern of racketeering activity; (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce.  See 18 U.S.C. § 1962(b) (2006); see generally Davis v. Hudgins, 896 F. Supp. 561, 567 (E.D. Va. 1995).

Under the reasoning of Titan International, Inc. v. Becker, 189 F. Supp. 2d 817 (C.D. Ill. 2001), Smithfield has sufficiently alleged that the Defendants conspired to violate Section 1962(b).  In Titan, the court held that:

> To properly state a claim for a conspiracy to violate § 1962(b), Plaintiffs' allegations of Defendants' agreement to control or participate in the enterprise need not rise to the level of formal control.  To allege control, Plaintiffs must allege that Defendants agreed to manipulate Plaintiffs' activities through predicate acts which would *cause Plaintiffs to make decisions it would not have otherwise made.*

189 F. Supp. 2d at 829 (emphasis added).  And, Smithfield has offered proof from which a reasonable jury could make findings in Smithfield's favor on each point.

19

Failing to advance any new legal arguments, the Defendants simply urge "reconsideration" of the issue with "a fuller record now before the Court." (Def's Mot. at 23). Again, the Defendants contend that "control" under Section 1962(b) requires "actual day-to-day" involvement in the enterprise.[1] Id. However, the one case cited by Defendants in support of this position, NCNB Nat'l Bank v. Tiller, 814 F.2d 931 (4th Cir. 1987), is not in tension with the above holding in Titan, and actually lends support to the Court's prior ruling on the Defendant's Motion to Dismiss.

In Tiller, 814 F.2d at 936, the Fourth Circuit held that "actual day-to-day involvement in management and operations of the borrower *or the ability to compel the borrower to engage in unusual transactions* is required for the purposes of showing that [the] lending institution had control." (emphasis added). In neglecting the latter part of the holding in Tiller, the Defendants fail to recognize that the holdings of Titan and Tiller are not in disagreement, and that the standard set forth in Titan still controls the analysis. See Def's Mot. at 23.

As the Court previously noted, "by interfering with Smithfield's business relationships with third parties and

---

[1] This same argument was considered, and rejected by the Court, during the Defendants' Motion to Dismiss ("Mem. Op.").

damaging Smithfield's relations with its shareholders and
in the institutional investment community," the Defendants
have allegedly inflicted "significant financial losses on
Smithfield." (Mem. Op. at 31). These losses have surely
caused Smithfield to make decisions that it otherwise
"would not have made." See Titan, 189 F. Supp. 2d at 829.
Therefore, because of the evidentiary showing made by
Smithfield, which details the nature and the extent of the
Defendants' involvement in the Smithfield Campaign, summary
judgment will be denied on this Count.

VI.   Summary Judgment On Count Three Of The Complaint
      With Respect To All Seven Defendants

Count Three alleges a violation of 18 U.S.C.
§ 1962(c). To make out a violation of Section 1962(c),
Smithfield must prove "(1) conduct (2) of [the affairs of]
an enterprise (3) through a pattern (4) of racketeering
activity." Davis v. Hudgins, 896 F. Supp. 561, 567 (E.D.
Va. 1995) quoting Sedima, S.P.R.L. v. Imrex, 473 U.S. 479,
496 (1985).

In support of their Motion for Summary Judgment, the
Defendants contend that none of the seven Defendants have
sufficiently "conduct[ed] or participate[d]" in the affairs
of the UFCW or Local 400 to be held liable under
Section 1962(c). This same argument was made by the

21

Defendants in their Motion to Dismiss, and was rejected under the decision of <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 178-79 (1993). (Mem. Op. at 35). The Defendants simply request that this Court "reconsider its reliance" on <u>Reves</u>. (Def's Mot. at 27).

In <u>Reves v. Ernst & Young</u>, the Supreme Court held that, in order to "conduct or participate" in an enterprise's affairs through a pattern of racketeering activity, it is necessary to have some part in "directing" the affairs of the enterprise. <u>Id.</u> at 178-79. In <u>Reves</u>, the Court held that outside auditor, Arthur Young, did not participate in the operation or management of the enterprise by creating the enterprise's financial statements. <u>Id.</u> at 186. Thus, the Court made clear that it is necessary to distinguish between or entity "acting in an advisory professional capacity (even if in a knowingly fraudulent way) and [one] acting *as a direct participant in corporate affairs*." <u>In re American Honda Motor Co. Inc. Dealerships Relations Litigation</u>, 941 F. Supp. 528, 560 (D. Md. 1996) (emphasis added).

While the Defendants persuasively point to a number of seemingly analogous cases where a defendant's conduct was deemed insufficient to ground liability under the standard articulated in <u>Reves</u>, none of those cited cases speak to

22

the type of direct, ground-level facilitation of extortionate conduct as is alleged, and as for which there is evidentiary support in, this record. See, e.g., Chisolm v. Charlie Falk Auto Wholesalers, 851 F. Supp. 739, 749 (E.D. Va. 1994) (where one defendant was "only alleged to have associated with [the other Defendant]" there was no liability under Section 1962(c)) (cited by the Defendants). Consequently, the record offers no reason to amend the prior holding which relied on Reves. The evidence presented by Smithfield illustrating the active participation of all seven Defendants in the Smithfield Campaign necessitates that summary judgment be denied on this Count.

### VII. Summary Judgment On Count Four Of The Complaint With Respect To All Seven Defendants

Count Four alleges a violation of 18 U.S.C. § 1962(d) by conspiring to violate Section 1962(c). To make a case for conspiracy, each defendant "must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." Brouwer v. Raffensperfer, Hughes & Co., 199 F.3d 961, 967 (7th Cir. 2000).

By virtue of the Defendants' respective corporate positions, conversations, and participation in the

23

Smithfield Campaign, there appears to be sufficient evidence for a reasonable jury to conclude that each of the seven Defendants knew of the allegedly extortionate goal of UFCW (i.e., recognition and a first contract). Therefore, viewing the inferences from this evidence in the light most favorable to Smithfield, summary judgment will be denied on this Count.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Docket No. 89) will be denied.

It is so ORDERED.

                                              _____/s/_____ /REP/
                                            Robert E. Payne
                                            Senior United States District Judge

Richmond, Virginia
Date: October 14, 2008