

F I L E D

OCT 1 4 2008

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SMITHFIELD FOODS, INC.
and SMITHFIELD PACKAGING
COMPANY,

    Plaintiffs,

v.                      Civil Action No. 3:07cv641

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment (Docket No. 88) filed by Defendants United Food and Commercial Workers International Union ("UFCW"), United Food and Commercial Workers Local No. 400, Change to Win, Research Associates of America, Jobs with Justice, Gene Bruskin, Joseph Hansen, William T. McDonough, Leila McDowell, Patrick J. O'Neill, Andrew L. Stern, and Tom Woodruff (collectively "Defendants"). For the reasons set forth below, the Motion for Summary Judgment will be denied.

## BACKGROUND

Smithfield Foods, Inc. is a Virginia corporation with its principal place of business in Smithfield, Virginia. (Amended Compl. at ¶ 8). Smithfield Packaging Company is a wholly-owned subsidiary of Smithfield Foods. Id. at ¶ 9. Smithfield's largest asset is its pork processing plant in Tar Heel, North Carolina. Id. The Tar Heel plant is the world's

largest pork processing plant and employs approximately 4,650 hourly employees.  According to the Complaint, the UFCW has been unsuccessfully trying for well over a decade to become the bargaining representative for the employees of the Tar Heel plant.  Id.

The National Labor Relations Act ("NLRA") 29 U.S.C.A § 158(a)(3) permits a union to become a collective bargaining representative for an employer's employees if the union prevails in an election certified by the National Labor Relations Board ("NLRB").  The NLRA also permits an employer, under certain circumstances, to voluntarily recognize a union. See 29 U.S.C.A. § 158(a)(3) (2008).

According to the Amended Complaint, the UFCW publicly announced a "corporate campaign" against Smithfield in June 2006.  Corporate campaigns include a "wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state and federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public."  Food Lion, Inc. v. UFCW, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997).  The alleged object of the Defendants' campaign against Smithfield was to force Smithfield to recognize the UFCW as the collective bargaining representative of the employees at the Tar Heel plant and

2

agree to a collective bargaining contract or to force the Plaintiffs to become so unprofitable as to necessitate cessation of business operations. (Amended Compl. at ¶¶ 38-41).

Smithfield has presented a nine count Amended Complaint. Counts One through Four allege Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, with violations of state extortion law forming the RICO predicate offense. Counts Five through Nine allege various state law claims. On May 29, 2008, the Court denied the Defendants' Joint Motion to Dismiss under Fed. R. Civ. Pro. 12(b)(6) as to Counts Two through Nine of the Complaint, and granted the Motion as to Count One, with leave to file an Amended Complaint as to Count One (hereinafter "Mem. Op."). After additional discovery, and with a "fuller record before the Court," the Defendants have now moved for summary judgment.

The Defendants have presented six "undisputed material facts" which allegedly provide grounds for summary judgment. These six material facts are:

1.  UFCW's sole request was that Smithfield agree to enter into a secret ballot election process which would be supervised by a mutually agreeable, neutral third party.

2.6. Attached copies of letters, emails, and depositions in which the parties undertake the process of trying to negotiate for the "voluntary" recognition of the UFCW. The crux of these attached documents is that in no way did the Defendants ever "demand" Smithfield's recognition. As such, the corporate campaign undertaken by the Defendants was an entirely

3

lawful attempt to persuade Smithfield to recognize the union.

(Defs' Mot. at 7-17).

In sharp contrast to these six "uncontested" material facts, Smithfield has presented numerous citations to physical documents and deposition transcripts which allegedly permit the trier of fact to make a number of key permissible inferences. These inferences include, *inter alia*, that: (1) the Defendants are conducting the corporate campaign because they know that they can not win a "free and fair" election process; (2) the Defendants could have availed themselves of the opportunity to have a fair election process; (3) the Defendants instituted a "smear campaign" because they knew that they would not win a fair election; (4) the Defendants' true goal was a "rigged and fraudulent" election process; (5) the Defendants will not stop the corporate campaign until they gain recognition and a first contract; (6) the Defendants attempted to extort Smithfield into agreeing to recognition through a "sham election" and a "pre-negotiated" contract; and (7) the Defendants have continued their extortionate conduct to this day. (Pltfs' Opp. at 4-21). Based on the facts and the assertedly permissible inferences to be drawn from them, Smithfield contends that there remain disputed issues of material fact which must be tried to a jury.

4

## DISCUSSION

Counts One through Four of the Amended Complaint allege federal Racketeering Influenced and Corrupt Organization ("RICO") claims.   The Defendants have identified five so-called "fatal" flaws in Smithfield's RICO case.   The Defendants contend that: (1) Smithfield has failed to satisfy RICO extortion's "wrongfulness" requirement; (2) Smithfield's claims are barred by the First Amendment; (3) Smithfield's claims are barred by the "federal labor laws;" (4) Smithfield has failed to meet RICO extortion's "obtaining from another" requirement; and (5) Smithfield has failed to meet the RICO "pattern" element.

Counts Five through Nine allege various state law claims. The Defendants contend that Smithfield's state law claims are preempted by the federal labor laws.

### I.    The Standard For Assessing A Motion For Summary Judgment Under Fed. R. Civ. Pro. 56(c)

Summary judgment is appropriate where there is no genuine issue as to any material fact.   See Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A genuine

issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party.  See id.

Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party.  See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

A party cannot, however, "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp., 477 U.S. at 327. These precepts and standards govern the resolution of the Defendants' Motion. Swann v. City of Richmond, 498 F. Supp. 2d 847, 853 (E.D. Va. 2007).

These principles guide the assessment of the Defendants' contention that Smithfield's RICO claims are fivefold flawed.

6

## II.        RICO's "Wrongfulness Requirement"

Smithfield has identified three property interests which allegedly were "wrongfully" targeted by the Defendants through the Smithfield Campaign.  First, Smithfield alleges that the Defendants have continuously demanded that Smithfield recognize the UFCW and execute a contract with the UFCW. (Pltfs' Supp. Mot. at 1, 2).  Second, Smithfield contends that the Defendants "sought to extort Smithfield's participation in an illegal shoebox election scheme."[1]  Id. at 2.  Third, Smithfield states that the Defendants "sought to have Smithfield remain 'neutral' during an election and waive all its other rights under the NLRA that attach to an organizational election, including the right to insist upon a NLRB-sanctioned election itself."  Id.

The Defendants argue that Smithfield's extortion claims necessarily fail for three reasons: (1) Virginia and North Carolina's extortion statutes contain a "wrongfulness" requirement which has not actually been satisfied by Smithfield; (2) Smithfield's argument is contrary to the assertedly well-established legal principle that the use of fear of economic loss in support of a lawful negotiation demand is not extortionate; and (3) to the extent that

---

[1] All parties have agreed that if a shoebox election was demanded, it would constitute extortion under RICO. Therefore, the legal dispute has centered on whether the additional "lawful" demands by the Defendants can constitute extortion under RICO.

Smithfield's construction of the RICO statute is correct, it would be unconstitutional.  (Defs' Supp. Opp. at 6, 7, 11).

Primarily, the Defendants contend that, under RICO, Smithfield cannot state a cognizable claim for extortion which does not have at its core an "unlawful objective."  Id. at 7.  Hence, the Defendants argue that they have, at most, engaged in "lawful hard bargaining" through the application of economic pressure, and that they have not engaged in unlawful extortion simply through their use of economic "force."  (Defs' Mot. at 21).

