

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SMITHFIELD FOODS INC.,
et al.,

     Plaintiffs,

v.                    Civil Action No. 3:07cv641

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
et al.,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court for resolution of a dispute between the parties respecting the standard of proof applicable to the Plaintiffs' damages (Docket Nos. 200, 217, 232). The matter has been briefed and argued and, at least in part, is ripe for decision.

### BACKGROUND

Smithfield Foods, Inc. is a Virginia corporation with its principal place of business in Smithfield, Virginia. Amended Compl. at ¶ 8. Smithfield Packaging Company is a wholly-owned subsidiary of Smithfield Foods. Id. at ¶ 9. Smithfield's largest asset is its pork processing plant in Tar Heel, North Carolina. Id. The Tar Heel plant is the world's largest pork processing plant and employs

approximately 4,650 hourly employees. According to the Complaint, the UFCW has been unsuccessfully trying for well over a decade to become the bargaining representative for the employees of the Tar Heel plant. Id.

The National Labor Relations Act ("NLRA") 29 U.S.C. § 158(a)(3) permits a union to become a collective bargaining representative for an employer's employees if the union prevails in an election certified by the National Labor Relations Board ("NLRB"). The NLRA also permits an employer, under certain circumstances, to voluntarily recognize a union. See 29 U.S.C. § 158(a)(3) (2008).

According to the Complaint, the UFCW publicly announced a "corporate campaign" against Smithfield in June 2006. Corporate campaigns include a "wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state and federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." Food Lion, Inc. v. UFCW, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997). The alleged object of the Defendants' campaign against Smithfield was to force Smithfield to recognize the UFCW as

2

the collective bargaining representative of the employees at the Tar Heel plant and agree to a first contract or to force the Plaintiffs to become so unprofitable as to necessitate cessation of business operations.  Amended Compl. at ¶¶ 38-41.

Smithfield has asserted four claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), as well as state law claims alleging tortious interference and unfair/deceptive trade practices. Smithfield has claimed approximately $900 million in damages as a result of the Defendants' conduct during the Smithfield Campaign.  These damages include: (1) the "direct" expenses realized by Smithfield as a result of the campaign; (2) "customer specific" lost profits; (3) a loss of free advertising on the Oprah Winfrey show; (4) "nationwide" lost profits; and (5) cumulative abnormal returns on Smithfield's stock price.  Pltfs' Reply at 6-7.

The Defendants argue that Smithfield's damages are "based on the theory that the UFCW's campaign, taken as a whole, has injured Smithfield's reputation, thereby resulting in a loss of sales and profits by Smithfield and a diminution in Smithfield's stock price."  Defs' Opp. at 4.  Accordingly, the Defendants contend that "Smithfield's effort to recover publication damages relating to its

3

reputation . . . can succeed if, *but only if*, Smithfield is able to satisfy applicable First Amendment and federal labor law standards for the recovery of such [damages]." Id. at 6 (emphasis in original). In contrast, Smithfield claims that none of these losses constitute "reputational damages," thereby eliminating the need for any heightened First-Amendment scrutiny of Smithfield's damage claims. Pltfs' Reply at 3.

## I.   The New York Times Standard

Under well-established defamation law, a plaintiff who qualifies as a "public figure"[1] may recover for a claim of defamation only upon proof, by "clear and convincing evidence," that the challenged statements were false and that defendant acted with "actual malice." New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).