### A.  The Particular Statutes At Issue

The resolution of the parties' arguments necessarily turns on the interplay of decisions applying four statutes:  (1) the federal extortion statute (the "Hobbs Act"); (2) RICO;  (3) the Virginia extortion statute; and (4) the North Carolina extortion statute.

#### a.  The Hobbs Act

Codified at 18 U.S.C. § 1951(a) (2008), the Hobbs Act proscribes interference with commerce by threats or violence. In relevant part, the statute provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both

Id.  "Extortion" is further defined under the Hobbs Act, as

"the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear."  18 U. S. C. § 1951(b)(2) (2008).

The contours of the Hobbs Act were defined by the Supreme Court in United States v. Enmons, 410 U.S. 396 (1973).  In Enmons, the Supreme Court specifically addressed "whether the Hobbs Act proscribes violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands."  Id. at 399. The Supreme Court observed that "[t]he legislative framework of the Hobbs Act . . . makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends."  Id. at 401. However, "when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate."  Id. at 406 n.16.

Thus, in Enmons, the Supreme Court held that a person employs "wrongful" means not necessarily by employing means that are illegal unto themselves, but by exploiting one of the means identified in the Hobbs Act (e.g., "actual or threatened force, violence, or fear") to obtain property to which "the alleged extortionist has no lawful claim."  Enmons, 410 U.S. at 400; Clemente, 640 F.2d at 1076.  Under Enmons, when the objective is wrongful (i.e., to obtain property to which one "has no lawful claim"), then the means (e.g., exploitation of fear) are also wrongful, but the converse is not necessarily

9

true.  <u>Viacom Int'l, Inc. v. Icahn</u>, 747 F. Supp. 205, 210

(S.D.N.Y. 1990).

### b.  The RICO Statute

Enacted in 1970, RICO acts as a sweeping law enforcement

tool to combat extortion.  The statute provides:

> It shall be unlawful for any person who has received any
> income derived, directly or indirectly, from a pattern of
> racketeering activity or through collection of an
> unlawful debt in which such person has participated as a
> principal within the meaning of section 2, title 18,
> United States Code [18 USCS § 2], to use or invest,
> directly or indirectly, any part of such income, or the
> proceeds of such income, in acquisition of any interest
> in, or the establishment or operation of, any enterprise
> which is engaged in, or the activities of which affect,
> interstate or foreign commerce

18 U.S.C. § 1962(a) (2008).  The statute further defines

"racketeering activity" as "any act or threat involving

murder, kidnapping, gambling, arson, robbery, bribery,

_extortion_, dealing in obscene matter, or dealing in a

controlled substance or listed chemical . . . ., _which is_

_chargeable under State law_ and punishable by imprisonment for

more than one year."  18 U.S.C. § 1961(1)(A) (2008) (emphases

added).

Notably, for a "state extortion offense" to qualify as a

predicate act under the federal RICO statute, the conduct must

be capable of being generically classified as extortionate:

that is, "obtaining something of value from another with his

consent induced by the _wrongful_ use of force, fear or

threats."  <u>Scheidler v. Nat'l Org. for Women, Inc.</u>, 537 U.S.

10

393, 409-10 (2003) (emphasis added); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088 (11th Cir. 2004). Federal district courts are given broad statutory authority to craft civil remedies for violations of the RICO statute.  18 U.S.C. § 1961(3) (2008).

### c.  The Virginia Extortion Statute

In Virginia, "[a]ny person who threatens injury to the character, person, or property of another person . . . and thereby extorts money, property, or pecuniary benefit or any note, bond, or other evidence of debt from him or any other person, is guilty of a Class 5 felony." Va. Code Ann. § 18.2-59 (2008). Under the statute, extortion has been defined as follows: "To gain by wrongful methods; to obtain in an unlawful manner, as to compel payments by means of threats of injury to person, property, or reputation." Stein v. Commonwealth, 12 Va. App. 65, 69, 402 S.E.2d 238, 241 (1991) (quoting Black's Law Dictionary 525 (6th ed. 1990)).

As the above definition makes clear, in Virginia, "the gravamen of extortion is wrongfully obtaining a benefit." Strohecker v. Commonwealth, 475 S.E.2d 844, 852 (Va. Ct. App. 1996). The Virginia courts are equally clear, however, that the "wrongfulness" requirement of extortion does not require that the aim of the extortionate scheme be unlawful.  Indeed, the Virginia courts have explicitly rejected any "claim of right" defense to a charge of civil extortion.  Pierce v. Commonwealth, 205 Va. 528, 533, 138 S.E.2d 28, 31-32 (1964)

11

("While a bona fide claim of right may be a valid defense to a charge of robbery or larceny in Virginia," the same is not true for extortion.); see also Strohecker, 475 S.E.2d at 852 ("An intent to steal is not, however, an element of extortion."). The absence of any such "claim of right" defense demonstrates that, under the Virginia extortion statute, the lawfulness of the demanded object is irrelevant. Therefore, an extortionate means is sufficient to establish liability under Va. Code Ann. § 18.2-59 (2008).

### d. The North Carolina Extortion Statute

Under North Carolina law, "[a]ny person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon." N.C. Gen. Stat. § 14-118.4 (2008). Thus, there are two elements to extortion under North Carolina law: (1) that the defendant communicated a threat; and (2) that the defendant did so with the intent to wrongfully obtain something of value. State v. Greenspan, 92 N.C. App. 563, 566 (N.C. Ct. App. 1989). North Carolina courts also have rejected any "claim of right" defense to a charge of extortion. Id. at 569-70. Therefore, it is clear that the "wrongfulness" requirement of North Carolina's extortion statute can be met solely by reference to the means employed by a defendant.

### B. The Application Of The Hobbs Act To The State Law

### Extortion Claims At Issue In This Case

The central dispute between the parties pertains to whether the "object of the [alleged] perpetrator's threat must be unlawful in order for a violation [of the RICO statute] to occur." (Pltfs' Supp. Mot. at 5). Smithfield contends that what the civil RICO statute "criminalizes is not asking for something unlawful, but [simply] making a threat as a means to obtain property or anything of value." Id. at 5, 6. In contrast, the Defendants argue that an "unbroken line of RICO extortion law decisions" hold that the use of economic fear to induce a lawful negotiation demand is not wrongful, and thus not extortionate under the RICO statute. (Defs' Supp. Opp. at 7).

### a.   The Proper Scope Of Enmons

The Defendants base their position on the Supreme Court's opinion in Enmons, which held that unlawful conduct in support of the lawful objective of a strike could not be deemed extortion under the Hobbs Act. 410 U.S. at 401; see also United States v. Clemenete, 640 F.2d 1069 (2d Cir. 1981) (explaining the Supreme Court's decision in Enmons). The Defendants contend that Enmons spoke in "general" terms, and that its holding was not limited to claims of extortion asserted under the Hobbs Act. (Defs' Supp. Opp). at 17. Smithfield, however, argues that "Enmons does not govern Smithfield's RICO claims in the first instance because those

13

claims do not rely on violations of the Hobbs Act for their predicate acts.  The predicate acts for those claims are based exclusively on violations of Virginia and North Carolina law." Pltfs' Mot. at 10.  On that point, Smithfield's position is correct.

The text and content of the Supreme Court's decision in Enmons reveals that the Court was concerned specifically with the legislative history and textual provisions of the Hobbs Act.  In reaching its conclusion, the Court painstakingly detailed the particular legislative compromises and floor speeches made before the enactment of the Hobbs Act.  See Enmons, 410 U.S. at 402-07.  Subsequent to that exhaustive undertaking, the Supreme Court explicitly observed that "[t]he legislative framework of the Hobbs Act . . . makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends," id. at 401, referring to the strike there at issue.