---

[1] Ordinarily, a defendant bears the burden of proving the plaintiff's public figure status. Carr v. Forbes, Inc., 259 F.3d 273, 278 (4th Cir. 2001). In the context of labor disputes, however, the requirement that the plaintiff be a public figure in order to trigger the "falsity" and "actual malice" requirements of New York Times has been eliminated. See Linn v. Plant Guard Workers, 383 U.S. 53, 65 (1966). Therefore, "libel and slander actions may be maintained within the context of a labor dispute . . . if the defamatory publication is shown by clear and convincing evidence to have been made with reckless disregard of whether it was false or not." Old Dominion Br. No. 496, Nat'l Ass'n Letter Car. v. Austin, 418 U.S. 264, 281 (1974); accord Henry v. National Ass'n of Air Traffic Specialists, 1994 U.S. App. LEXIS 20293, at *8 n.5 (4th Cir. Aug. 4, 1994) ("the 'actual malice' standard [is] applicable to all libel claims arising out of labor-management disputes, whether or not the plaintiff was a 'public figure.'") (citing Linn). This conclusion obviates Smithfield's asserted need for an "evidentiary hearing" on the issue of whether it can be deemed a limited-purpose public figure in this case.

4

The "actual-malice" standard requires a plaintiff to prove that the defendant made the statement with knowledge of its falsity or with reckless disregard of its truth. New York Times, 376 U.S. at 280; Gertz, 418 U.S. at 342. "Reckless disregard of a statement's truth" is a subjective standard, Harte-Hanks Commc'ns Inc. v. Connaughton, 491 U.S. 657, 688 (1989); it is "not measured by whether a reasonably prudent man would have published or would have investigated before publishing," but by whether "the defendant in fact entertained serious doubts as to the truth of [its] publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968); see also Gertz, 418 U.S. at 331. Therefore, while a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth, the "purposeful avoidance of the truth is in a different category" and may be sufficient to establish actual malice. Harte-Hanks, 491 U.S. at 692.

## II.  Decisions Applying The New York Times Standard To Non-Reputational Torts

Smithfield has not made a claim for defamation. That, however, is not dispositive of whether the New York Times standard applies to Smithfield's damage claims under RICO or to its state law claims of tortious interference with contract and unfair trade practices. That is because of

5

precedent which teaches that the standard of proof is not in all instances to be determined by the label affixed to particular claims.

### A.   *Hustler Magazine. Inc. v. Falwell*

In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), a popular liquor advertisement prompted the magazine to run a parody that featured the Reverend Jerry Falwell "detailing" an incestuous sexual act that he committed while intoxicated. *Id.* at 48. Falwell sued Hustler Magazine, seeking damages for libel and intentional infliction of emotional distress. *Id.* At trial, the jury held against Falwell on the libel claim, specifically finding that the parody could not reasonably be understood as describing actual facts about Falwell. *Id.* The jury, however, found for Falwell on the emotional distress claim and awarded him both compensatory and punitive damages. *Id.*

On appeal, the Supreme Court held that Falwell clearly had sought "damages for emotional harm caused by the publication of an ad parody offensive to him." *Id.* at 50. Thus, the question presented to the Court was whether Falwell was required to satisfy the heightened First Amendment proof standard set forth in *New York Times*. After concluding that the parody was protected expression,

6

the Court held that the constitutional libel standard applied to Falwell's claim for intentional infliction of emotional distress:

> We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with "actual malice," i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true.

Id. at 56.   The Court explained that its holding was necessary to give adequate "breathing space" to the freedoms protected by the First Amendment.   Id.   Hustler thus confirmed "that when [a plaintiff] uses a law to seek damages resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of New York Times."   Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 523 (4th Cir. 1999).

### B.   Cohen v. Cowles Media Company

The Court again addressed the issue in Cohen v. Cowles Media Co., 501 U.S. 663 (1991).   There, Cohen, who was associated with a candidate for governor of Minnesota, gave damaging information about a candidate for another office to two reporters on the promise that his identity would not be disclosed.   Id. at 666.   However, because editors at the

7

reporters' newspapers concluded that the source was an essential part of the story, the story was ultimately published with Cohen named as the source.  Id.  Cohen was then fired from his job, and he subsequently sued the newspaper for breach of contract and fraud.  Id.  After the trial, the jury awarded compensatory and punitive damages without consideration of whether the defendant acted with actual malice.  The Supreme Court of Minnesota reversed the compensatory damages award, concluding that enforcement of the promise of confidentiality under a promissory estoppel theory violated the defendants' rights under the First Amendment.  Id.