Moreover, the Enmons Court concluded that, in enacting the Hobbs Act, Congress did not change "the federal-state balance" by defining "as a federal crime conduct readily denounced as criminal by the states."  Id. at 411 (quoting United States v. Bass, 404 U.S. 336, 349 (1971)).  Rather, the Supreme Court explained that the Hobbs Act was passed to remedy Congress's disapproval with one portion of the Court's prior decision in United States v. Local 807, 315 U.S. 521 (1942); a decision which would have allowed labor unions to

14

demand money through violent means.  See Enmons, 410 U.S. at 402.

    With this in mind, it is unsurprising that "[i]n the [years] since Enmons was decided courts have applied it restrictively."   A. Terzi Prods. v. Theatrical Protective Union, Local No. One, 2 F. Supp. 2d 485, 506-508 (S.D.N.Y. 1998); United States v. Zappola, 677 F.2d 264, 269 (2d Cir. 1982).  A number of courts have expressed the view that the holding of Enmons is limited to its facts under the Hobbs Act. See United States v. Cerilli, 603 F.2d 415, 419 (3d Cir. 1979) ("More importantly, Enmons is a labor case.  The Court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context."); United States v. Porcaro, 648 F.2d 753, 760 (1st Cir. 1981) (Enmons is a labor case dealing with the unique problem of strike violence" under the Hobbs Act); United States v. Agnes, 753 F.2d 293, 298-99 (3d Cir. 1985); United States v. Thordarson, 646 F.2d 1323, 1326 (9th Cir. 1981); United States v. Zappola, 677 F.2d 264, 269 (2d Cir. 1982); United States v. Warledo, 557 F.2d 721, 730 (10th Cir. 1977); United States v. Quinn, 514 F.2d 1250, 1257 (5th Cir. 1975); see also John E. Higgins, Jr., The Developing Labor Law (Vol. II), 2586 (5th ed. 2006). The present case, which involves neither the Hobbs Act nor striking workers, is neither analogous nor controlled by Enmons.

Furthermore, subsequent to the Supreme Court's decision in Enmons, lower courts consistently have held that union conduct alleged to violate a state extortion statute can form the basis of a RICO predicate act, without regard for whether the "wrongfulness" element of Enmons is satisfied. See, e.g., Teamsters Local 372 v. Detroit Newspapers, 956 F. Supp. 753, 764 (E.D. Mich. 1997) (notwithstanding Enmons, the court held that "conduct alleged to violate the Michigan extortion statute can form the basis of a RICO predicate act"); C & W Constr. Co. v. Brotherhood of Carpenters & Joiners, Local 745, 687 F. Supp. 1453, 1469 (D. Haw. 1988) ("Even if the Hobbs Act did not support the plaintiffs' RICO claim, the court could, upon proper application after hearing, allow the plaintiffs to amend their complaint under Fed. R. Civ. P. 15(a) to plead violations of state extortion law."); cf. Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639, 839 F.2d 782, 789 (D.C. Cir. 1988) (a successful appellant did not base predicate its acts of extortion on the Hobbs Act, but on various D.C. and Maryland statutes). Consequently, these courts made clear that "[n]othing in [Enmons] even remotely suggests" that "using economic force to obtain a [] collective bargaining agreement" is "not extortion within the generic meaning of that term employed by the RICO statute." Overnite Transp. Co. v. Truck Drivers, etc. Local No. 705, 704 F. Supp. 859, 862 (N.D. Ill. 1989).

16

Indeed, in _Enmons_, the Supreme Court took particular care to note that its decision did not affect the availability of state prosecution for the actions which were afforded immunity under the Hobbs Act.   See _Enmons_, 410 U.S. at 412 ("This type of violence, as the Court points out, is subject to state criminal prosecution.") (Blackmun, J., concurring).   As the Court stated in _Local 807_ and reaffirmed in _Enmons_:

> The power of the state and local authorities to punish acts of violence is beyond question. It is not diminished or affected by the circumstance that the violence may be an outgrowth of a labor dispute. The use of violence disclosed by this record is plainly subject to the ordinary criminal law.

_Local 807_, 315 U.S. at 536.   The Hobbs Act, therefore, narrowly overruled that portion of the Court's decision in _Local 807_ pertaining to union violence, but it left the law otherwise unchanged.   See _Enmons_, 410 U.S. at 402-06.

These decisions strongly counsel against the Defendants' proffered restrictive application of _Enmons_ because that restrictive application rung counter to the actual holding of the case.[2]   Indeed, notwithstanding the superficial tendency

---

2 An additional dispute between the parties appears to be whether the "wrongfulness" of the Defendants' conduct presents a question of fact for the jury or question of law for the court to decide on summary judgment.  (Defs' Reply at 12).   In support of the contention that the resolution of the "wrongfulness" of the Defendants' conduct presents a question of law, the Defendants rely on three cases: George Lussier Enters. v. Subaru of New Eng., Inc., 393 F.3d 36 (1st Cir. 2004); Brokerage Concepts v. United States Healthcare, 140 F.3d 494, 524 (3d Cir. 1998); Viacom Int'l, Inc. v. Icahn, 747 F. Supp. 205, 213 (S.D.N.Y. 1990).  Careful examination these cases, however, reveals that, in all of these cases, where the

to "read and apply Enmons as a general jurisprudence of extortion law," using Enmons "to legalize conduct made criminal under state law would turn Enmons upside down." Herbert R. Northrup & Charles H. Steen, Union Corporate Campaigns As Blackmail: The RICO Battle at Bayou Steel, 22 Harv. J.L. & Pub. Pol'y 771, 815 (1999). Therefore, the Court declines the invitation to extend Enmons beyond its self-contained limitations.

### b. The Civil RICO Statute

The RICO statute explicitly includes violations of state extortion law among its predicate offenses. See 18 U.S.C. § 1961(1)(A). Accordingly, civil claims under RICO can be based *either* on violations of the Hobbs Act *or* on "any act or threat involving . . . extortion . . . which is chargeable under state law . . . ." 18 U.S.C. § 1961(1). Significantly, the text of the civil RICO statute does not graft any restrictions onto the state-based actions which can permissibly constitute a RICO predicate offense. In fact, the text of the statute

---

"wrongfulness" of the defendant's actions was resolved as a matter of law, a Hobbs Act claim was brought by the plaintiff. See also Clemente, 640 F.2d at 1076 (Hobbs Act case cited by the Defendants). Significantly, outside of the strictures of the Hobbs Act, it is apparent that the issue of "wrongfulness" presents a question of fact and should therefore be resolved by a jury so long as there remain disputed issues of material fact. See Archer v. Economic Opportunity Comm'n, 30 F. Supp. 2d 600, 607 (E.D.N.Y. 1998) ("Viewing the evidence in the light most favorable to the plaintiffs, they have raised a factual issue as to the existence of an extortion agreement," and summary judgment should be denied).

belies any interpretation of that sort through its use of the word "any."  18 U.S.C. § 1961(1).