In the Supreme Court, the key inquiry was whether the law of promissory estoppel was a "generally applicable law."  Id.  The Supreme Court began its analysis with some examples of generally applicable laws that must be obeyed by the press, such as those relating to copyright, labor, antitrust, and tax.  Id. at 669.  The Court subsequently sustained the verdict in Cohen's favor because the defendant newspaper publisher had no "special immunity from the application of general laws," and was therefore liable just as any other party for breach of contract based on promissory estoppel.  Id. at 670.  As such, the result in Cowles "depended on the finding that the general law was

8

not being used to avoid the strict requirements for establishing a libel or defamation claim." Compuware Corp. v. Moody's Investors Servs., 499 F.3d 520, 530 (6th Cir. 2007).

C. **Food Lion, Inc. v. Capital Cities/ABC**

In Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir. 1999), Food Lion brought a tort action after the defendant television broadcasting company aired a videotape of unwholesome food handling practices at certain grocery stores; a videotape filmed by reporters who had obtained employment at Food Lion supermarkets through misrepresentation. Food Lion asserted claims for breach of an employee's duty of loyalty, trespass, and fraud. Id. at 511. Food Lion conceded at trial that it could not quantify its actual damages with regard to its common law claims of breach of loyalty and trespass, nor could it prove "actual malice." See id. at 515 n.3, 522.[2]

On appeal, Food Lion argued that the district court erred in refusing to allow it to use its non-reputational tort claims, i.e., breach of duty of loyalty and trespass, to recover compensatory damages through "non-reputational tort claims," and further claimed that Cowles, not Hustler,

---

[2] The verdict on the fraud claim was set aside. The Unauthorized Trade Practices claim was dropped when Food Lion elected to take damages on its fraud claims.

9

governed its claim for reputational damages. _Id._ at 521-22. In rejecting Food Lion's argument, the Fourth Circuit quoted from the decision in _Cowles_:

> Cohen is not seeking damages for injury to his reputation or his state of mind. He sought damages for breach of a promise that caused him to lose his job and lowered his earning capacity. Thus, this is not a case like _Hustler_ where we held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress.

_Id._ at 523 (quoting _Cowles_, 501 U.S. at 671). For that reason, the Fourth Circuit held that "Food Lion, in seeking compensation for matters such as loss of good will and lost sales, is claiming _reputational damages_ from publication, which the _Cowles_ Court distinguished by placing them in the same category as the emotional distress damages sought by Falwell in _Hustler_." _Id._ (emphasis added).

In other words, "according to _Cowles_, 'constitutional libel standards' apply to _damage claims for reputational injury_ from a publication." _Id._ (emphasis added). Therefore, _Food Lion_ instructs that, if a plaintiff seeks damages which are "reputational" in nature, constitutional libel standards (i.e., falsity and actual malice) apply to the plaintiff's damage claims. To allow otherwise would be to countenance "an end-run around First Amendment strictures." _Id._ at 522. Thus, taken together, _Hustler_,

10

Cowles and Food Lion, teach that the label of the claim is not dispositive of the standard of proof for damages. Hence, if the damages sought are for injury to reputation caused by some sort of publication, the plaintiff must prove, by clear and convincing evidence, falsity of the statement and actual malice in the publication of it, even if the claim is not for defamation.

### III.   The Damage Claims In The Present Case

The dispute between the parties here centers on two issues.    First,   Smithfield   claims   that,   because extortionate speech is not protected by the First Amendment, the "constitutional libel standards" have no application in this case if the Defendants are found liable for extortion.   In support of this contention, Smithfield cites Rice v. Paladin Enters., 128 F.3d 233 (1997), where the Fourth Circuit held that "speech, which, in its effect, is tantamount to legitimately proscribable nonexpressive conduct, may itself be legitimately proscribed, punished, or regulated incidentally to the constitutional enforcement of generally applicable statutes."   Id. at 243 (citing Cowles, 501 U.S. at 669); see also National Organization for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994) ("aiding and abetting of an illegal act may be carried out through speech is no bar to its illegality.").