In sharp contrast to the text of the statute, however, the Defendants would have the Court effectively "read out" of 18 U.S.C. § 1961(1) "any act or threat involving extortion chargeable under state law" *if* such conduct failed to satisfy the "wrongfulness" requirement of <u>Enmons</u>.  So applied, <u>Enmons</u> would provide unions with an unassailable defense to civil RICO actions based on state extortion law so long as the union's goals remained within the ambit of labor objectives, vaguely all of which are asserted to be "legitimate."  <u>See</u> <u>States v. Debs</u>, 949 F.2d 199 (6th Cir. 1991) (en banc) (if every union activity were held to be "within the orbit of <u>Enmons</u> . . . such a holding would immunize union members from sanction so long as their otherwise illegal action is committed in the context of labor activity").  Such an interpretation of <u>Enmons</u> would greatly circumscribe the conduct which can form the predicate acts of a civil RICO claim, and would also effectively destroy the explicit conjunctive choice that Congress provided to plaintiffs under RICO.  That interpretation of RICO must be rejected.  <u>Cf.</u> <u>Lowe v. SEC</u>, 472 U.S. 181, 219 (1985) (a "fundamental axiom" of statutory interpretation is "that a statute is to be construed so as to give effect to all its language").

Furthermore, the Defendants' proffered restrictive interpretation of the RICO statute runs contrary to the rather

clear legislative history of the statute.  As numerous courts have held, "by adopting the states' statutory law of extortion, Congress meant to punish as extortion *any effort* to obtain property by inherently wrongful *means*, such as force or threats of force."  See, e.g., Zappola, 677 F.2d at 268 (emphases added); Gillmor v. Thomas, 490 F.3d 791, 799 (10th Cir. 2007).

Accordingly, in light of both the text and legislative history of 18 U.S.C. § 1961(1), and the subsequent decisions interpreting the RICO statute, it is clear that the Hobbs Act's definition of "wrongful," as articulated by the Supreme Court in Enmons, does not apply to the state law extortion predicates of Smithfield's RICO claims.  Therefore, the Defendants' argument that extortion under RICO requires the existence of an "unlawful objective" must be rejected.

Under this legal framework, Smithfield has presented sufficient evidence for a jury to conclude that the Defendants acted with a "wrongful purpose" (i.e., wrongful means) through their corporate campaign; namely, that the campaign sought to force Smithfield to give up valuable property rights in recognizing the Union and agreeing to a first contract. Therefore, summary judgment cannot be granted on this basis.[3]

---

[3] The Defendants advance the additional argument that "if Smithfield's position on the use of economic pressure (in the form of a negative publicity and boycott campaign) to achieve a lawful objective constitutes the crime of RICO extortion" it would "be unconstitutional."  (Defs' Supp Opp. at 11).  The First Amendment implications of the Smithfield Campaign are

### III.    Whether The Plaintiffs' Claims Are Barred By The First Amendment

The Defendants contend that, because the "pressure devices" employed during the Smithfield Campaign have consisted entirely of "speech or petitioning activities," the Defendants have a "First Amendment right to publicize their objections to [Smithfield's] business practices." (Defs' Mot. at 23).  That alone, say the Defendants, entitle them to summary judgment.

There can be no question that meetings, speeches, petitions, nonviolent picketing, and boycotts are all forms of speech and conduct that are entitled to protection under the First Amendment.  "[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process, and citizens must be able to make their views known by collective effort, lest their voices be faint or lost."  Citizens Against Rent Control Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294 (1981).  Such speech may cajole others to boycott businesses without losing its protected character, and governmental abridgement of such discussion can only occur to prevent "clear danger of substantive evils."  Thornhill v. Alabama, 310 U.S. 88 (1940).  Indeed, it is abundantly clear that "[s]peech does not lose its protected character . . . simply

---

addressed in Section III, infra.

21

because it may embarrass others or coerce them into action."
NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910 (1982); see
also Organization for a Better Austin v. Keefe, 402 U.S. 415
(1971).

In the specific context of labor relations, the Supreme
Court has made it equally clear that "[t]he dissemination of
information concerning the facts of a labor dispute must be
regarded as within that area of free discussion that is
guaranteed by the Constitution." Thornhill, 310 U.S. at 102.
This is true even though the information distributed "may
persuade some of those reached to refrain from entering into
advantageous relations with the business establishment that is
the scene of the dispute." Id. at 104.

However, the right to First Amendment protection for
acrimonious speech within the labor context, although broad,
is not absolute. See Gertz v. Robert Welch, Inc., 418 U.S.
323 (1974). As an initial matter, it is clear that the "First
Amendment does not provide a defense to a criminal charge
simply because the actor uses words to carry out his illegal
purpose." United States v. Barnett, 667 F.2d 835, 842 (9th
Cir. 1982). The Supreme Court repeatedly has recognized that
it does not abridge freedom of speech to make a course of
conduct illegal, even though the conduct is in some respect
carried out by means of expression. Cox v. Louisiana, 379
U.S. 559, at 563 (1966); see also Giboney v. Empire Storage &
Ice Co., 336 U.S. 490, 502 (1949) ("[I]t has never been deemed

an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.").

Moreover, while the use of speech, boycotts, and threats of social ostracism cannot provide the basis of a damages award or a judgment in equity, it is indisputable that "violent conduct is beyond the pale of constitutional protection." Claiborne, 458 U.S. at 933. "[V]iolence has no sanctuary in the First Amendment under the guise of advocacy." Samuels v. Mackell, 401 U.S. 66, 71 (1971)(Douglas, J., concurring).

Additionally, it is well-settled that "true threats" of violence are not protected by the First Amendment. Virginia v. Black, 538 U.S. 343, 359 (2003). True threats, in contrast to mere "political hyperbole," have been characterized by the Supreme Court as statements made by a speaker who "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group." Black, 538 U.S. at 359. The rule, thus, is rather clear that no federal law or legal principle prevents a court from imposing liability for losses that are caused by violence and threats of violence. Claiborne, 458 U.S. at 916; Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 773 (1994) (stating, in a case involving abortion protesters, that "threats . . .

however communicated, are proscribable under the First Amendment").

In this case, however, Smithfield has not alleged that the Defendants ever resorted to violence, or insinuated that they would resort to violence, in order to achieve their stated goal of recognition and a first contract. Accordingly, the allegations of "extortion" made by Smithfield in this case occupy a somewhat uncertain middle-ground between the well-defined judicial extremes of proscribable "true threats" and protected nonviolent protest.

### A. The Applicable First Amendment Calculus

The general validity of the RICO statute has not been, and cannot be, seriously challenged by either side. E.g., United States v. Weslin, 156 F.3d 292, 296 (2d Cir. 1998) (noting that RICO was validly enacted under the Commerce Clause). However, even "[a] statute [like RICO] that is valid on its face because it does not, by its terms, unconstitutionally restrict free speech, may still be examined as applied to a specific case." See John E. Nowak & Ronald Rotunda, Constitutional Law 1155 n.27, (7th ed., 2000). Thus, notwithstanding the general validity of RICO's statutory prohibitions, the intersection of Smithfield's RICO claims and the First Amendment must be analyzed under the specific facts of this case.

Obviously, some inconvenience to speech is caused by all laws, including RICO, and this inevitable inconvenience to

free speech that the law engenders cannot by itself be a basis for avoiding liability. See Arcara v. Cloud Books, 478 U.S. 697 (1986) (". . . every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities."). Additionally, it is well-established that "secondary boycotts" and picketing by labor unions may be prohibited as part of Congressional action in striking the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from forced participation in industrial strife. NLRB v. Retail Store Employees, 447 U.S. 607, 617-18 (1980) (Blackmun, J., concurring in part).