11

Therefore, Smithfield contends that, if the Defendants' conduct was extortionate, there is no reason to engage in an inquiry as to whether the speech was either true or false.[3]

However, Smithfield's argument is not in accord with the central holding of Food Lion. There, the Fourth Circuit was explicitly concerned with the proper legal standards for assessing *the damages* sought by the plaintiffs, and expressed no concern over the constitutional propriety of the plaintiff's substantive causes of action. See Food Lion, Inc., 194 F.3d at 524 ("Food Lion could not bypass the New York Times standard if it wanted *publication damages*") (emphasis added). Perhaps more importantly, the Food Lion Court rejected the core of Smithfield's argument when it held that "Food Lion also argues that because ABC obtained the videotapes through unlawful acts, that is, the torts of breach of duty of loyalty and trespass, it (Food Lion) is entitled to publication damages without meeting the New York Times standard. The Supreme Court has never suggested that it would dispense with the Times standard in this situation, and we believe Hustler indicates that the Court would not.

---

[3] That argument also finds some support in the "by reason of publications such as the [protected] one here at issue" language in Hustler, 485 U.S. 46, 56 (1988), and the "resulting from speech covered by the First Amendment" language in Food Lion, 194 F.3d at 523.

Notwithstanding the [illegal] nature of the underlying act, the [Supreme] Court held that satisfying New York Times was a prerequisite to the recovery of publication damages." Id.

Furthermore, wholly apart from the Fourth Circuit's decision in Food Lion, it is clear that speech may altogether lack constitutional protection, yet still be subjected to the constitutional defamation standards of New York Times. See Linn, 383 U.S. at 63 (even in a labor dispute, defamation enjoys no constitutional protection, but there must still be a showing of falsity and actual malice to recover). Consequently, it is apparent that the salient constitutional inquiry pertains to the type of damage sought, and does not hinge on the protected or unprotected nature of the Defendant's conduct. See Veilleux v. NBC, 206 F.3d 92, 127 (1st Cir. 2000) ("the type of damages sought bears on the necessity of constitutional safeguards"). Hence, if Smithfield alleges "reputational injury from publication," Food Lion, 194 F.3d at 523, then it must satisfy the constitutional defamation standards set forth in New York Times, regardless of the fact that extortionate speech is not protected under the First Amendment. Rice v. Paladin does not hold otherwise

13

because the plaintiff there did not seek reputational damages.

Smithfield is correct, as this Court previously has held, that the First Amendment provides no defense to the imposition of liability for engaging in extortion, even if the extortion is effectuated by speech. Decisions such as Rice v. Paladin and Operation Rescue are clearly founded on the like principle that speech in the commission of crime will find no sanctuary from liability in the First Amendment. These principles are solidly embedded in the law and they apply here.

However, the Supreme Court and the Fourth Circuit have also established the related precept that, if a party seeks damages caused to its reputation by the publication of speech, the party must prove that the speech was false and made with actual malice. Thus, in order to recover a certain specie of damages, the party must meet a higher standard. That precept was established in order to "give breathing room" to the protections afforded by the First Amendment. And, considering that the Supreme Court has held that Congress intended there to be "robust" debate over labor conditions and labor issues, see Letter Carriers v. Austin, 418 U.S. 264, 272-273 (1974), it is appropriate to apply that precept even though the First Amendment

14

affords no relief from liability for speech which is itself extortionate.

The rule that emerges from harmonizing these two controlling principles is that liability may be imposed for extortionate speech, and that the First Amendment provides no refuge against such liability. However, if a particular type of damage is sought, i.e., reputational damage caused by publication, then the prevailing party also must prove that the publication was false and made with actual malice to recover, no matter what label is applied to the underlying claim. That rule is fraught with practical difficulty for litigants, trial judges, and juries, but it is the rule.