Nevertheless, the exact interplay between extortion under RICO and the First Amendment has yet to be definitively established by the Supreme Court. In Scheidler v. NOW, the Supreme Court's first Scheidler opinion, Justice Souter specifically noted that the Court's decision was a narrow procedural ruling that in no way meant that a later assertion of First Amendment rights could not protect activities normally targeted under RICO. 510 U.S. 249, 264 (1994) (Souter, J., concurring). Justice Souter stated that "[c]onduct alleged to amount to Hobbs Act extortion, for example, or one of the other somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis." Scheidler, 510 U.S. at 264. That description of the decision

25

in the first Scheidler decision is correct, and thus, the First Amendment issue remains an unresolved topic in civil RICO litigation.

Nonetheless, it is clear that, when allegedly unlawful conduct occurs in the context of constitutionally protected activity, "precision of regulation" is demanded. Claiborne, 458 U.S. at 916 (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)). With this in mind, the Fourth Circuit straightforwardly has held that "threats of extortion" are "not constitutionally protected simply because they are verbalized or written." United States v. Bly, 510 F.3d 453, 456 (4th Cir. 2007); see also United States v. Marchetti, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Extortion is a crime although it is verbal."). Of course, Bly dealt with extortionate threats of violence and Marchetti concerned matters of national security. Hence, notwithstanding the cited decisional text from the Fourth Circuit, it is unclear whether the decisions in Bly and Marchetti would extend beyond their facts.

Numerous other courts, however, have held that the government may proscribe "threats, extortion, blackmail and the like," notwithstanding "their expressive content." Gresham v. Peterson, 225 F.3d 899, 909 (7th Cir. 2000) (collecting cases); see also R.A.V. v. City of St. Paul, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) ("Although the First Amendment broadly protects 'speech,' it does not protect

the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'") (internal citation omitted).   Indeed, "Congress has passed numerous laws that proscribe threats . . . and these statutes have been consistently upheld as constitutional . . . ." United States v. Hayward, 6 F.3d 1241, 1259 (7th Cir. 1993); see also United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) ("Speech is not protected when it is the very vehicle of the crime itself.") (citing 18 USCS § 871-871 ("threats, extortion, blackmail, kickbacks")); Boos v. Barry, 485 U.S. 312, 326 (1988) (commenting favorably on a law that prohibits activity undertaken to "intimidate, coerce, threaten, or harass").   These categories of speech are, in short, "properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues."   United States v. Irving, 509 F.2d 1325, 1331 (5th Cir. 1975) (citing Watts, 402 F.2d at 690).

These considerations have lead two courts to conclude that "[i]t may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which [has] no protection at all."   United States v. Hutson, 843 F.2d 1232, 1235 (9th Cir. 1988) (quoting United States v. Quinn, 514 F.2d 1250, 1268 (5th Cir. 1975), cert. denied, 424 U.S. 955 (1976)).   Therefore, whether or not the Defendants' actions consisted entirely of speech-based activism, it

appears that "[t]he First Amendment [simply] does not protect extortion." United States v. Boyd, 231 Fed. Appx. 314, 315-16 (5th Cir. 2007), and that is consistent with the rule as generally expressed and applied by the Fourth Circuit in Bly and Marchetti.

That conclusion is supported by the fact that RICO is comparable with a number of other statutes which have withheld First Amendment scrutiny. For example, in United States v. Velasquez, 772 F.2d 1348 (7th Cir. 1985), cert. denied, 475 U.S. 1021 (1986), the federal retaliation statute, 18 U.S.C. § 1513, which punishes those who threaten to do bodily harm to or destroy or damage the property of an informant, survived constitutional challenge. In Velasquez, the court observed that the statute prohibits only speech made with "intent to retaliate," and concluded that "the statute's limited scope takes it out of the realm of social or political conflict where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas." Id. at 1357.

Further, in United States v. Gilbert, 813 F.2d 1523, 1526 (9th Cir.), cert. denied, 484 U.S. 860 (1987), the court upheld as constitutional Section 901 of the Fair Housing Act, 42 U.S.C. § 3631, which prohibits an individual who "by force or threat of force willfully injures, intimidates or interferes with" any person's activities with respect to housing on account of race, color, religion, sex, or national

origin. In analyzing the statute, the court held that "there is no question that the proscription of force or threat of force is within the government's powers" and is not prohibited by the First Amendment. Id. at 1531.

Third, it is well-established that prison officials may prohibit "jailhouse lawyering" for a fee, "not because charging a fee reveals a state of mind that is not protected by the First Amendment, but because officials may have a legitimate administrative reason, such as preventing extortion, for prohibiting fee charging." Adams v. James, 784 F.2d 1077, 1084 (11th Cir. 1986).

Fourth, in United States v. Cerilli, 603 F.2d 415 (3d Cir. 1979), cert. denied, 444 U.S. 1043 (1980), the Third Circuit applied the Hobbs Act to a corrupt leasing scheme. In Cerilli, officials of the Pennsylvania Department of Transportation demanded kickbacks from equipment lessors doing business with the state. In rejecting the defendant's excuse that the payments were "protected by the First Amendment," id. at 418, the court held that their conduct "constituted extortion." Id. at 420.

Fifth, in United States v. Rowlee, 899 F.2d 1275 (2d Cir. 1990), cert. denied, 498 U.S. 828 (1990), members of a political group that promotes the evasion of income taxes, were charged with violating 26 U.S.C. § 7602(2), which prohibits the willful assistance in preparation of a false or fraudulent tax return. The United States Court of Appeals for

the Second Circuit, in rejecting a First Amendment defense to the criminal convictions, held that "[i]f the defendants did not violate [the statute], the restrictions imposed by that statute did not violate their First Amendment rights. If they did violate [the statute], they were not protected by the First Amendment." Id. at 1280.

Finally, in rejecting a First Amendment defense to a charge of extortion under state law, the court held that "[p]laintiffs allege that much of the 'speech' by the Defendants was . . . damaging to Plaintiffs' property. Therefore, the First Amendment offers no protection for such activity." Titan Int'l. Inc. v. Becker, 189 F. Supp. 2d 817, 827 (C.D. Ill. 2001).

Therefore, the law seems quite settled that the First Amendment provides no refuge for extortion.

B. The Canon of Constitutional Avoidance

Notwithstanding the apparent unavailability First Amendment protection to extortionate speech, the Defendants contend that this Court should grant them summary judgment in its case under the "canon of constitutional avoidance," (Defs' Mot. at 26), which reflects the well-established doctrinal principle that, where an otherwise acceptable construction of a statute would raise serious constitutional problems, the evaluating court should construe the statute to avoid such problems, unless such construction is plainly contrary to the intent of Congress. Edward J. DeBartolo Corp. v. Florida Gulf

Coast Building & Constr. Trades Council, 485 U.S. 568, 575 (1988). This doctrine not only reflects the prudential concern that constitutional issues must not be confronted needlessly, but also recognizes that Congress, like this Court, is bound by an oath to uphold the Constitution. Id. The courts therefore do not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power that is constitutionally forbidden. See Grenada County Supervisors v. Brogden, 112 U.S. 261, 269 (1884). However, the canon of constitutional avoidance only comes into play "when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." Boumediene v. Bush, 128 S. Ct. 2229, 2271 (2008) (citation omitted).

Importantly, the doctrine of constitutional avoidance has no application when the judicial interpretation of a statute does not implicate constitutional concerns. See United States v. Davani, 212 Fed. Appx. 634, 637 n.1 (9th Cir. 2006) (no need to apply the doctrine when the case raised no "due process" concerns); De Fuentes v. Gonzales, 462 F.3d 498, 503 n.6 (5th Cir. 2006). As explained above, it does not appear that RICO's proscription of extortionate activities, without regard to whether those activities are speech-based, raises any true constitutional problems. Therefore, the doctrine of

constitutional avoidance is of no moment in the analysis of Smithfield's claims.