In practical effect, the rule no doubt operates to limit the kind of redress available from those who engage in extortionate speech, and there are, as Smithfield argues, persuasive reasons to carve out an exception for such speech because, as criminal activity, it deserves no breathing room. That, however, must be done, if at all, by the Supreme Court or perhaps, in the labor arena, by Congress.

Second, the parties disagree as to whether Smithfield's asserted damage claims are "reputational" in nature. If they are, then Smithfield's damage claims must

15

satisfy the constitutional requirements of New York Times. From a purely analytical standpoint, the distinction between economic and reputational damages remains unsettled and is often difficult to ascertain. For instance, "[o]ne of the obvious ways in which a defamatory remark can harm someone, particularly a business, is by causing economic losses. Such damages are not distinguishable from the damages caused by the harm to reputation but rather flow directly from the loss in reputation." Alan E. Garfield, The Mischief of Cohen v. Cowles Media Co., 35 Ga. L. Rev. 1087, 1124 (2001).

Notwithstanding this analytical uncertainty, it is evident that a party's own characterization of its damage claims is highly persuasive in determining whether the damages sought are "reputational." See Food Lion, Inc., 194 F.3d at 522; Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc., 542 F. Supp. 2d 452, 462 n.10 (E.D. Va. 2008) (a party is "bound by its pleading"). In the present case, Smithfield's characterization of its damages in the Amended Complaint militates strongly in favor of the conclusion that significant components of Smithfield's alleged damages are "reputational." In detailing the "Effect of Defendants' Conduct" on Smithfield through the allegedly

extortionate   corporate   campaign,   Smithfield   avers   the
following:

> The Defendants' actions as described throughout
> have had a lasting and irreparable effect on
> Smithfield.   In addition to millions of dollars
> in lost or reduced business, lost contracts and
> lost promotional and advertising opportunities,
> *the Smithfield brand name has been significantly*
> *tarnished.   Defendants have caused many of*
> *Smithfield's customers and business partners, as*
> *well as an uncountable number of formerly loyal*
> *customers, to believe that it is a disreputable*
> *company that operates an unsafe workplace,*
> *mistreats it workers and regularly violates the*
> *law.   Many of Defendants' extortionate acts have*
> *painted a revolting and visceral picture of*
> *Smithfield's business and human relations*
> *practices.   Predictably, this has lead to a*
> *devastating loss of goodwill in the marketplace.*

Amended Compl. at ¶ 242 (emphases added).

Other passages in the Amended Complaint disclose that

Smithfield has cast its damages, in significant part, as

reputational injury caused by the publication of false and

misleading statements.   Various passages illustrate the

point:

| ¶ 45 | "discovering and disclosing negative information;" |
| ¶ 48 | allegations of racism; and |
| ¶ 49 | bringing all available media to relentlessly harass the target employer. |

These references are to Smithfield's description of a

"corporate campaign."   Moreover, when describing the

17

Defendants' conduct in the campaign against Smithfield, the Amended Complaint asserts that the Defendants:

¶ 66        portrayed Smithfield's business and operating practices in a misleading or negative light;

maliciously published false, misleading, baseless, negative and/or damaging information to Smithfield's analysts; and

¶¶ 88-95    published/used the Research Associates of America report.

Furthermore, in the last paragraph of each RICO count, it is alleged that:

As a result [of the alleged misconduct], the Plaintiffs have suffered substantial injury to its business or property . . . including, but not limited to, lost or reduced sales and distribution and lost or reduced promotional and/or advertising opportunities, and substantial and irreparable loss of goodwill and business opportunity . . . .

Amended Compl. at ¶¶ 249, 255, 262, 269. The same text appears in the Fifth through Ninth Counts of the Amended Complaint. See ¶¶ 273, 277, 281, 295, 302. The Prayer For Relief also reflects the same kind of language.