### C.   Disputed Issues Of Fact In This Action

Although much, if not all, of the Defendants' conduct in prosecuting the corporate campaign is not disputed, there remains a dispute as to the intent of the Defendants in undertaking and pursuing the corporate campaign against Smithfield.   The Defendants have offered evidence that their intent was to secure a fair process agreement pursuant to which there would be conducted a non-NLRB supervised election. Smithfield has offered evidence that the Defendants' intent was to force Smithfield to agree to recognize the Union and agree to a first contract whether those agreements were secured by a fraudulent "shoebox election" or other means. Id. at 14-16.   Hence, there remains a genuine dispute of material fact which is not appropriate for resolution at the summary judgment stage.   See Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (in assessing a motion for summary judgment, "whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial.").   At least on this record, the principles of Celotex Corp. v. Catrett, supra, and the remainder of the now familiar summary judgment trilogy, neither require or permit summary judgment.

## IV.   Defendants' Asserted Federal Labor Law Defense

The Defendants have asserted that Smithfield's claims are barred as a matter of statutory interpretation.  The gravamen of the Defendants' argument is:

> Defendant's federal labor law argument is that (i) Congress, in enacting the NLRA, did not regulate the "conduct" at issue here (a negative publicity and boycott campaign to put economic pressure on an employer to enter into a lawful representation election process agreement), but rather "left" a union's use of such "economic pressure" to the "free play of contending market forces," Machinists, 427 U.S. at 150 (internal quotations omitted);   and   (ii)   given   the   NLRA's comprehensiveness in the specific subject matter area of labor-management relations, a general federal statute like RICO cannot be read to "regulate" such "conduct" either.

(Defs' Reply at 23) (emphases added).  In other words, the Defendants contend that, because the subject-matter specific NLRA did not speak to economic pressure campaigns, it would be illogical to read such a prohibition into RICO, a statute of general applicability.

In all matters of statutory interpretation, courts are ultimately looking for the intent of Congress, Farley v. Metro-North Commuter R.R., 865 F.2d 33, 33 (2d Cir. 1989). The primary analytical fault in the Defendants' argument is the assumption that, in enacting RICO, a statute of "general application," Congress did not envision the application of RICO's proscriptions within the labor context.

Through RICO, Congress adopted a statutory tool that was intended, inter alia, to aid in the eradication of "organized

33

crime," meaning the Mafia and other structured criminal organizations. But, that kind of criminal activity proscribed by RICO can be, and often is, committed by people and organizations that are not structured criminal organizations such as the Mafia. And, nothing in RICO limits the reach of the statute to the activities of structured criminal organizations often referred to as "organized crime." Congress, indeed, provided for a liberal construction of the RICO statute, in derogation of the general principle that penal statutes are to be strictly construed. Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1237 (2d Cir. 1992) (a liberal construction of RICO was mandated to "to effectuate RICO's remedial purposes"). Congress gave the district courts "jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders." Id. Additionally, RICO included a special provision for the attorney general to bring civil actions. Id.

With this in mind it has been held that "the labor-specific predicate racketeering acts specified in the RICO statute, the express grants of jurisdiction to district courts and of power to the attorney general in 18 U.S.C. § 1964, as well as legislative findings and history addressing the infiltration of labor unions by organized crime groups, all lead us to conclude that Congress anticipated that RICO would extend to some 'labor disputes.'" Local 1814, Int'l

34

Longshoremen's Ass'n, 965 F.2d at 1237 (permitting a government suit against a labor union under the civil RICO statute despite the federal labor laws). "Congress was well aware that it was entering a new domain of federal involvement through the enactment of [RICO]." Id. (citation omitted). Accordingly, it is now relatively settled that "Congress did not intend that RICO be given limited application in the labor context, notwithstanding the labor statutes cited by the [union]." United States v. International Bhd. of Teamsters, 708 F. Supp. 1388, 1395 (S.D.N.Y. 1989) (rejecting the union defendant's arguments that the federal labor laws, including the NLRA, provided the "exclusive mechanism" for civil relief against the labor union); cf. Butchers' Union, Local No. 498, etc. v. SDC Invest., Inc., 631 F. Supp. 1001, 1009 (E.D. Cal. 1986) (the "legislative history [of RICO] . . . speaks quite directly to Congressional intent that RICO provide civil remedies for labor law crimes").

Therefore, far from "imput[ing] to Congress a silent intention . . . to override its determination," the expansive application of RICO within the civil labor law context fits squarely within the intent of Congress in enacting RICO. Accord Stirone v. United States, 361 U.S. 212, 215 (1960) ("the words of the [federal extortion statute] do not lend themselves to restrictive interpretation because they manifest . . . a purpose to use all the constitutional power Congress

has to punish interference with interstate commerce by extortion.").

The Defendants' argument is also not compelling in light of the fact that RICO *explicitly* incorporates by reference "any act or threat involving . . . extortion . . . which is chargeable under State law." 18 U.S.C. § 1961(A)(1). Through this provision, Congress made clear that it intended RICO to apply to encompass both current and future state extortion law. This large body of law includes the state-based extortion claims at issue in this case. Consequently, the Defendants' proffered *restrictive* interpretation of RICO is neither plausible nor consistent with basic principles of statutory construction. Indeed, under the Defendants' views of the law, labor unions would be permitted to engage in extortion so long as their objective was labor related. Neither RICO nor any decision on which the Defendants rely provides for license of that sort.

V. **The "Obtaining From Another" Requirement**

The Defendants assert that Smithfield's RICO claims suffer from yet another "fatal flaw." Namely, the "failure to meet RICO extortion's 'obtaining . . . from another' requirement." (Defs' Mot. at 33). The Defendants contend that, far from obtaining any property from Smithfield, at most, the Smithfield Campaign sought simply to "dictate and restrict" Smithfield's actions, and that doing so "does not

constitution extortion." Id. at 33 (citing Scheidler, at 405-06).

In Scheidler, 537 U.S. at 409, the Supreme Court held that a defendant's conduct constitutes extortion under state law only if it meets the "generic" definition of extortion: "*obtaining* something of value *from another* with his consent induced by the wrongful use of force, fear, or threats." (emphasis added). The Supreme Court explained that the "obtaining" of property from another entails both a "deprivation and acquisition of property" from the victim by the defendant. Id. at 404-05. Significantly, the Court also held that the "obtaining" requirement is "further explained as bringing about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another." Id. at 408 n.13 (citation omitted).

Based on these standards, it is evident that the Smithfield has a triable claim against the Defendants for attempting to "obtain" a property interest that legally belongs to Smithfield. Here, as explained fully in the opinion denying the Defendants' motions to dismiss, the Defendants have sought to acquire (even is indirectly) highly-valuable legal rights from Smithfield through their allegedly extortionate attempts to gain union recognition and a first contract at Smithfield's Tar Heel plant. Moreover, given the Supreme Court's language in Scheidler, the Defendants' argument that the "UFCW [itself] would not by virtue of such

an agreement" automatically acquire the property interest is of no consequence. Rather, it is enough that the Defendants would, through their actions, cause the relevant property interest to be initially acquired by someone else (i.e., the Smithfield employees).