That language, which remains binding on Smithfield, demonstrates rather clearly that Smithfield is seeking damages, *inter alia*, on the basis of harm to its corporate reputation. And, that language refutes Smithfield's more recent contention that none of its asserted losses represent "reputational damages." See Pltfs' Reply at 3.

18

Therefore, it is clear that, at least with respect to certain portions of its damage claims, Smithfield must prove both falsity and actual malice to recover.

## IV.  The Substance Of The Damage Claims At Issue

As explained above, Smithfield has placed its damages into five categories, which include: (1) the "direct" expenses realized by Smithfield as a result of the corporate campaign; (2) customer specific lost profits; (3) a loss of free advertising on the Oprah Winfrey show; (4) nationwide lost profits; and (5) the cumulative abnormal returns on Smithfield's stock price.  Accordingly, it is necessary to determine whether each of Smithfield's asserted damages are either "reputational" or "economic" in substance.  See Veilleux, 206 F.3d at 128.

Of the five categories of damage identified by Smithfield, only the alleged loss of free advertising on the Oprah Winfrey show asserts a claim for purely economic damages.  That particular component of Smithfield's damages is based solely on the loss of a business expectancy caused by the Defendants active interference and is not based on any harm to Smithfield's reputation.

The other four categories of damage identified by Smithfield seem to be significantly, and perhaps inextricably, linked with the contention that the

19

Defendants' conduct damaged Smithfield's corporate reputation. First, the damages pertaining to the "direct, out-of-pocket expenses" caused by the Smithfield Campaign include Smithfield's efforts to rebut the claims made by the Defendants during the campaign in an effort to restore Smithfield's corporate image. See Farris Report at 38 (these damages represent the "costs required to protect [Smithfield's] brand"). While this damage claim ostensibly takes the form of an "expense," in reality, it may simply be the flip-side of a reputational damage claim.

Additionally, Smithfield claims "lost profits," both nationally and on a customer-specific basis, as a result of the corporate campaign. However, Smithfield's briefing has left the impression that these lost profits may have resulted from the company's diminished corporate reputation due to the activities of the campaign. See Pltfs' Reply at 7 ("One of Smithfield Packing's customers, by way of example, *may have ceased* buying Smithfield products because it did not want to subject its employees and customers to Defendants' harassment"). That ambivalent language indicates that some, or all, of this part of the damage claim may be "reputational" in nature.

Finally, Smithfield claims significant damages as a result of the "cumulative abnormal returns" on its stock

20

price due to the corporate campaign. Smithfield is clearly correct that "myriad" variables may affect a company's stock price, and that there is no *necessary connection* between a corporation's stock price and concurrent unfavorable public opinion of that corporation. Id. at 7. Nevertheless, in opining on what empirically caused the cumulative abnormal return on Smithfield's stock price, Smithfield's expert stated that he believed it to be a product of the campaign "damaging the company's reputation." Abowd Dep. at 99. This inevitably leads to the conclusion that the drop in Smithfield's stock price is significantly, and perhaps entirely, related to the effect of the Defendants' publications on Smithfield's corporate reputation.

At trial, the Court must permit the jury to award Smithfield damages only for its "pecuniary loss . . . flowing from the [alleged] misrepresentations, [and] not reputational or emotional distress damages," Veilleux, 206 F.3d at 128, unless Smithfield proves its reputational damage under the New York Times standard. See id. This will be accomplished, in part, through limiting instructions to the jury. And, it may be necessary to bifurcate the trial. First, however, Smithfield must explain to the Court why the "expenses" and the cumulative

21

abnormal returns do not assert purely reputational damages, and must also explain how, if at all, the lost profits are economic losses. The parties must weigh in on trial management techniques, such as jury instruction, and a verdict form that will implement the controlling principles set forth above.

### CONCLUSION

For the foregoing reasons, Smithfield may recover any reputational damages under any of its nine counts only if it meets the <u>New York Times</u> standard.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  October 23, 2008

22