Moreover, as the Second Circuit held in United States v. Gotti, 459 F.3d 296, 323, 324 n.9 (2d Cir. 2006), the determination of whether a defendant has attempted to "obtain" a relevant property interest involves an inquiry into whether the defendant intends to "do something affirmative with respect to the property right." In this case, Smithfield has presented sufficient evidence for a jury to decide that the Defendants sought to acquire from Smithfield the status of the Tar Heel employee's representative and a first contract, and to then "affirmatively" use the revenue from that representation to carry out their own activities. In other words, Smithfield has presented sufficient evidence for a jury to conclude that the Defendants sought to "obtain" a property interest in Smithfield through their allegedly etortionate conduct.

VI.     **Whether Plaintiffs' RICO Extortion Claims Meet**
        **The "Pattern" Element Of The Statute**

The Defendants claim that "Smithfield's RICO extortion claims suffer from [a] fatal statutory flaw – the failure to meet the RICO 'pattern' element." (Defs' Mot. at 36). A pattern of racketeering activity requires "at least two acts

38

of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." See 18 U.S.C. § 1961(5) (2006). The Supreme Court held in H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 240 (1989) that, in order to assess whether there is a "pattern of racketeering activity," it was necessary to analyze: (1) the relationship of the criminal acts; and (2) the continuity of the acts.

The "relationship" requirement is satisfied when "criminal acts . . . have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240. The "continuity" requirement refers to "a closed period of repeated conduct, or to past conduct that by its nature projects into the future a threat of repetition." Id. at 241; see also Walk v. The Baltimore and Ohio Railroad, 890 F.2d 688, 690 (4th Cir. 1989) (racketeering activity that continued over a ten-year period met the requirements of continuity necessary to prove a pattern of racketeering activity, notwithstanding the fact that the conduct was "closed-ended").

Significantly, continuing racketeering activity may be demonstrated even without proof of multiple racketeering "schemes." H.J., Inc., 492 U.S. at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown

39

*only* by proof of multiple schemes. The Eighth Circuit's test brings a rigidity to the available methods of proving a pattern that simply is not present in the idea of 'continuity' itself; and it does so, moreover, by introducing a concept -- the 'scheme' -- that appears nowhere in the language or legislative history of the [Hobbs] Act.").

Notwithstanding this explicit language from the Supreme Court, which is clearly binding on this Court, the Defendants continue to declare, as unsound, Smithfield's position, which "attempts to separate multiple acts in furtherance of the same alleged [extortion] scheme into multiple predicate acts." (Defs' Mot. at 37. By citing DTEX, LLC v. BBVA Bancomer, S.A., 405 F. Supp. 2d 639, 649-50 (D.S.C. 2005), and the recently decided case of US Airline Pilots Ass'n v. AWAPPA, LLC, 2008 WL 2761388, at *15 (W.D.N.C. July 11, 2008) (citing the pertinent language from DTEX), the Defendants argue that this line of reasoning is "improper." (Defs' Mot. at 37, 38). The Court, however, has already considered the implications of DTEX, and in so doing, has noted that the passage cited by the Defendants in DTEX was dictum, and that DTEX is inapplicable to the facts of this case. (Mem. Op. at 25).

The Defendants also assert that Smithfield cannot establish a pattern of racketeering activity in this case because the Smithfield Campaign has a "built in ending point." (Defs' Mot. at 37) (citing GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 549 (4th Cir. 2001)). The Court

40

previously has considered and rejected, this same argument, and has held that this case was different from those cases where no threat of "long-term extortionate activity" was present. (Mem. Op. at 25). Additionally, in the specific context of organized labor, courts have held that extortionate activity which seeks to bring about a union contract does create an ongoing relationship, and thereby satisfies RICO's "pattern" requirement. A. Terzi Prods. v. Theatrical Protective Union, Local No. One, 2 F. Supp. 2d 485, 507 (S.D.N.Y. 1998) ("[T]his Court rejects defendants' argument that a threat of continuity did not exist because the alleged unlawful activity terminated when [the plaintiff] signed the [union] Agreement."); see also Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36, 39 (3d Cir. 1987) (remedial purposes of RICO would be disserved if the continuity requirement "allowed a party to maintain a RICO claim if he brought suit before the unlawful scheme had obtained its objective," but prohibited the claim where the "scheme had fully accomplished its goal"). Rightly or not, the Court concluded, in denying the Defendants' motion to dismiss, that the principles of Terzi apply here.4 The pattern argument resurrected from their motion to dismiss fails for the reasons previously expressed in rejecting it.

---

4 The recent decision in [NC-USAIR CASE] does not require a different conclusion.

In this case, Smithfield has presented sufficient facts to demonstrate that the predicate acts of extortion committed by the Defendants were within the scope of the standard for "relatedness" articulated in H.J., Inc. The predicate acts had the same or similar purpose. The acts were participated in generally by the same people. The victim was the same. The method of commission was the same or similar. The acts were not isolated events.

Moreover, the Plaintiffs have identified facts sufficient to meet the continuity requirement of H.J., Inc. The conduct in question has continued for over 20 months, and allegedly continues to this day. Id. Therefore, Smithfield has identified sufficient disputed material facts to meet RICO's "pattern requirement. Summary judgment will not be granted on this ground.

### VII. The Preemption Of Smithfield's State Law Claims

The Defendants assert that the state laws invoked by Smithfield in the present case are preempted to the extent that Smithfield seeks to press those state laws into service in this case to "regulate . . . economic pressure deemed by the federal [labor] Act desirably left for the free play of contending economic forces." (Defs' Mot. at 39) (citing Machinists v. Empl. Rel. Comm., 427 U.S. 132 (1976)).

Although the NLRA itself contains no express preemption provisions, the Supreme Court consistently has held that

42

Congress implicitly mandated two types of preemption as necessary to implement federal labor policy. These well-established preemption doctrines have come to be known as "Garmon preemption" and "Machinists preemption."

### A.   Garmon Preemption

The first type of preemption, known as "Garmon preemption," is "intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." Golden State Transit Corp. v. Los Angeles, 475 U.S. 608, 613 (1986). To this end, Garmon preemption forbids States from "regulat[ing] activity that the NLRA protects, prohibits, or arguably protects or prohibits." Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc., 475 U.S. 282, 286 (1986). The Defendants have abandoned their assertion that the Garmon preemption applies to bar Smithfield's claims. Accordingly, the Garmon preemption issue is moot.

### B.   Machinists Preemption

The second type of federal labor law preemption, known as "Machinists preemption," forbids both the NLRB and States from regulating conduct that Congress intended "to be controlled by the free play of economic forces." Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 140 (1976) (internal citation omitted). In Machinists, the Supreme Court held that the Wisconsin Employment Relations Commission could

43

not designate as an unfair labor practice a concerted refusal by a union and its members to work overtime because Congress did not intend for such activity to be regulated by the States.   427 U.S. at 148-50.   In Machinists, the Court held there was "simply no question that the [National Labor Relations] Act's processes would be frustrated in the instant case were the State's [action] permitted.   It is clear beyond question that Wisconsin [entered] into the substantive aspects of the bargaining process to the extent that Congress has not countenanced."   Id. at 148.   Consequently, Machinists preemption is based on the principle that it would frustrate Congress's intent to regulate economic pressure which was desirably left unregulated by the federal labor laws.   Id. at 150.

     i.   Machinists Preemption And Non-violent Speech

     As enacted in 1935, the NLRA did not include any provision that specifically addressed the intersection between organizational rights and speech rights.   Chamber of Commerce of the United States v. Brown, 128 S. Ct. 2408, 2413 (2008). In 1947, Congress passed the Labor Management Relations Act ("LMRA"), which amended §§ 7 and 8 of the NLRA in several key respects.   Id.   Notably, the LMRA added § 8(c) to the NLRA, which protects speech by both unions and employers from regulation by the NLRB.   29 U.S.C. § 158(c) (2008). Specifically, § 8(c) provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in

written, printed, graphic, or visual form, shall not
constitute or be evidence of an unfair labor practice under
any of the provisions of this subchapter, if such expression
contains no threat of reprisal or force or promise of
benefit." Id.

"From one vantage, § 8(c) merely implements the First
Amendment." NLRB v. Gissel Packing Co., 395 U.S. 575, 617,
(1969). However, its enactment also manifested a
"congressional intent to encourage free debate on issues
dividing labor and management." Linn v. Plant Guard Workers,
383 U.S. 53, 62 (1966). The Supreme Court has characterized
this policy judgment, which inheres in the NLRA as a whole, as
"favoring uninhibited, robust, and wide-open debate in labor
disputes," stressing that "freewheeling use of the written and
spoken word . . . has been expressly fostered by Congress and
approved by the NLRB." Letter Carriers v. Austin, 418 U.S.
264, 272-273 (1974). The addition of § 8(c) expressly
precludes state regulation of speech regarding unionization
"so long as the communications do not contain *a threat of
reprisal or force or promise of benefit*." Brown, 128 S. Ct.
at 2413 (internal citation omitted) (emphasis added).
However, the NLRA does not specifically mention extortionate
speech.5 Therefore, the general principles of Machinists

---

5 The language "threat of reprisal or force or promise of
benefit" could be generally construed to include extortionate
speech, but the preemption jurisprudence has not developed
along those lines. Of course, if that text is interpreted

preemption are relevant.

### ii. Prior Applications Of <u>Machinists</u> Preemption

The Defendants are correct that, as a general rule, federal labor law preempts similar or contradictory state laws. <u>See</u> <u>Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton</u>, 377 U.S. 252, 259-61 (1964). The federal system seeks "to provide an informed and coherent basis for stabilizing labor relations conflict" and to "equitably and delicately structure the balance of power among competing forces so as to further the common good." <u>Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees of America v. Lockridge</u>, 403 U.S. 274, 286 (1971). Consequently, "[a]ny state regulation that conflicts with or frustrates the purpose of this federal policy must yield to it." <u>Morton</u>, 377 U.S. at 259-61.

It is well established, however, that states may regulate union conduct which is marked by "violence and imminent threats to the public order." <u>Gibbs</u>, 383 U.S. at 721 (1966). State regulation in such cases is not preempted because of the "the compelling state interest in the maintenance of domestic peace." <u>Id.</u> (citation omitted). Additionally, states may regulate "secondary union activity" which does not involve violence, such as the extortionate conduct alleged in the present case, so long as the regulation is "carefully limited"

---

to include extortionate speech, then there would be no federal preemption.

to the protection of the state's compelling interest.  Gibbs,
383 U.S. at 730.

C.  **Machinists** Preemption Applied

It is obvious from those decisions, that Machinists
preemption is not to be applied "inflexibly." In re Sewell,
690 F.2d 403, 408 (4th Cir. 1982). Accordingly, "the
[Supreme] Court has allowed a state to enforce certain laws of
general applicability even though aspects of the challenged
conduct were arguably prohibited by § 8 of the NLRA." Sears,
Roebuck & Co. v. Carpenters, 436 U.S. 180, 194-95 (1978).
Four decisions of the Supreme Court inform the resolution of
the preemption question raised here.

First, in Linn v. United Plant Guard Workers, 383 U.S. 53
(1966), the Supreme Court held that a state's regulation of
defamatory statements made with actual malice only
"peripherally concerned" the LMRA, and that the state had an
overriding interest in protecting its citizens from such
statements. Id. at 61. Thus, the state regulation was not
preempted by the NLRA. Id.

Second, in Farmer v. United Brotherhood of Carpenters and
Joiners, 430 U.S. 290 (1977), the Supreme Court held that
state claims for intentional infliction of emotional distress
were not preempted by the federal labor acts. Id. at 302.
The Court observed that no provision of the labor acts protect
this "outrageous conduct." Id. The Court cautioned, however,
that "concurrent state-court jurisdiction cannot be permitted

47

where there is a realistic threat of interference with the federal regulatory scheme." Id. at 305.

Third, in Belknap, Inc. v. Hale, 463 U.S. 491, 507 (1983) the Supreme Court held that an action for breach of contract by employees who were hired to replace economic strikers and were then discharged was not preempted under the holding of Machinists. In reaching this conclusion, the Court held that there would be "no substantial impact on the availability of settlement of economic or unfair labor practice strikes if the employer is careful to protect itself against suits like this in the course of contracting with strike replacements." Id. at 505.

Finally, in Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180 (1978), the Supreme Court held that a state trespass action was permissible and not preempted because the action concerned only the location of the picketing, while the arguable unfair labor practice would focus on the object of the picketing. Id. at 207. The core teaching of these decisions is that the "paramount traditional consideration underlying the labor preemption doctrine" is the "danger of interference with federal protected conduct." Sears, 436 U.S. at 203.

With the foregoing decisions of the Supreme Court in mind, it is the concurrence of Machinists itself which most clearly articulates the relevant considerations for the purposes of the present matter:

> I write to make clear my understanding that the
> Court's opinion does not, however, preclude the
> States from enforcing, in the context of a labor
> dispute, "neutral" state statutes or rules of
> decision: state laws that are not directed toward
> altering the bargaining positions of employers or
> unions but which may have an incidental effect on
> relative bargaining strength. Except where Congress
> has specifically provided otherwise, the States
> generally should remain free to enforce, for
> example, their law of torts or of contracts, and
> other laws reflecting neutral public policy.

427 U.S. at 156 (Powell, J., concurring) (emphases added).

That reasoning was applied by the Fourth Circuit in Rum Creek

Coal Sales v. Caperton, 971 F.2d 1148, 1154 (4th Cir. 1992)

wherein the Court of Appeals held that:

> A more preferable application of a doctrine of
> neutrality would mandate neutral enforcement of the
> laws of the state, not neutral acquiescence to
> unlawful acts of destruction, and would promote, or
> at least not effectively undermine, the federal
> purpose of free interplay of economic forces.
> Without neutral enforcement of the law, the
> criminal acts of one or another party in a labor
> dispute can effectively hold that federal purpose
> hostage, as the acts of the strikers did here.

And, in United Credit Bureau, Inc. v. NLRB, 643 F.2d 1017,

1025 (4th Cir. 1981), the Fourth Circuit explained that

"[S]tate courts are preempted only in cases of arguably

prohibited or protected union activity where the

controversy presented to the state court is identical to that

which otherwise would have been presented to the Board."

Application of the principles and decisions of the Supreme and

the Fourth Circuit leads to the conclusion that the state

extortion laws at issue in this case, which are themselves

"neutral" laws of general application, are not preempted under the holding of Machinists.

Furthermore, bearing in mind the "paramount consideration" regarding labor preemption, "the "danger of interference with federal protected conduct," Sears, 436 U.S. at 203, it is notable that the Defendants have identified no provision of the NLRA that *entitles* a union to threaten economic harm to an employer if the employer does not agree to recognize the union or agree to a first contract. In fact, § 8(c) of the NLRA states just the opposite. 29 U.S.C. § 158(c). There appears to be no danger that application of these state extortion laws will interfere with any federally protected conduct. Thus, the Defendants' assertion that Smithfield's claims are barred by the Machinists preemption doctrine is without merit.

### CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Docket No. 88) will be denied.

It is so ORDERED.

_____ /s/   *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 14, 2008